# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

|  |  |
|---|---|
| CITY OF HIALEAH EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of FIDELITY NATIONAL INFORMATION SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br> STEPHANIE L. FERRIS, GARY A. NORCROSS, JAMES W. WOODALL, LEE ADREAN, ELLEN R. ALEMANY, VIJAY G. D'SILVA, JEFFREY A. GOLDSTEIN, LISA A. HOOK, KENNETH T. LAMNECK, GARY L. LAUER, LOUISE M. PARENT, BRIAN T. SHEA, JAMES B. STALLINGS JR., CHARLES D. DRUCKER, KEITH W. HUGHES, DAVID K. HUNT, and JEFFREY E. STIEFLER, <br><br> Defendants, <br><br> and <br><br> FIDELITY NATIONAL INFORMATION SERVICES, INC., <br><br> Nominal Defendant. | CASE NO.: <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT <br><br> JURY TRIAL DEMANDED |

**<u>TABLE OF CONTENTS</u>**

I.     NATURE OF THE ACTION ..................................................................1

II.    INTRODUCTION ...............................................................................1

III.   JURISDICTION AND VENUE .............................................................6

IV.    PARTIES ..........................................................................................7

    A.    Plaintiff ...................................................................................7

    B.    Nominal Defendant ...................................................................7

    C.    Individual Defendants ...............................................................7

        1.    Officer Defendants ...........................................................7

        2.    Current Director Defendants ...............................................9

        3.    Former Director Defendants ..............................................13

V.     OVERVIEW OF THE FRAUD .............................................................14

    A.    Background of the Company and the Worldpay Acquisition .............14

    B.    FIS and Worldpay Insiders Confirm That the Integration of Worldpay was a Failure ............................................................23

        1.    IT Issues Resulting from Worldpay's Failure to Merge Its Acquired Companies Onto One Platform ................................25

        2.    FIS's Lack of Adequate Due Diligence ...................................29

        3.    Lack of Integration of Administrative Processes and Customer Relationship Management Software ........................31

        4.    Cross-Selling/Business Model/Culture Issues .........................32

        5.    Cross-Selling Problems Were Raised at FIS Town Hall Meetings .....................................................................36

        6.    Key Employees Left the Company After the Merger ...............37

        7.    FIS's Public Disclosures About Integration and Cross-Selling Were Misleading ..................................................40

    C.    Defendants Caused Fidelity National to Conduct Massive Share Repurchases ..........................................................................41

D.    The Worldpay Integration Incentive Plan ...........................................45

E.    Performance in the Merchant Solutions Business Deteriorates..........52

F.    FIS Records Goodwill Impairment Charges Totaling $24.4 Billion and Unwinds the Merger, Acknowledging it was a Total Failure.................................................................................................54

    1.    FIS Announces the Spinoff of Worldpay and a First Impairment Charge ..................................................54

    2.    Comparing the Worldpay Acquisition to the Fiserv/First Data Merger ...............................................58

    3.    FIS Announces the Sale of a Majority of Worldpay and a Second Impairment Charge.......................................61

VI.   THE DEFENDANTS VIOLATED SECTIONS 10(b) AND 14(a) OF THE EXCHANGE ACT AND BREACHED THEIR FIDUCIARY DUTIES BY CAUSING FIDELITY NATIONAL TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD ....................................................................................................62

A.    In Connection with the Share Repurchases, Defendants Issued Materially False and Misleading Statements ......................................62

    1.    Defendants Made False and Misleading Statements in 2019....................................................................64

    2.    Defendants Made False and Misleading Statements in 2020....................................................................75

    3.    Defendants Made False and Misleading Statements in 2021....................................................................85

    4.    Defendants Made False and Misleading Statements in 2022....................................................................97

    5.    In 2022 Executives Start To Flee And Defendants Make False Statements To Cover Up The Reasons For Their Fleeing....................................................................101

B.    Defendants' Statements During the Relevant Period Were False and Misleading When Made ...........................................104

C.    In Repurchasing Stock, Fidelity Relied on Defendants' False and Misleading Statements .................................................................109

D.    Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrine Applies to Defendants' Misrepresentations ......................112

E.    The Group Pleading Doctrine Applies to Defendants' Misstatements and Omissions ..........................................................113

F.    Defendants' Misstatements and Omissions Caused Damages to Fidelity National.................................................................................114

G.    Defendants Norcross, Woodall, and Ferris Unlawfully Profited at Fidelity National's Expense by Selling Shares While in Possession of Non-Public Information.................................................118

VII.   DAMAGES TO FIDELITY NATIONAL ...............................................124

VIII.  DEFENDANTS WERE OBLIGATED TO SAFEGUARD THE COMPANY'S INTERESTS.................................................................125

A.    The Duties of All Defendants.............................................................125

B.    Defendants' Obligations and Representations in the Company's Corporate Codes and Policies ..........................................................127

C.    The Board and its Committees Were Expressly Charged with Overseeing and Monitoring Specific Aspects of Fidelity National's Business ...........................................................................133

1.    Audit Committee...............................................................134

2.    Compensation Committee..................................................135

3.    Corporate Governance, Nominating and Sustainability Committee.........................................................................137

4.    Risk and Technology Committee .......................................138

5.    The Board's Committees Failed to Discharge Their Duties ..............................................................................139

IX.   THE DEMAND .......................................................................142

A.    The Board Rejected The Demand .....................................................142

B.      The Board is Incapable of Conducting a Fair and Impartial Investigation ....................................................................... 143

X.     CLAIMS AGAINST DEFENDANTS ........................................... 144

XI.    PRAYER FOR RELIEF ................................................................. 157

XII.   JURY TRIAL DEMANDED ......................................................... 159

## I.   <u>NATURE OF THE ACTION</u>

1.     Plaintiff City of Hialeah Employees' Retirement System ("Plaintiff"), a shareholder of Fidelity National Information Services, Inc. ("Fidelity National," "FIS," or the "Company"), brings this shareholder derivative action on behalf of Fidelity National against the Company's current and former officers and directors identified below (collectively, "Defendants"), arising from Defendants' breaches of fiduciary duties and violations of state and federal law from at least February 1, 2019 through November 3, 2022 (the "Relevant Period").[1]

## II.   <u>INTRODUCTION</u>

2.     For more than three years, the Defendants represented that Fidelity National's $43 billion acquisition of Worldpay, Inc. ("Worldpay") in July 2019 (the "Merger") was a raging success.  They described it as a "transformative" acquisition, "a significant combination for us and a bold and exciting milestone," and warranted to investors that the integration of the two companies was proceeding so smoothly it

---

[1] While Fidelity National is named as a nominal defendant in this action, any reference to "Defendants" does not encompass the Company.  Plaintiff, through its undersigned counsel, has conducted an investigation into the facts supporting the allegations in this Complaint, including a review of (i) filings by Fidelity National with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of the Company's conference calls with investors; (iii) news articles; (iv) securities analysts' reports about Fidelity National; (v) wire and press releases; and (vi) additional information readily obtainable on the Internet.  Plaintiff believes that discovery will elicit further evidentiary support for its allegations.  All emphasis is added unless indicated otherwise.

was "ahead of schedule," "exceeding our expectations," and was "the easiest integration [Fidelity National] has done to date."  Defendants later claimed that FIS had "successfully completed the Worldpay integration nearly a year ahead of schedule," that the result of the successful integration was Fidelity National achieving enormous financial returns, and that the combined company opened incredible opportunities for FIS to prosper and grow.  Unfortunately, the Defendants' representations were not true.  Nor had the members of Fidelity National's board of directors (the "Board") complied with their fiduciary duties.  Specifically, the Board failed to comply with their fiduciary duty of oversight, which contributed to an acquisition and integration that was a failure.  And the Board failed to comply with their fiduciary duty of candor by making false and misleading statements about the due diligence, the acquisition, and the integration.

3.     In February 2023, Fidelity National announced it would spin off Worldpay – undoing the Merger that the Defendants had touted as a success for the past three years.  FIS also announced that it would take a write down of $17.6 billion in the value of Worldpay.  A few months later, in July 2023, Fidelity National announced that it would instead sell 55 percent of Worldpay for *$11.7 billion*, then valuing Worldpay at approximately $18.5 billion, and writing down an additional $6.8 billion.  Despite Defendants' continuous representations to the contrary, the

Worldpay integration was such a failure that FIS collectively wrote off *$24.4 billion* of Worldpay's value, more than half the value FIS had paid for the Merger.

4.     Back when she was Worldpay's Chief Financial Officer, Stephanie Ferris (who is currently Fidelity National's Chief Executive Officer) characterized the $43 billion FIS paid for Worldpay as a "good fair price."  Now, as CEO and a board member of FIS, she characterized the sale price for Worldpay a few years later—reflecting an $18.5 billion valuation, or $24.4 billion less than the purchase price—as "attractive" and a "compelling valuation."  And yet despite the enormous value destruction to Fidelity National, and the resulting layoff of thousands of employees and contractors, the Board awarded Ferris $6.5 million in special bonuses for the "successful" integration of Worldpay, as well as awarding tens of millions to other senior executives for the same reason.

5.     The enormous harm to the Company was a direct result of the Defendants' failures to act as required as officers and/or directors of Fidelity National, including (i) failing to conduct proper due diligence on Worldpay—such as having access to the merger data room for just days before signing the merger agreement, (ii) misrepresenting in the proxy statement for the acquisition the condition of Worldpay—such as failing to disclose that Worldpay was still in the middle of its prior merger with Vantiv and continued to face substantial integration risks from that prior merger, (iii) failing to properly oversee the integration, (iv)

ignoring red flags of serious problems with the integration—such as nearly all of the senior executives of Worldpay who signed contracts to stay on at Fidelity National leaving after the Merger, and the failure to integrate such basic systems as the customer relationship management systems, undermining the ability to cross-sell, (v) passing and keeping in place a highly lucrative Worldpay Integration Incentive Plan (the "Incentive Plan") for executives, even though shareholders had previously objected to such merger incentive plans and voted against this Incentive Plan in the say on pay vote, (vi) touting the Incentive Plan in the proxy statements as having been "highly successful" at driving management's achievement of critical integration milestones, with full disclosure of the massive problems with the integration only starting immediately after the three year period to receive bonuses under the Incentive Plan had closed and as the executives who received tens of millions were fleeing the Company, (vii) spending approximately $3.8 billion on share repurchases in less than two years to boost the price of Company stock while touting the success of the integration in proxy statements and elsewhere, and then later claiming Fidelity National  needed to spin off Worldpay so more money could be spent on strategic investments for Worldpay, (viii) insiders selling hundreds of millions of dollars' worth of stock, profiting from the substantial artificial inflation their misstatements had caused, and (ix) making false statements in proxy statements and elsewhere about the success and completion of the integration.

6.     The serious problems with the integration of Worldpay and Fidelity National were concealed from investors during the Relevant Period, but well known within the Company.   Numerous former employees of the Company were interviewed in connection with Plaintiff's investigation of the Complaint and detailed these serious problems, which are discussed below.   These witnesses represented, *inter alia*, that: (i) when Worldpay was acquired, it was an un-integrated mess, as "Worldpay had acquired 6-7 platforms through its various acquisitions, and Worldpay had never merged these payment system platforms under one roof," (ii) there was a complete lack of due diligence by Fidelity National as Worldpay "wasn't trying to hide [their lack of integration] from anyone… There was no reason for FIS not to be aware," and given the speed of the transaction, "there was no way any or appropriate due diligence could have been carried out," (iii) key employees who understood the systems and the clients left Worldpay after the Merger; (iv) "there was no integration from admin-type processes from contracts all the way up to acting like one company," (v) Fidelity National and Worldpay used separate customer relationship management software that could not "talk" to each other, (vi) with respect to cross-selling, "we were told we could sell yet there were no procedures and definition or education on how to sell Worldpay," with no idea about pricing or quoting contracts, (vii) at Company town hall meetings, these issues were repeatedly raised, and (viii) when asked about Defendants' statements that the integration with

Worldpay was complete, they were described as "bullshit" and "completely misleading."

7.     After conducting a detailed investigation, Plaintiff made a written demand (the "Demand") on the Board of Fidelity National to investigate on July 9, 2023, as required by Georgia law.  Unfortunately, instead of investigating to determine the merits of Plaintiff's claims and the benefits to the Company that could result from pursuing these claims, the Board rejected the Demand and demonstrated that it would not and could not fairly and impartially make a determination on the Demand.  Indeed, without even investigating, the Board stated in an August 2, 2023 quarterly filing with the SEC that the Demand was "without merit" and that they intended to contest the Demand "vigorously."

8.     Plaintiff now seeks judicial intervention to hold Defendants accountable for their misconduct.

## III.   **JURISDICTION AND VENUE**

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.    Venue is proper in this Court because FIS has its principal place of business in this District, Plaintiff's claims arose in this District, and FIS has suffered and will continue to suffer harm in this District.

## IV.    PARTIES

### A.    Plaintiff

11.    Plaintiff is a benefit pension plan based in Hialeah, Florida, that provides pension services and benefits to employees, retirees, and beneficiaries of the City of Hialeah.  Plaintiff is, and at all relevant times was, a shareholder of Nominal Defendant Fidelity National.

### B.    Nominal Defendant

12.    Nominal Defendant Fidelity National is incorporated under the laws of Georgia, with its headquarters located at 347 Riverside Avenue, Jacksonville, Florida 32202.  Fidelity National provides payment processing products and services to financial institutions and other companies.  Fidelity National's common stock is traded on the New York Stock Exchange under the ticker symbol "FIS."

### C.    Individual Defendants

#### 1.  Officer Defendants

13.    Defendant Stephanie L. Ferris ("Ferris") has served as a Director of Fidelity National since October 2022.[2]   In addition, Ferris has served as the

---

[2] Ferris is also a Director Defendant.

Company's President since February 8, 2022, and as CEO since December 16, 2022. Ferris previously served as the Company's Chief Operating Officer from August 1, 2019 to September 2, 2020, before leaving FIS and subsequently returning to serve as the Company's Chief Administrative Officer from September 2, 2021 to February 8, 2022.  Prior to joining Fidelity National, Ferris served as CFO of Worldpay, and its predecessor, from April 26, 2016 until the closing date of the Merger on July 31, 2019.  At the time this action was commenced, Ferris served as a member of FIS's Executive Committee.  From 2019 through 2022, Fidelity National paid Ferris approximately $59.5 million in salary, stock awards, and other compensation, including approximately $6.5 million pursuant to the Worldpay Integration Incentive Plan.

14.     Defendant Gary A. Norcross ("Norcross") served as the Company's CEO from January 1, 2015 through December 16, 2022 and as Chairman of the Board of Directors from May 30, 2018 through December 16, 2022.[3]  From 2019 to 2020, Norcross served as a member of the Executive Committee, and from 2021 to 2022, he served as Chair of the Executive Committee.  From 2019 through 2022, Fidelity National paid Norcross approximately $115.9 million in salary, stock

---

[3] Norcross is also a Director Defendant.

awards, and other compensation, including approximately $14.9 million pursuant to the Worldpay Integration Incentive Plan.

15.     Defendant James W. Woodall ("Woodall") served as the Company's Executive Vice President and CFO from May 18, 2013, through November 4, 2022. From 2019 through 2022, Fidelity National paid Woodall approximately $45 million in salary, stock awards, and other compensation, including approximately $9.9 million pursuant to the Worldpay Integration Incentive Plan.

## 2. Current Director Defendants

16.     Defendant Lee Adrean ("Adrean") has served as a Director at Fidelity National since January 2023– his second tenure after having previously served as a Director of the Company from July 31, 2019 until May 19, 2021.  Prior to that, Adrean served as a Director of Worldpay, and its predecessor, from March 21, 2012 until the closing date of the Merger.  At the time this action was commenced, Adrean served as a member of the Audit Committee.  From 2020 to 2021, Adrean served as a member of the Audit and Risk and Technology Committees.  From 2019 to 2021, Adrean was awarded $678,834 in fees, stock awards, and other compensation for his service on the Board.

17.     Defendant Ellen R. Alemany ("Alemany") has served as a Director of Fidelity National since June 2014.  At the time this action was commenced, and throughout the Relevant Period, Alemany served as Chair of the Corporate

Governance, Nominating and Sustainability Committee and a member of the Audit and Executive Committees.  From 2019 to 2022, Alemany was awarded $1,535,401 in fees, stock awards, and other compensation for her service on the Board.

18.     Defendant Vijay G. D'Silva ("D'Silva") has served as a Director of Fidelity National since March 2022.  At the time this action was commenced, D'Silva served as a member of the Corporate Governance, Nominating and Sustainability and Risk and Technology Committees, after serving as a member of the Risk and Technology Committee in 2022.  In 2022, D'Silva was awarded $389,945 in fees, stock awards, and other compensation for his service on the Board.

19.     Defendant Jeffrey A. Goldstein ("Goldstein") has served as a Director of Fidelity National since June 2020 and has served as Chairman of the Board of Directors since December 16, 2022.  At the time this action was commenced, Goldstein served as the Lead Independent Director, Chair of the Executive Committee, and a member of the Compensation and Corporate Governance, Nominating and Sustainability Committees.  From 2021 to 2022, Goldstein served as a member of the Audit and Compensation Committees.  From 2020 to 2022, Goldstein was awarded $994,966 in fees, stock awards, and other compensation for his service on the Board.

20.     Defendant Lisa A. Hook ("Hook") has served as a Director of Fidelity National since July 2019.  Prior to that, Hook served as a Director of Worldpay, and

its predecessor, from 2015 until the closing date of the Merger. At the time this action was commenced, and throughout the Relevant Period, Hook served as Chair of the Risk and Technology Committee and a member of the Audit and Executive Committees. From 2019 to 2022, Hook was awarded $1,444,096 in fees, stock awards, and other compensation for her service on the Board.

21.     Defendant Kenneth T. Lamneck ("Lamneck") has served as a Director of Fidelity National since March 2022. At the time this action was commenced, Lamneck served as a member of the Audit and Compensation Committees, after serving as a member of the Audit Committee in 2022. In 2022, Lamneck was awarded $394,945 in fees, stock awards, and other compensation for his service on the Board.

22.     Defendant Gary L. Lauer ("Lauer") has served as a Director of Fidelity National since July 2019. Prior to that, Lauer served as a Director of Worldpay, and its predecessor, from March 21, 2012 until the closing date of the Merger. At the time this action was commenced, Lauer served as Chair of the Compensation Committee, and a member of the Corporate Governance, Nominating and Sustainability and Executive Committees. From 2020 to 2022, Lauer served as a member of the Compensation and Corporate Governance, Nominating and Sustainability Committees. From 2019 to 2022, Lauer was awarded $1,275,763 in fees, stock awards, and other compensation for his service on the Board.

23.    Defendant Louise M. Parent ("Parent") has served as a Director of Fidelity National since October 2017.  At the time this action was commenced, Parent served as a member of the Audit and Corporate Governance, Nominating and Sustainability Committees. From 2020 to 2022, Parent served as Chair of the Audit Committee and a member of the Executive Committee.  From 2019 to 2022, Parent was awarded $1,568,504 in fees, stock awards, and other compensation for her service on the Board.

24.    Defendant Brian T. Shea ("Shea") has served as a Director of Fidelity National since June 2018.  At the time this action was commenced, Shea served as Chair of the Audit Committee, and a member of the Risk and Technology and Executive Committees. From 2019 to 2022, Shea served as a member of the Corporate Governance, Nominating and Sustainability and Risk and Technology Committees.   From 2019 to 2022, Shea was awarded $1,454,370 in fees, stock awards, and other compensation for his service on the Board.

25.    Defendant James B. Stallings Jr. ("Stallings") has served as a Director of Fidelity National since April 2013.  At the time this action was commenced, Stallings served as a member of the Compensation and Risk and Technology Committees since 2020.  In 2019, Stallings served as a member of the Audit and Compensation Committees.  From 2019 to 2022, Stallings was awarded $1,456,651 in fees, stock awards, and other compensation for his service on the Board.

### 3. Former Director Defendants

26.     Defendant Charles Drucker ("Drucker") served as the Vice Chairman and a Director at Fidelity National from July 2019 to March 1, 2020.  Prior to that, Drucker served as the CEO and a Director of Worldpay, and its predecessor, from June 2009 until the closing date of the Merger.  Drucker also served as the Executive Chairman of Worldpay from January 2018 until the closing date of the Merger.  In 2019, Drucker was awarded $2,531,810 in fees, stock awards, and other compensation for his service on the FIS Board.

27.     Defendant Keith W. Hughes ("Hughes") served as a Director at Fidelity National from 2002 to January 19, 2023, and served as the Lead Independent Director from February 1, 2018 to July 31, 2019.  From 2019 to 2022, Hughes served as Chair of the Compensation Committee, and as a member of the Executive and Risk and Technology Committees.  From 2019 to 2021, Hughes was awarded $1,577,102 in fees, stock awards, and other compensation for his service on the Board.

28.     Defendant David K. Hunt ("Hunt") served as a Director at Fidelity National from 2001 to May 28, 2020.  In 2019, Hunt served as Chair of the Audit Committee, and as a member of the Compensation and Executive Committees. In 2020, Hunt was a member of the Audit and Compensation Committees. From 2019

to 2020, Hunt was awarded $726,304 in fees, stock awards, and other compensation for his service on the Board.

29.     Defendant Jeffrey E. Stiefler ("Stiefler") served as a Director at Fidelity National from July 2019 to May 24, 2023, and served as the Lead Independent Director from July 31, 2019 to December 16, 2022.  Prior to that, Stiefler served as a Director and non-executive Chairman of Worldpay, and its predecessor, from August 4, 2010 until the closing date of the Merger.  From 2020 to 2022, Stiefler served as a member of the Compensation and Corporate Governance, Nominating and Sustainability and Executive Committees.   In 2023, Stiefler served as a member of the Compensation and Corporate Governance, Nominating and Sustainability Committees.  From 2019 to 2022, Stiefler was awarded $1,505,796 in fees, stock awards, and other compensation for his service on the Board.

30.     The Current Director Defendants and Former Director Defendants, are collectively referred to herein as the "Director Defendants."

31.     The Director Defendants and the Officer Defendants are collectively referred to herein as the "Defendants" or the "Individual Defendants."

## V.     OVERVIEW OF THE FRAUD

### A.     Background of the Company and the Worldpay Acquisition

32.     Fidelity National provides technology products and services for financial institutions and businesses worldwide.  The Company's SEC filings,

including its Form 10-K for 2018 filed on February 21, 2019, explain: "We have grown organically, as well as through acquisitions, which have contributed critical applications and services that complement or enhance our existing offerings, diversifying our revenue by customer, geography and service offering."

33.     Before its acquisition of Worldpay, Fidelity National specialized in selling technology to retail banks, ranging from core banking platforms to asset management software.   In early 2019, FIS watched as several transformative acquisitions reshaped the financial technology sector.  On January 16, 2019, Fiserv, FIS's chief competitor, announced that it would be acquiring the payment processor First Data in a $22 billion deal.  A few months later, Global Payments Inc. and Total System Services announced a merger of the two payment processing companies in a deal valued at over $21 billion.

34.     Feeling the pressure to undertake a transformative acquisition of its own, FIS set its sights on Worldpay.  At the time, Worldpay was one of the largest payment processors, helping merchants across the globe accept payments.  FIS sold the Merger to stockholders as creating a global giant in payments and back-office financial services, reaching more customers as transactions increasingly moved online.

35.     After the acquisition of Worldpay, the Company operated through four segments: Banking Solutions; Merchant Solutions; Capital Market Solutions; and

Corporate and Other.  Merchant Solutions, the segment consisting of the Worldpay business, serves merchants by enabling them to accept, authorize, and settle credit card or electronic payment transactions.  Merchant Solutions accounted for approximately 30% of the Company's total revenue in 2021.  Accordingly, upon acquiring Worldpay, FIS began referring to itself by stating, "FIS is now a global leader in financial technology solutions and services for merchants, banks and capital markets."

36.     FIS announced its planned acquisition of Worldpay on March 18, 2019 (defined above as the "Merger").  The Worldpay deal was the Company's largest acquisition ever, which Defendants referred to as "transformational" and FIS Chairman and CEO Defendant Norcross called "a significant combination for us and a bold and exciting milestone."  Including the assumption of Worldpay's debt, the deal's overall value was approximately *$43 billion*.  Fidelity National's total market cap at the time of the Merger was just $35 billion.

37.     Commenting on the Merger on March 18, 2019, Defendant Norcross said in a statement:

> Scale matters in our rapidly changing industry.  Upon closing later this year, our two powerhouse organizations will combine forces to offer a customer-driven combination of scale, global presence and the industry's broadest range of global financial solutions.  As a combined organization, we will bring the most modern solutions targeted at the highest growth markets.  The long-term value we will create for clients and for shareholders will set the bar in our industry and will create a

range of new career opportunities for our employees.  I have never been more excited about the future of FIS.

38.     Under the terms of the cash and stock deal, Fidelity National would pay 0.9287 of a share and $11 in cash for every share of Worldpay.  Based on FIS's share price at the time, the deal consideration was the equivalent of around $112 per share, a 13% premium over Worldpay's market value at the time.  FIS's purchase of Worldpay for $43 billion was priced at a rich 24-times EBITDA (earnings before interest, taxes, depreciation, and amortization), while the median deal price in the sector at this time equated to 15.9 times EBITDA.

39.     When the deal was announced, Defendants asserted the Merger "will create meaningful revenue growth opportunities across the merchant and banking ecosystems" along with "$700 million of total EBITDA synergies from the combination of revenue and expense opportunities over the next three years."[4]  In a conference call discussing the Merger on March 18, 2019, FIS executives continually hyped the synergies that they predicted would result from the successful integration of Worldpay.  Some of the avenues for generating these revenue

---

[4] A synergy is any effect that increases the value of a merged firm above the combined value of the two separate firms.  The three main types of synergies are financial synergies (financial benefits like those related to a company's cost of capital, tax benefits, and increased debt capacity), revenue synergies (additional revenue that companies generate after merging), and cost synergies (the ability of companies to reduce costs as a result of merging).

synergies identified by Fidelity National's then-CFO Defendant Woodall included "increasing authorization rates for our customers, driving significant increase in dollar volumes processed, cross-selling of payment processing, enabling faster payment initiatives and alternative payment types and expanding into B2B [business to business] commercial payments in capturing the high demand for data analytics and insights."  Cross-selling—selling related or complementary services to existing customers—was one of the main justifications for the Merger, but as reflected in the accounts of former employees detailed below, and unbeknownst to the market, FIS's cross-selling initiatives failed miserably.

40.     From the beginning, industry observers questioned the price of the deal and the synergies story.  *Bloomberg Intelligence* presciently stated on March 19, 2019, "Fidelity National's offer for Worldpay seems steep and we have less confidence in its ability to achieve assumed revenue synergies than we do in Fiserv's targets for its acquisition of First Data.  The Fiserv deal could add more than 20% to EPS in its first full year, whereas Fidelity National-Worldpay may struggle to break even."  A few weeks later, Bloomberg expressed further skepticism regarding cross-selling synergies, stating "it's unclear how much [FIS's] bank clients can help expand Worldpay's base of larger ecommerce clients."

41.     In response, between the announcement of the acquisition and its closing on July 31, 2019, Defendants sought to reassure investors that the integration

of Worldpay would proceed smoothly by touting their purported expertise in effectively integrating companies and overachieving synergies.  For instance, in the FIS proxy statement filed with the SEC on April 12, 2019, the Director Defendants proclaimed that (i) "[t]he foundation of both the Company's success and long-term growth strategy includes four pillars," one of which is "Strategic Mergers and Acquisitions"; (ii) "[t]he collective skills and experience of our ten directors is broad and supports each of the pillars of our long- term growth strategy"; and (iii) 7 of the 10 directors nominated for reelection in 2019 had significant "Mergers and Acquisitions" expertise.

42.     Defendant Woodall also promoted FIS's purported skill at merger integration, stating: "One of our core competencies is integrating large scale M&A deals and we're ready to bring these companies together to drive enhanced capabilities to our clients and to extend and broaden our reach into the fast growing global ecommerce markets."   He also emphasized the cultural fit of the two companies: "[Y]ou cannot underestimate the importance of cultural fit if you want to successfully integrate companies.  Our management teams collectively have a very strong track record of exceeding synergy targets."  (Notably, multiple former employees discussed the persistent culture clash between the two companies, as discussed in greater detail in Section V.B below.)  Likewise, the Company's press

release announcing the deal touted its management teams' "proven track record of innovation leadership, superior integration, and exceeding synergy plan targets[.]"

43.     These statements by Defendants seemingly had the intended effect of soothing the concerns of the market.  Indeed, in "resuming coverage of FIS with a **Strong Buy** rating and a $131 target price," an April 12, 2019 analyst report by Raymond James aptly noted: "In our view, the recently announced WP acquisition is not only the biggest positive of the FIS story, *but also likely the most important driver of the stock over the near-to-medium term*."  Moreover, the same analyst report further explained:

> *It's all the about the WP deal + FCF generation*. In our view, the success, or lack thereof, of the stock will hinge on the transformative WP acquisition. *Simply put, if management successfully integrates the WP business and delivers on its initial synergy expectations, we struggle to see what would keep the stock from significantly outperforming*.

44.     Despite the size and complexity of the companies to be integrated, the joint proxy issued by FIS and Worldpay on April 15, 2019, and amended on June 7, 2019, soliciting shareholder votes approving the Merger (the "Merger Proxy") describes a lightning-fast deal negotiation.  In the barely six weeks from February 1, 2019 to March 18, 2019, FIS and Worldpay conducted deal discussions and all due diligence for the $43 billion transformative transaction.  The parties first entered into a confidentiality agreement on February 2, 2019, after which "preliminary business and financial information" was exchanged between the two companies.

45.     During this time, Worldpay also was in the middle of a three-year integration plan with Vantiv (which had merged with Worldpay in 2018).   On February 26, 2019, Worldpay issued its annual report on Form 10-K for the year 2018, which warned of the risks of integration from Worldpay's prior merger with Vantiv, stating:

> The complexity and magnitude of the integration effort associated with our acquisition of Worldpay Group plc are significant and require that we fund significant capital and operating expenses to support the integration of the combined operations.  Such expenses have included significant transaction, consulting and third party service fees. . . . ***The integration of the departments, systems, business units, operating procedures and information technologies of the two businesses continue to present certain challenges to management***.  There can be no assurance that we will be able to continue to integrate and manage these operations effectively[.]

46.     Despite this, the Merger Proxy stated that FIS and Worldpay only provided data room access to the other party beginning on March 8, 2019—ten days before the Merger was announced publicly.  It appears that most due diligence for the deal was conducted between March 8 and March 17, 2019—an unreasonably short time period for a deal of this size and complexity.  By comparison, in the contemporaneously announced merger between FIS's closest competitor Fiserv and payment processor First Data, First Data provided data room access to Fiserv 55 days before the merger was made public.  As noted in Section V.B.2 below, a former FIS employee (CW 1) confirmed that there was no way appropriate due diligence

21

could have been carried out based on the short time period from the announcement to the closing of the deal.

47.     In the press release announcing the transaction, Defendants also hyped the "enhanced financial profile" the successful integration of FIS and Worldpay would create:

> The combined company will have pro forma 2018 annual revenue and adjusted EBITDA of approximately $12.3 billion and $4.9 billion, respectively.   FIS anticipates retaining its investment grade credit ratings of Baa2 / BBB, reducing leverage to approximately 2.7x in 12 to 18 months and continuing to grow its dividend supported by robust free cash flow.

48.     The Merger was ultimately approved by each party's shareholders, closing on July 31, 2019.  Two days later, *Bloomberg Intelligence* expressed further skepticism on the deal, stating "Fidelity National's acquisition of Worldpay likely won't add meaningfully to EPS [earnings per share] given the price paid, the lack of overlapping operations and assumed revenue benefits we believe may not fully materialize."

49.     Indeed, the accounts of many former employees indicated that FIS's decision to acquire Worldpay was plagued by inadequate due diligence.  While FIS executives and directors later misrepresented the Merger integration process as successful, the former employees painted a picture of a clash of corporate cultures that was well known within the Company.  The Merger of these two ultimately

incompatible companies was plagued by major IT problems, an inability to successfully cross-sell, and a steady attrition of both customers and key employees.

**B.    FIS and Worldpay Insiders Confirm That the Integration of Worldpay was a Failure**

50.    Worldpay, originally acquired by private equity firms Advent and Bain Capital in 2010 from Royal Bank of Scotland, was essentially a holding company composed of a number of different payment processing companies.  Worldpay was acquired by Vantiv in a merger worth approximately $10.4 billion that closed in January 2018.   Along the way, Worldpay had also acquired many smaller companies.  As stated by Peter Keenan, chief executive of the financial technology company Apexx Global, "One of the challenges Worldpay has had is that Worldpay itself has been a collection of acquisitions—how you knit all those together from a tech point of view so you can offer a unified proposition to your customer base. That's a challenge they've been grappling with."[5]

51.    At the time that FIS announced the Worldpay acquisition, Worldpay was only a third of the way into the integration plan it had begun when it was acquired by Vantiv barely a year before.  According to FIS CEO Norcross, there was no time to wait: "This is such a fast-moving industry you have to grab the growth and move toward where the growth is when you have the time."  In FIS's rush to

---

[5] *Worldpay and FIS: the 'original sin' that tore up a $43bn merger*, FINANCIAL TIMES (March 2, 2023), https://on.ft.com/46qaI93.

complete the deal, they failed to conduct adequate due diligence and ignored the significant challenges that accompany acquiring a complicated un-integrated company like Worldpay.

52.    After the acquisition closed, FIS executives repeatedly touted the Company's supposed success in integrating Worldpay into the overall operations of Fidelity National.   Indeed, in February 2020, just months after the Worldpay acquisition closed, the Company noted that one of its priorities for the year was to "seamlessly execute the Worldpay integration in order to achieve our revenue and cost synergy goals[,]" stating that "[w]e are already well ahead of schedule, and we'll look to further accelerate our momentum in 2020."  In earnings conference calls and elsewhere from 2020 through 2021, FIS executives continuously stated, among other things, that the Company's integration of Worldpay was "on track" or "ahead of schedule" and eventually claimed "FIS successfully integrated Worldpay."   These false and misleading statements are described in greater detail in Section VI below.

53.    Analysts set high expectations for Fidelity National, with Oppenheimer noting that the Company had increased its synergy targets, "demonstrating strong early cross-sell progress" and that the "combination is off to a strong start." Similarly, analysts at Berenberg highlighted the fact that the Company "is 12 months ahead of its original integration plan for recent acquisition Worldpay" as "evidence that the company will outperform its synergy targets and accelerate organic growth."

54.    In fact, a plethora of confidential witness[6] accounts have confirmed that the integration of Worldpay was a failure from the outset, as FIS was never able to successfully integrate Worldpay, causing Worldpay's business to suffer and lose market share to competitors and eventually resulting in FIS's unwinding of the Merger in 2023.  These former employees of the Company identified a number of different issues which prevented a successful integration, including IT problems, business model issues, and a culture clash between the two organizations, leading to the loss of customers and a high employee attrition rate.

### 1. IT Issues Resulting from Worldpay's Failure to Merge Its Acquired Companies Onto One Platform

55.    CW 1,[7] a former Senior Vice President of Engineering Merchant Acquiring, who either reported directly to several Worldpay/FIS Chief Information Officers or Chief Technology Officers (or at times had one manager in between), stated that Worldpay had acquired 6-7 platforms through its various acquisitions,

---

[6] Former FIS employees are referred to herein as Confidential Witness "CW __" and are referenced in the feminine form to maintain their confidentiality.

[7] CW 1 was employed by Vantiv prior to the Worldpay and FIS acquisition beginning in November 2012, working out of the London office.  After the Merger, CW 1 worked from the Boston, Massachusetts office.  CW 1's final position within FIS was SVP of Engineering Merchant Acquiring, whereupon she retired in June 2022.  CW 1 was responsible for teams in both the U.S. and the U.K., heading the Worldpay/FIS development of Global E-Commerce.  During her tenure with FIS, CW 1 directly reported to James Black, Chief Information Officer ("CIO") of Worldpay, then directly (or with one manager in between) to Ido Gileadi, CIO of FIS, then to Barbara Morgan, Chief Technology Officer, EVP.

and Worldpay had never merged these payment system platforms under one roof. This created many issues.  For example, CW 1 stated that problems arose when FIS said it would be "ending everyone's platform and migrating them to Outlook 360," as the email systems FIS had inherited from Worldpay were not compatible.  In a three-year period, CW 1 either sunsetted or shut down these e-commerce and brick and mortar platforms.   Referring to one of Worldpay's acquisitions, CW 1 specifically noted "we never got the Mercury people onto the FIS system."  CW 4,[8] a former Mercury/Vantiv/Worldpay/FIS account executive, confirmed that Mercury was never properly integrated, stating, "This was not a simple merger of Worldpay to FIS, it was three companies with their own ideas on how to build platforms and merging them into one giant company."

56.    CW 1 also described how data center consolidation was improperly handled after the Merger.  She stated that FIS inherited approximately 15 different data centers from Worldpay, and during her tenure this was reduced to four data centers.   According to CW 1, FIS CIO Ido Gileadi gave instructions to the

---

[8] CW 4 began working for Vantiv in July 2014 as a Team Lead, just after they acquired Mercury Payment Systems in May 2014.  She worked for Vantiv from July 2014 until they acquired Worldpay in August 2017 (when Vantiv assumed Worldpay's name).  She worked for Worldpay from August 2017 as a Team Lead/Service Manager until they were acquired by FIS in July 2019, then worked for FIS as a Service Manager/Account Executive from July 2019 until July 2021 in Durango, Colorado.

infrastructure teams that they had a certain amount of time to accomplish the reduction and centralization of the data centers, but the tight deadlines required accomplishing the mission without the appropriate protocol.   CW 1 stated specifically that the "security stuff wasn't finished, but infrastructure had a deadline they had to meet."

57.     CW 1 also stated that FIS outsourced software development and IT to India, which negatively affected Worldpay because the Indian workers had little or no experience dealing with the issues Worldpay faced.

58.     Similarly, CW 2,[9] a VP of Sales Engineers for Paymetric (a Worldpay subsidiary) stated that when FIS acquired Worldpay, FIS thought the process would be "plug and play" and that it would be easy to maintain the existing customers. Instead, many of "Worldpay's existing customers were on different operating systems sold through a lot of different channels, with relationships with different banks."   For example, CW 2 stated that Worldpay never assimilated its subsidiary Paymetric into the Worldpay database system or within their SAP configuration.

59.     CW 2 described an example involving Petersen Medical, which sold medical devices through multiple channels.   CW 2 stated that FIS directed Worldpay

---

[9] CW 2 was employed by Paymetric from June 2016 until May 2021, starting as a sales engineer and eventually promoted to VP of Sales Engineers.   CW 2 worked remote but was based out of Houston.

to direct Petersen to end their relationships with the numerous banks they were using and exclusively use FIS.  But this policy was complicated, CW 2 said, because each channel would have to be changed and adapted, costing both Petersen and Worldpay time and money if Petersen did indeed decide to adapt their systems to the FIS operating system.  "Implementing Worldpay's payment system could be done in a week, where the Paymetric SAP system would take anywhere from 9-12 months for change or implementation," CW 2 said.

60.    When FIS realized the Paymetric part of Worldpay was going to be too challenging to adapt, CW 2 said that FIS "cut down the budgeting and efforts, allowing that section of Worldpay to die on the vine."  CW 2 stated that because of a lack of support from FIS, the Paymetric part of Worldpay was not able to meet their predicted numbers.  CW 2 stated that each member of the Paymetric team either left or was laid off, and most of these former employees "went to a Worldpay competitor, HighRadius."

61.    CW 7,[10] a former FIS Principal Software Engineer, confirmed that Worldpay's antiquated technology was a significant challenge for FIS.  "There were significant technology challenges because it was a complicated, monolithic application.  We faced significant technology challenges with the build and

---

[10] CW 7 worked for FIS from March 2020 until April 2021.

deployment of the system."  CW 7 stated that the code was very complicated, requiring FIS to have sophisticated testing mechanisms and test tools, including testing that started at 6:30 pm that would not be completed until 9:00 am the following day.

62.    CW 7 described a "mismatch of antiquated technology that Worldpay acquired through acquisitions 10-15 years ago," adding "the antiquated technology was so deeply ingrained that no one could change it.  You could not think of changing technologies which were so deeply ingrained and that the company relied on to run every single day."

63.    CW 3,[11] a VP of Sales for FIS, also reported that the Company's IT compatibility issues had a negative effect on customer retention.  CW 3 stated that when FIS told customers they would need to invest and migrate to new software to maintain the FIS/Worldpay services, customers would shop with FIS competitors: "If existing customers were going to be forced to rebuild their whole IT system, they might as well shop for less expensive competitors and systems."

### 2.  FIS's Lack of Adequate Due Diligence

64.    CW 1 explained that when FIS competitor Fiserv purchased First Data, FIS decided it had to respond, and Worldpay was targeted because it was a company

---

[11] CW 3 was employed by Worldpay and FIS from November 2012 through June 2022, working remotely from Georgia.

similar to First Data.  Because FIS felt the need to respond quickly and not lose a step on their competitor, FIS did not perform the appropriate due diligence prior to the acquisition of Worldpay.  CW 1 stated she had never seen any information related to due diligence based on her past experience of having performed due diligence research in past roles, stating "based on the amount of time from announcement to acquisition, there was no way any or appropriate due diligence could have been carried out."

66.     According to CW 1, the ongoing cost of integrating Worldpay's numerous different payment system platforms was "material," and Worldpay "wasn't trying to hide it from anyone….There was no reason for FIS not to be aware" of the "material" costs associated with integrating the payment systems prior to FIS's acquisition of the company.  CW 1 stated that if FIS had performed due diligence, they would have seen the challenge ahead of them; namely, that all of the company platforms housed under the Worldpay umbrella were standalones and were not properly integrated.  "Worldpay should have done this centralization, but they never did," she explained.

66.     CW 2, a former VP of Sales Engineers for Paymetric, an entity purchased by Vantiv in 2017 and rolled into a Worldpay subsidiary in 2018, confirmed the disarray at Worldpay prior to the Merger.  According to CW 2, Worldpay and Paymetric never integrated.  CW 2 participated in weekly meetings

between Worldpay and Paymetric where she outlined existing problems and offered to provide training to Worldpay personnel in an attempt to explain the Paymetric system, but Worldpay dismissed any attempt to teach and implement a functioning unified system.  When CW2 raised issues up the chain of command, Worldpay executives just dismissed them out of hand.

67.    CW2 explained that Paymetric utilized SAP systems that were not designed to accept or allow payments on the Worldpay system.  In addition, Worldpay never assimilated Paymetric into its database systems or within its SAP configuration, so when FIS acquired Worldpay, it inherited a segmented Paymetric division.  As a result, when FIS acquired Worldpay, Worldpay's "existing customers were on different operating systems sold through a lot of different channels, with relationships with different banks."

### 3. Lack of Integration of Administrative Processes and Customer Relationship Management Software

68.    CW 8,[12] a former Senior Sales Executive at FIS, had previous experience working with a company that acquired and integrated another company.  Based on that experience, she said that FIS never integrated Worldpay, commenting "there was no integration from admin-type processes from contracts all the way up

---

[12] CW 8 worked for FIS from August 2018 until August 2021 within the Company's Managed Risk Services division.

to acting like one company."  For example, CW 8 indicated that FIS and Worldpay used separate customer relationship management ("CRM") software:[13]  Microsoft Dynamics for FIS and Salesforce for Worldpay.  CW 8 said that both systems could not "talk" to each other, and though FIS was working on the issue, it was never completed while she was with the Company.  According to CW 8, having two separate CRMs meant that it was nearly impossible for FIS and Worldpay to provide quotes to each other's clients.

### 4.  Cross-Selling/Business Model/Culture Issues

69.    CW 8 stated that she attended a sales conference in 2021 where Defendant Norcross was touting how great the Merger with Worldpay was going, yet the two companies were unable to successfully cross-sell each other's products. CW 8 said that, while everyone was originally told that they could sell Worldpay products and Worldpay could sell FIS products, there were no rules of engagement on how to cross-sell.  She added, "We were told we could sell yet there were no procedures and no definition or education on how to sell Worldpay."  Furthermore, they had no idea about pricing or quoting contracts.  She commented, "They were two separate companies the entire time I was there and run with animosity."  CW 8

---

[13] Customer relationship management software manages a company's relationships and interactions with customers and potential customers.  A centralized CRM system improves organization and efficiency, helping businesses offer a better customer experience and convert leads into sales.

said that there was a lot of animosity at Worldpay because of their concern with losing customers due to the acquisition.   She stated that Worldpay was very established at major banks and retailers, and the overall opinion was that FIS was pushing into an area that they had no knowledge of.

70.   CW 5,[14] a former Worldpay/FIS VP of Merchant Solutions Sales, echoed these comments.  She said that her team was never able to cross-sell FIS products to merchants through the Worldpay brand, as her Worldpay team had to refer any FIS product inquiry over to a legacy FIS rep, adding "I don't know any business that can be profitable when a third of your business is going out the backdoor as fast as it is coming in the front door."

71.   CW 2 also explained that cultural issues were a major reason for the failure of the FIS/Worldpay Merger.  CW 2 stated that FIS was a "large, stoic company with numerous silos."  The Worldpay mentality was "cocky, our way or the highway."

72.   CW 3 cited significant cultural problems resulting from the Merger, stating that the FIS business model did not translate well into the Worldpay business model.   CW 3 explained that when FIS acquired Worldpay, it immediately introduced 2-3 layers of personnel and managers to every unit, creating "more

---

[14] CW 5 was employed by Worldpay/FIS from July 2018 through January 2022.

mouths to feed." This bloated sales structure did not fit with Worldpay's business model because, as CW 3 explained, Worldpay's success was due to the personal relationships they provided to their customer base. Prior to the Worldpay acquisition, only one person from Worldpay would be contacting a customer, which CW 3 described as mostly "Mom and Pop" types of businesses. The FIS model required numerous people from Worldpay and FIS to contact customers attempting to sell the products, and CW 3 said it wasn't unusual for 20 salespeople to reach out to the same customer without any coordination. CW 3 said this was FIS's existing sales model, and FIS thought it had "worked before so [they] assumed it would work now."

73. CW 3 outlined the FIS business model of internal competition: "There was no coordination within the company and the FIS sales model was intended to bombard the customer." CW 3 stated that this confused the customers, and each salesperson reaching out to the one customer would then flash projections of the sale, which was inaccurate because the customer would not be buying all the products being offered. "If 10 people were estimating a sale, 9 would be wrong," CW 3 said. CW 3 stated that "FIS could not understand why the cross-selling wasn't working," stating that FIS tried to remedy the sales problem through companywide re-organizations. CW 3 described that from 2019 through 2023, FIS instituted three companywide re-organizations, each one taking 9-12 months to complete, which

meant that by the time one re-organization was completed a new one would start. CW 3 explained that these reorganizations changed teams' reporting structures, personnel, and incentives, but the constant changes made it impossible to address the sales deficiencies.

74.     CW 4 stated that FIS's approach to merchants was to offer them the cheapest solutions to get them in the door and later hit them with extra fees: "It was a race to the bottom by undercutting other processors and to book the numbers that everyone cares about."  Working in tech support and the retention department, CW 4 received calls from upset merchants who complained about these fees that were "footnoted" in their monthly statement, stating that FIS made an art of sneaking additional fees onto merchants.  CW 4 stated that FIS estimated what percentage of merchants would call to complain about fees and what percentage would cancel their contracts with FIS, adding "they worked out all of the numbers and they figured out how many people would actually notice these fees.  They factored in how many people that they would be able to delay these fees or offer them discounts."  In particular, CW 4 mentioned the "transaction risk fee," a fee charged by FIS even though the banks, not FIS, assumed the transaction risk.  CW 4 recalled speaking with merchants that complained about their rates doubling.

75.     CW 5 echoed these comments, stating that after FIS acquired Worldpay, the culture of the Company changed overnight.   "They were

hemorrhaging money from day one," CW 5 said.  At sales summits, CW 5 stated that colleagues were discussing 30-40% customer attrition on the merchant segment, and the transaction risk fee was a major source of this attrition.  CW 5 stated that many merchants had entered into three-year contracts with FIS and were faced with paying early termination fees if they wanted to leave: "The merchants were left with either paying huge exit fees or staying and paying the new trumped-up fees that they were adding to their contracts."

### 5. Cross-Selling Problems Were Raised at FIS Town Hall Meetings

76.    CW 8 explained that Fidelity National's problems with cross-selling were "systemic" and known throughout the Company.  CW 8 stated that these issues were raised and discussed during quarterly Town Hall meetings which were facilitated by Managing Directors, adding, "These issues were raised but were very much glossed over by management.  We were assured that we would be able to complete a transaction or get the information that we need.  By the time I left, none of this was happening."  CW 8 stated that Worldpay employees also participated in these Town Hall meetings, and participants were allowed to ask limited questions.  At every Town Hall meeting CW 8 attended, people raised questions and concerns about not being able to cross-sell.  She commented, "salespeople were also raising these issues about wanting to know how to even sell the other company's products.

If you wanted to crossover and take advantage of Worldpay's capabilities, it was impossible."

### 6. Key Employees Left the Company After the Merger

77.   A significant red flag that the integration of Worldpay was deeply troubled was the fact that, after the Worldpay executive team initially joined FIS following the Merger, the vast majority of the Worldpay executive leadership team soon resigned from the Company.  As the confidential witnesses explained, this loss of knowledge of Worldpay's systems, operations, business, and client relationships contributed to the failed integration.

78.   Fidelity National's March 18, 2019 press release announcing the acquisition of Worldpay touted the experience of Worldpay's management:

> Experienced Management Team
>
> Both management teams have a proven track record of innovation leadership, superior integration, and exceeding synergy plan targets to drive transformational value to clients and shareholders.  This combination leverages expertise within the banking and payment industry.

79.   In FIS's July 31, 2019 press release announcing the closing of the Merger, Fidelity National again touted that the key members of Worldpay leadership were joining Fidelity National in critical positions:

> ***Several former Worldpay executives will assume key leadership roles at FIS***.  Mark Heimbouch, former president and chief operating officer at Worldpay, is joining FIS as president of the company's Merchant Solutions division.  Stephanie Ferris, former chief financial officer at

Worldpay, is joining FIS as its enterprise-wide chief operating officer. Charles Drucker, former executive chairman and chief executive officer at Worldpay, is joining the FIS board of directors as vice chairman.  Key leaders from Worldpay will also remain with the company.

80.    Despite these executives being so important for the integration and operation of Worldpay, each subsequently left FIS, vacating their "key leadership roles."  Charles Drucker, the executive chairman and CEO of Worldpay, and then the Vice Chairman of the Board of Fidelity National, announced his retirement from both his executive position and his membership on the Fidelity National Board on January 30, 2020.  Mark Heimbouch, the former President of Worldpay and then the President of Merchant Solutions at Fidelity National, resigned in January 2020 and did not find another job for ten months.  Stephanie Ferris, the CFO of Worldpay and then the Chief Operations Officer of Fidelity National, resigned in September 2020. Each of these resignations is noted in proxy statements authorized by the Board.

81.    Worldpay's 2019 proxy statement lists nine executive officers, including Drucker, Heimbouch, and Ferris.  All nine joined Fidelity National after the Merger.  Then, remarkably, eight left Fidelity National.  In addition to Drucker, Heimbouch, and Ferris, Steve Newton left FIS in December 2019; Kimberly Martin left in April 2020; Shane Happach left in March 2021; Asif Ramij left in May 2021; and Royal Cole left in July 2021.

82.    Indeed, this exodus of Worldpay senior executives was so serious that Fidelity National needed to bring back Ferris in September 2021 as Chief Administrative Officer, and later as President and then CEO.  Similarly, it was recently announced that Drucker would return to lead Worldpay after 55% of the business was sold to the private equity firm who would operate it going forward.

83.    As the Defendants knew, the departure of Worldpay's senior leadership undermined the successful integration of Worldpay.  Former employees confirmed the damage that FIS suffered as a result of this attrition.  CW 2 explained that the loss of Worldpay C-Suite executives meant that the post-Merger entity lost any type of continuity or succession planning.  CW 6[15] confirmed this executive attrition, stating that after the acquisition was completed, FIS had their own people assume all of the leading positions within the merchant business, with almost all of the former Vantiv/Worldpay executives leaving the company.  She added, "FIS put people in charge that had no idea what they were doing in the merchant business….The people that grew Vantiv to the largest processor in the world were all gone after the acquisition.  That did not help things on the merchant side of the business."

---

[15] CW 6 was employed by Vantiv/Worldpay and FIS as a Senior Business Development Executive from August 2012 through June 2022.

84.    CW 1 echoed these sentiments, explaining that when FIS had acquired companies in the past, they were usually similar companies to FIS and could be assimilated into FIS like branches.  CW 1 stated that FIS had never acquired a company like Worldpay and thus was not able to assimilate it into the appropriate FIS segment.  "Worldpay had a customer set FIS never dealt with," CW 1 said, and FIS had no idea how to run Worldpay's Merchant Business.  According to CW 1, this problem was exacerbated by Worldpay executives leaving the company.

85.    CW 1 also explained that when software development was outsourced to India, experienced employees at Worldpay left, and without those experienced people with institutional knowledge, Worldpay was going to fail.  After her experience with the Merger, CW 1 decided to retire from the Company.

86.    CW 7 indicated that high attrition contributed to FIS's IT problems because people that knew the technology were leaving.  CW 7 left FIS because she was tired of working with antiquated technology, and many others on her team either retired or quit for the same reason.

## 7. FIS's Public Disclosures About Integration and Cross-Selling Were Misleading

87.    CW 8 stated that any representations by Defendants about Worldpay being fully integrated were "bullshit" and that what was touted to the market was "completely misleading."   With respect to CEO Norcross's claim during the Company's May 6, 2021 first quarter 2021 earnings call with analysts that "we had

some big programs that we had to get completed with the Worldpay integration, the NAP [next-generation acquiring platform] completion and migration is completely behind us," CW 8 laughed and commented that nothing came to fruition from what FIS told the public and from what FIS management told its employees.

88.    CW 8 was particularly critical of FIS's representations regarding cross-selling.  When CW 8 was read a statement made by Norcross on March 22, 2021, where he touted the benefits of the Company having completed the integration of Worldpay by stating "our cross-sell wins have been very strong coming out of the Worldpay integration," CW 8 responded that those comments were false at the time they were made.  According to CW 8, the two companies were not fully integrated, and FIS had no cross-sell wins, adding, "We were absolutely two separate companies."

## C.    Defendants Caused Fidelity National to Conduct Massive Share Repurchases

89.    Throughout the Relevant Period, Defendants continually represented that, once Fidelity National had successfully integrated itself with Worldpay, the Company would be able to dramatically accelerate organic revenue growth and generate significantly more free cash flow than it had before the acquisition.

90.    For instance, during FIS's earnings call with investors on August 6, 2019, mere days after the closing of the Merger, Defendant Woodall explained: ***"As we achieve our integration targets, free cash flow will almost double over the next***

41

*3 years*, *dramatically expanding our capacity to invest for future growth*."  During another earnings call with the Company's investors on February 9, 2021, a bit over one week after Fidelity National announced its new, Board-approved share repurchase program, Defendant Woodall reiterated:  "Looking forward, we expect free cash flow conversion to continue to improve, up from 24% of revenue in 2020, increasing to 25% to 27% of revenue in 2021 as we continue to drive integration[.]" And during FIS's earnings call on May 6, 2021, Defendant Norcross proclaimed: "*We leveraged our continually strong free cash flow to begin buying back stock*, fund our increased dividend *and make strategic investments* in intriguing new companies that are accelerating new capabilities and pushing the boundaries of financial technology."

91.    On February 1, 2021, Fidelity National issued a press release, in which Fidelity National announced that its Board of Directors had approved a new share repurchase program.  That program authorized the Company to repurchase up to 100 million shares of Fidelity National common stock at management's discretion.

92.    In this press release, Defendant Norcross explained the Board had approved the program because the Company shares were "trading well below [their] intrinsic value," and Fidelity National purportedly had "robust cash flow" sufficient to allow the Company to simultaneously "continue investing for growth . . . and return capital to [] shareholders[,]" stating:

*We believe that FIS shares are trading well below intrinsic value and that repurchasing shares of FIS is a good use of capital at this time. Our strong business fundamentals and robust free cash flow enable us to continue investing for growth*, both organically and through M&A, while continuing to pay down debt to meet our leverage target *and return capital to our shareholders*[.]

The Board's decision to approve a new share repurchase program in conjunction with an increase in our quarterly dividend reflects continued confidence in the strength of our financial position, the durability of our business model and the future of FIS.

93.    Accordingly, Defendants' announcement and implementation of this new buyback program clearly signaled to the market that the integration of Worldpay was proceeding successfully.  In reality, however, that was not the case, as numerous former employees of the Company attest.

94.    Fidelity National ultimately repurchased approximately *36 million FIS shares for a collective $3.8 billion in less than two years at an average share price of $118.35 per share*:

**Fidelity National Information Services, Inc.**

***Share Repurchases***

| Reported Date | Approx. Shares Repurchased | Average Price Paid | Cost of Shares Repurchased |
|---|---|---|---|
| 12/31/22 | 7,600,000 | $63.03 | $479,000,000 |
| 09/01/22 | 4,700,000 | $84.43 | $400,000,000 |
| 08/01/22 | 6,300,000 | $98.70 | $621,000,000 |

| | | | |
|---|---|---|---|
| 04/01/22 | 2,900,000 | $102.73 | $300,000,000 |
| 09/01/21 | 1,200,000 | $124.60 | $150,000,000 |
| 08/01/21 | 7,800,000 | $133.53 | $1,054,800,000 |
| 06/01/21 | 1,200,000 | $146.30 | $169,500,000 |
| 05/01/21 | 1,500,000 | $148.64 | $230,600,000 |
| 03/01/21 | 2,700,000 | $143.20 | $385,000,000 |
| 02/01/21 | 100,000 | $138.39 | $15,000,000 |
| | **36,000,000** | **$118.35** | **$3,804,900,000** |

95.     In contrast, during an investor conference call on March 4, 2021, Defendant Woodall recalled that over the course of "my 10 years or so here, we bought back about 40 million shares at an average price of about $72 a share."

96.     Defendants' misconduct had two aims, both of which were realized. *First*, by causing Fidelity National to conduct share repurchases, Defendants signaled to investors their purported belief that FIS shares were trading at a discount, which caused investors to purchase shares and thereby drive the price up.  Further, and relatedly, the Company's repurchasing of shares artificially inflated its financial metrics such as earnings per share, as the repurchases resulted in fewer outstanding shares.   The artificial inflation of Fidelity shares was financially beneficial to Defendants, as numerous Defendants' compensation was tied to the Company's financial performance and the Director Defendants touted the success of the acquisition and integration in proxy statements seeking their re-election to the Board.

44

The artificial inflation also helped mask the failing integration of Worldpay described herein, thereby helping Defendants perpetuate their scheme.

97.    *Second*, as detailed below, as a result of the artificial inflation of the price of Fidelity National shares, Ferris, Norcross and Woodall sold shares at higher prices, and in some instances sold them to the Company—and thus reaped greater proceeds—than they would have absent the artificial inflation.

98.    The share repurchases used $3.8 billion worth of Fidelity National's cash during the Relevant Period.  But this fact runs counter to Defendants' claim, discussed below, that Worldpay needed to be spun off—for an enormous loss— because Worldpay required cash to make strategic investments so that it could continue to grow and remain competitive.

### D.    The Worldpay Integration Incentive Plan

99.    Incentive plans tied to the supposed success of mergers were not well received by Fidelity National shareholders.  In connection with Fidelity National's 2015 SunGard acquisition, the Compensation Committee had approved the "SunGard Synergy Bonus Program," with FIS's five named executive officers at the time participating in the plan.  Like with the Worldpay Integration Incentive Plan, the bonus payments awarded under the SunGard plan were linked to purported integration-generated synergies, and like the Worldpay plan, the synergy targets

were easy to meet.  Norcross had earned a whopping $18,525,000 from the SunGard Synergy Bonus Program.

100.   Fidelity National's 2019 Annual Proxy Statement, filed with the SEC on Schedule 14A on April 12, 2019 (the "2019 Proxy"), discussed shareholders' negative reaction to the SunGard Synergy Bonus Program:

> We hold a non-binding advisory 'say on pay' vote every year and 56% of the shares voted at our 2018 shareholders' meeting approved of our executive compensation proposal.  In prior years, we have always achieved shareholder approval of 80% or more on our annual non-binding 'say on pay' proposal.  Based on our shareholder engagement efforts, *we have concluded that the primary reason for our lower shareholder approval in 2018 was the increase in total compensation paid to our executive officers in 2017 due to the final payout of a synergy bonus plan related to the SunGard acquisition*, for which management exceeded all goals and participants were paid out at the maximum amount per the terms of the bonus plan.

101.   In response to these results, the 2019 Proxy stated that the Board, working with management, undertook a "shareholder engagement program…with our top 30 shareholders to seek input regarding our governance practices and executive compensation program."  Among other things, the shareholders noted that CEO Norcross's compensation "seemed high due to payments under the SunGard Synergy Bonus Program," and further suggested "broader participation in a synergy bonus plan."  Discussing the feedback, the 2019 Proxy states that the Board "would consider some or all of the improvements suggested by our shareholders."

102.   Despite this, Fidelity National's 2020 Annual Proxy Statement, filed with the SEC on Schedule 14A on April 17, 2020 (the "2020 Proxy"), disclosed that, in July 2019, the Compensation Committee of the Board once again approved an integration-based incentive plan (the "Worldpay Integration Incentive Plan" or the "Incentive Plan") for certain executive officers who "would play critical roles in driving the revenue and expense synergies necessary to meet the expectations of the investor community following the close of the Worldpay acquisition."   The five participants in the program were granted performance share units ("PSUs") with an opportunity to vest based on the achievement of stated threshold, target, and maximum revenue and expense synergy goals.   The value of those incentive opportunities, based on the grant date fair value, were depicted in the 2020 Proxy as follows:

| | Threshold | Target | Maximum |
|---|---|---|---|
| Gary A. Norcross | $4,500,000 | $9,000,000 | $27,000,000 |
| James W. Woodall | $3,000,000 | $6,000,000 | $18,000,000 |
| Stephanie L. Ferris | $3,000,000 | $6,000,000 | $18,000,000 |
| Mark L. Heimbouch (1) | $3,000,000 | $6,000,000 | $18,000,000 |
| Bruce F. Lowthers | $3,000,000 | $6,000,000 | $18,000,000 |

(1)Pursuant to the terms of the Worldpay Integration Incentive Plan, Mr. Heimbouch forfeited his entire Worldpay integration incentive award, with no payment, when he resigned from FIS on January 31, 2020.

103.   According to the 2020 Proxy, 50% of the award was based on attaining revenue synergies and 50% was based on attaining expense synergies to be achieved via Fidelity National's integration of Worldpay, with an extended three-year vesting period.   Revenue synergies were defined as "non-organic incremental annualized revenue realized by the Company from specific actions taken in connection with the

47

acquisition of Worldpay," while expense synergies were defined as "incremental annualized expense savings realized by the Company from specific actions taken in connection to the acquisition of Worldpay." The performance period for the Incentive Plan ran from April 1, 2019 to September 30, 2022, after which point no further bonuses could be awarded under the Incentive Plan.

104. Unfortunately, the Board did not learn any lessons from the SunGard Synergy Bonus Program, and the Worldpay Integration Incentive Plan proved to be even more unpopular with shareholders. Indeed, Norcross was eligible to receive $27 million under the Worldpay Integration Incentive Plan, even more than the $18,525,000 he had received from the SunGard program. And the Worldpay Integration Incentive Plan was still limited to just five officers, with no broader participation by FIS employees. In 2020, after the Incentive Plan was disclosed in the 2020 Proxy, just 45.6% of the shares voted approved the Plan. FIS's 2021 Annual Proxy Statement, filed with the SEC on Schedule 14A on April 9, 2021 ("2021 Proxy"), explained that the low vote was largely due to concerns with the Incentive Plan.

105. By design, the Incentive Plan's synergy targets were easy to meet. The program had a revenue synergy target of $500 million in annual run rate, with a threshold of $375 million and a maximum of $700 million, and an expense savings synergy target of $400 million in annual run rate, with a threshold of $300 million

and a maximum of $550 million.  As the *Financial Times* later astutely opined, "The problem with this approach is that what counts as a synergy is a bit subjective.  How much of the revenue added post-deal is attributable to the deal, and how much is just plain growth?  How much of any cost cuts done after the deal were made possible by the deal.  Who decides?"[16]  Indeed, FIS's SEC filings during the Relevant Period failed to disclose how the Company accounted for these synergies when computing whether the executives met the Incentive Plan's synergy targets, adding a layer of opacity to a program already unpopular with shareholders.

106.   Indeed, FIS's synergy targets were so easy to meet that they were increased several times from 2019 through 2021, falsely signaling to the market that the Worldpay integration was proceeding successfully.[17]

107.   Because these obscure, easy to reach synergy targets were met, the 2021 Proxy disclosed that as of the first of three measurement dates, "The Compensation Committee approved vesting of fifty percent (50%) of the PSUs at two hundred percent (200%) of the target amount for exceeding the expense synergy goal."  On

---

[16] *A big deal, gone badly wrong,* FINANCIAL TIMES (Feb. 16, 2023), https://on.ft.com/46TXktK.

[17] Defendants publicly announced that the expense and revenue synergy targets connected to the integration of Worldpay had been raised either individually or collectively on November 5, 2019, February 13, 2020, May 7, 2020, and May 6, 2021.

the second measurement date, revenue synergy targets were met, with the 2022 Annual Proxy Statement, filed with the SEC on Schedule 14A on April 15, 2022 (the "2022 Proxy"), announcing that the Compensation Committee had approved vesting 50% of the PSUs at 50% of the target amount for exceeding the threshold revenue synergy goal.

108. In making these awards, the Board repeatedly represented that the Worldpay Integration Incentive Plan was driving the success of the business and creating shareholder value. For example, the 2021 Proxy stated the "Worldpay Integration Incentive Plan has been highly successful in driving the attainment of revenue and cost synergies, which results in direct shareholder value creation." Similarly, the 2022 Proxy stated, "We believe the Worldpay Integration Incentive Plan has been highly successful in driving the attainment of revenue and cost synergies, which results in direct shareholder value creation."

109. As of the third and final measurement date for awarding bonuses under the Incentive Plan, September 30, 2022, the 2023 Annual Proxy Statement, filed with the SEC on Schedule 14A on April 14, 2023 (the "2023 Proxy"), stated that the Company had now exceeded the maximum level for both the revenue and expense synergies. But the vesting of the PSUs at the maximum level was conditioned upon the Company's total shareholder return ("TSR") being at or above the 50% percentile compared to the S&P 500 for the performance period, and as of the final

measurement date, the Company's TSR was below the 50% percentile. Accordingly, the final 50% of the PSUs were not vested at the maximum level of 200%, but did vest at 150% of the target amount for exceeding the maximum revenue synergy goal. Still, the cumulative value of the shares earned under the Incentive Plan represented 99.5% of the target grant date value.

110. To be sure, Defendants Norcross, Woodall, and Ferris each reaped enormous bonuses in connection with the Worldpay Integration Incentive Plan— which was in addition to the other generous components of their compensation, such as salary, an annual cash incentive, restricted stock, stock options, benefits, and other compensation. In total, Norcross received $14.9 million worth of stock from the Plan, Ferris received $6.5 million worth of stock from the Plan, and Woodall received $9.9 million worth of stock from the Plan.

111. The performance period for the Incentive Plan, which ended on September 30, 2022, was timed in a manner that allowed the beneficiaries of the Plan, Defendants Norcross, Woodall, and Ferris, to collect these massive bonuses before negative news about FIS and the Merger was revealed. As discussed in greater detail below, disappointing financial results and the failed integration were announced in November 2022 and February 2023, which caused major declines in the Company's stock price. And in October 2022, Norcross announced his retirement from the Company and Woodall stepped down as CFO in November

2022.  In response to the Company's February 2023 announcement about the spinoff of Worldpay, analyst Dan Dolev called the Merger "a huge failure."  Despite this failure, Norcross, Ferris, and Woodall received an aggregate of $31.3 million in bonuses for the "successful" integration of Worldpay.

### E.   Performance in the Merchant Solutions Business Deteriorates

112.   FIS shareholders first began to learn the true state of the Company on August 4, 2022, when FIS released its financial results for the second quarter of 2022.  FIS disclosed that adjusted EBITDA margin contracted by 280 basis points (2.8%) in the Merchant Solutions business.  This was in stark contrast to the two prior quarters, when adjusted EBITDA margin had increased by 1.4% year over year in the fourth quarter of 2021 and 0.6% year over year in the first quarter of 2022.

113.   In response to these disappointing results, FIS's share price declined steeply, from $104.13 on August 3, 2022 to $96.57 on August 4, 2022, a 7.3% decline on heavy trading volume.

114.   Notably, FIS chose to stop disclosing merchant volume in its earnings presentations, a metric that it had regularly reported in prior quarters.  Analysts were critical of the move.  Lowering its guidance for the Company, J.P. Morgan called the move "discouraging[]" in an August 4, 2022 analyst report.

115.   FIS also announced on August 4 that Defendant Woodall would be stepping down from his position as CFO, effective November 4, 2022.  Then on

October 18, 2022, FIS announced that CEO Norcross would be stepping down as CEO on January 1, 2023, with FIS President Defendant Ferris named the new CEO of FIS.   The Company also announced that Norcross would remain Executive Chairman of the Board.   These two leadership changes at the top of the Company, in quick succession, were a sign that the problems at FIS were significant.

116.   The bad news continued when the Company released its third quarter 2022 earnings results on November 3, 2022.   FIS reported that adjusted EBITDA margin for the Merchant Solutions business contracted by 430 basis points (4.3%), with Norcross stating during the earnings conference call that the "Merchant Solutions businesses saw continued pressure in the quarter" resulting in "overall adjusted EBITDA margin contracting 150 points year-on-year."   Ferris appeared to acknowledge structural problems in the Merchant Solutions business when she stated during the call that the small and medium-sized business ("SMB") sub-segment of Merchant Solutions "has been adversely impacted by changing market dynamics."   FIS's adjusted net earnings decreased 1% as compared to the prior year period, and FIS slashed its guidance for fiscal year 2023.

117.   In response to these results, FIS's share price fell from $79.47 on November 2, 2022 to $57.18 on November 3, 2022, a stunning 28% decline.

118.   In response to the earnings results, Baird analyst David Koning bluntly noted that "on margins . . . *if we look first just at Merchant, it was close to 100%*

*incremental margin in both 2020 and 2021.  And now this year it's closer to zero*."
Raymond James reported "a disastrous 3Q print that we can only hope was the kitchen sink and then some."  Also, in that same note, Raymond James highlighted they were "particularly disappointed by merchant growth[,]" writing that FIS's newly announced "enterprise transformation program . . . is a much-needed step in the right direction."  J.P. Morgan also issued an analyst report, titled "Slashing Estimates as Cost of Worldpay Acquisition Sinking In," which stated that "the Worldpay acquisition didn't fit."  These views were shared by UBS in a report, titled "Ripping the Band-Aid Off," which stated that the Company's "results missed our and Street expectations driven by underperformance from Merchant Solutions[,]" further noting, *"While we were expecting some form of medium-term guidance reset, we were still anticipating to hear about a path back to high-single digits for Merchant Solutions, which did not occur, leading some investors to wonder if there may be structural problems*."

### F.  FIS Records Goodwill Impairment Charges Totaling $24.4 Billion and Unwinds the Merger, Acknowledging it was a Total Failure

#### 1. FIS Announces the Spinoff of Worldpay and a First Impairment Charge

119.  As the bad news piled up for FIS, on December 15, 2022, the Company announced that Norcross would be leaving earlier than previously announced (on December 16, 2022) and, in another change, he would not remain Executive

Chairman.  The Company had little to say about Norcross when these changes were announced, other than to note that he was a 34-year veteran of the Company and that he would depart from the Board the next day.

120.   In December 2022, led by new CEO Ferris, FIS announced a "comprehensive assessment" of its business.  The plan was part of an agreement with activist investor D.E. Shaw and included the appointment of a Board member nominated by D.E. Shaw.  (Another activist investor, JANA Partners, was also involved in the discussions.)  In a press release announcing the strategic review, Ferris stated, "We are taking a hard look at every aspect of our company to define areas for change and develop specific action and improvement plans."  Those plans included cost-cutting efforts, "rightsizing the current workforce" (i.e. layoffs), the optimization and reduction of vendor spend, and outsourcing of non-value-added activities.  Fidelity National eliminated 2,600 jobs in January 2023, according to reports in *Bloomberg* and the *Jacksonville Daily Record*.

121.   Then, on February 13, 2023, FIS announced a plan to conduct a spinoff of its Merchant Solutions business, which would create two companies: Worldpay for payments, and FIS for providing software and other services to banks and capital-markets firms.  The move would essentially reverse the Worldpay Merger.  The Company said that the spinoff was intended to give the new Worldpay the balance

sheet flexibility to make necessary strategic investments or acquisitions to get it into higher-growth segments.

122.   The same day, FIS reported earnings for its fourth quarter 2022.  FIS shocked the market by reporting that it took a massive **$17.6 billion** non-cash goodwill impairment charge related to the Merchant Solutions business during the quarter.  Factoring in the impairment charge, the Company generated a fourth quarter net loss of $17.4 billion, or $29.28 a share, compared to net income of $291 million, or $0.47 in the year earlier quarter.  The Company issued a forecast for 2023 that missed the lowest of analyst estimates, with revenue guidance for the Merchant Solutions business projected to decline 2-4%.

123.   The market responded to the news by sending FIS shares tumbling 12.5%, the stock's fourth largest single-day percentage decline on record, from $75.43 on February 10, 2023 to $66.00 at the close on February 13, 2023.  *The $17.6 billion impairment charge represented approximately 41% of the $43 billion purchase price of Worldpay less than four years earlier*.

124.   Reporting on the planned spinoff, the *Financial Times* noted that, after acquiring Worldpay for $43 billion, the Company was now worth just $38 billion after shedding more than 42% of its value in a year.  The *Financial Times* stated:

> Not only did FIS fail to successfully integrate the business, it could not offer its core clients any better digital payment solutions than other fintechs.  Small and medium-sized businesses, which equal about half

of Worldpay's revenues according to Mizuho, defected to rival payment providers such as Square, Toast, Clover and Shopify.[18]

125.   Mizuho Securities analyst Dan Dolev put it even more bluntly, stating that the spinoff was "a sign that the acquisition was a huge failure" and that FIS's Merchant Solutions segment has "deteriorated considerably since the merger."[19] Dolev further stated the "original sin was…the board of FIS I believe felt obliged to get themselves a merchant acquirer" in response to Fiserv's acquisition of First Data. "There was peer pressure to create these payment conglomerates…this should never have happened."  Truist analyst Andrew Jeffrey stated, "We see little opportunity to materially accelerate organic revenue growth" and said that Worldpay is "the most competitively challenged of the three large Legacy processors."  Both Citi and Credit Suisse downgraded the Company's shares to neutral from buy.

126.   Notably, when the spinoff was announced in February 2023, the stated justification was that separating the two companies would allow them to pursue two different capital allocation strategies.  As CEO Ferris stated on a February 13, 2023 conference call:

> The pace of disruption in payments is rapidly accelerating, requiring increased investment for growth and a different capital allocation strategy for our merchant business….[The separation] should also

---

[18] *FIS/Worldpay: finserv group should not rush for a divorce*, FINANCIAL TIMES (Feb. 13, 2023), https://on.ft.com/48Yig4p.

[19] *Worldpay and FIS: the 'original sin' that tore up a $43bn merger*, FINANCIAL TIMES (March 2, 2023), https://on.ft.com/46qaI93.

simplify our operations and give each management team additional flexibility to operate the business in the way that best delivers value for all clients and shareholders alike. Specifically, it will enable FIS to pursue a strong investment-grade credit rating while enabling Worldpay to invest more aggressively in growth. A separation also enables FIS and Worldpay to implement different capital allocation strategies which align to their growth targets and underlying market needs.

* * *

Worldpay operates in a more dynamic and disruptive end market relative to Heritage FIS with more of a growth focus. The separation from FIS will allow Worldpay to pursue a more growth-oriented strategy, which we believe the company is better suited for and aligns more closely with investor expectations. Central to the growth strategy is a return to more consistent M&A and a capital structure that does not require an investment grade rating. Beyond an organic investment, the team is taking aggressive steps to repivot the business back towards growth…While near-term investments are impacting profitability, we are confident the business can return to growth and deliver value for shareholders as an independent entity.

### 2. Comparing the Worldpay Acquisition to the Fiserv/First Data Merger

127. The *Financial Times* punctured Ferris's explanation for the spinoff by comparing the FIS/Worldpay transaction to the Fiserv/First Data merger from 2019, noting that the Fiserv/First Data merger is "as close to being a control group for FIS-Worldpay as one can hope for" and it had proceeded smoothly.[20] The *Financial Times* demonstrated how the fates of these two mergers differed, first looking at

---

[20] *A big deal, gone badly wrong*, FINANCIAL TIMES (Feb. 16, 2023), https://on.ft.com/46TXktK.

share price return.  The chart below shows that the two stocks traded closely until mid-2021, but then diverged:



128.   Similar divergences could be seen in the growth rates of the companies' merchant services units.  After similar early runs, by the last quarter of 2022, Fiserv's merchant services unit was growing at 9%, while FIS's Merchant Solutions business shrank.  And when the companies' price/earnings ratios were compared over time, the result was the same.  In the early years following the deal, the metric was similar for the two companies, but by 2023, their performance diverged, with Fiserv's valuation in 2023 50% higher than FIS.

129.   In sum, these facts do not support Ferris's explanation that the Merchant Solutions business was changing rapidly, necessitating a separation of Worldpay.  Indeed, at the time the Merger was announced in 2019, fast-growing rivals Square and Stripe had been around for a decade, and Fiserv/First Data performed far better than FIS did facing these same competitors.  Instead, FIS fell behind its main competitor because of its failure to properly integrate Worldpay.

130.   Though the Company said that it had achieved $1.65 billion in annual revenue and cost synergies from the deal, with a present value of $10-$20 billion,[21] in the February 13, 2023 conference call Ferris described the "dis-synergies" that would result from the separation as "manageable."

131.   Thus, either the sale of Worldpay will result in the loss of tens of billions in synergy value (assuming FIS's financial reporting on the value of the synergies was accurate), or the value of the synergies was wildly overstated in the first place.  Either way, the Merger was highly destructive for FIS.  Yet, Defendants touted its success for years in reaping enormous compensation and seeking re-election to the Board.

---

[21] *A big deal, gone badly wrong*, FINANCIAL TIMES (Feb. 16, 2023), https://on.ft.com/46TXktK.

### 3. FIS Announces the Sale of a Majority of Worldpay and a Second Impairment Charge

132.   On July 6, 2023, FIS announced that the situation was even worse, when it announced that it would sell 55% of Worldpay to private equity firm GTCR for $11.7 billion.  FIS would retain a non-controlling 45% stake in a stand-alone joint venture and receive upfront proceeds of $11.7 billion, which it would use to pay down debt and return additional capital to shareholders via share buybacks.  The deal valued the entire payment processing business at an enterprise value of $18.5 billion—***less than half the $43 billion valuation FIS paid in 2019***.  Then, in its quarterly report dated August 2, 2023, Fidelity National took a second ***$6.8 billion*** impairment charge for the value of Worldpay.  Thus, during the short period between the Merger and this announcement, Defendants had managed to destroy a collective $24.4 billion of Worldpay's value.

133.   Fidelity National's press release touted the upfront payment for Worldpay as 9.8 times adjusted EBITDA, without referencing the 24 times EBITDA Fidelity National had paid for Worldpay.  Moreover, the press release noted that GTCR had committed "an additional equity capital investment in Worldpay of up to $1.25 billion to pursue inorganic growth opportunities" without addressing either the $3.8 billion spent on stock repurchases or the statements Defendants made about

having enough excess cash to both invest in the business to remain competitive and conduct repurchases.

**VI.   THE DEFENDANTS VIOLATED SECTIONS 10(b) AND 14(a) OF THE EXCHANGE ACT AND BREACHED THEIR FIDUCIARY DUTIES BY CAUSING FIDELITY NATIONAL TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD**

**A.   In Connection with the Share Repurchases, Defendants Issued Materially False and Misleading Statements**

134.   In breach of their fiduciary duties to Fidelity National and its shareholders under state law, and in violation of Sections 10(b) and 14(a) of the Exchange Act and SEC Rule 10b-5, Defendants issued, and caused the Company to issue, statements that, in light of the lack of due diligence conducted and failed integration of Worldpay, were materially false and misleading at the times they were made.  Defendants' misrepresentations were made in the Company's SEC filings, including in Fidelity National's Forms 10-K, 10-Q, and 8-K, and Proxy Statements, as well as during the Company's conference calls with investors, and artificially inflated the price of Fidelity National shares, causing the Company to purchase shares at inflated prices, through its significant stock repurchase program.

135.   During the Relevant Period, Defendants issued materially false and misleading statements and omissions concerning (i) the due diligence conducted on Worldpay, including the status of Worldpay's purportedly "integrated technology platform"; (ii) Fidelity National's efforts to integrate Worldpay with the Company,

including that the integration was "on track," "ahead of schedule," and "successfully complete"; and (iii) the Worldpay Integration Incentive Plan, including that the Incentive Plan had been "highly successful" in driving attainment of critical Worldpay-integration-related milestones.

136.   These materially false and misleading statements and omissions were either affirmatively false because the exact opposite was true or materially misleading because, among other reasons, they failed to disclose the following facts: (i) Defendants' due diligence with respect to Worldpay was inadequate and, in fact, Worldpay was never fully integrated; (ii) Fidelity National's efforts to integrate Worldpay were not "on track," "ahead of schedule," or "successfully complete," but instead the Worldpay integration had failed miserably; and (iii) the Worldpay Integration Incentive Plan had not been highly successful in driving attainment of critical integration milestones, but rather incentivized and financially rewarded Defendants' fraud.

137.   Defendants' misstatements caused the Company to purchase billions of dollars of its stock in order to inflate Fidelity National's stock price, including for the Officer Defendants' personal gain and for the Director Defendants to get elected or re-elected.

**1. Defendants Made False and Misleading Statements in 2019**

138.   As described herein, like Fidelity National, strategic mergers and acquisitions were a significant part of Worldpay's growth strategy, and Worldpay had engaged in multiple business combinations over the years leading up to the Merger, including most recently the approximately $10.4 billion merger of Worldpay and Vantiv, which closed in January of 2018.  The fact that Worldpay was still in the process of integrating itself and Vantiv at the time the Merger was announced on March 18, 2019 was well-known to Defendants.   For instance, Worldpay filed its Form 10-K for 2018 with the SEC on February 26, 2019 (the "WP Form 10-K").  The WP Form 10-K was executed by Defendants Ferris, Drucker, Stiefler, Adrean, Hook, and Lauer, among other of Worldpay's former executive officers and directors, and each of those Defendants would shortly become Fidelity National directors.  In the WP Form 10-K, those persons explained that the success of that merger "depends, in significant part, on our ability to successfully integrate the acquired business[.]"

139.   Additionally, regarding the status of efforts to integrate Vantiv and Worldpay, the WP Form 10-K explicitly disclosed the following:

> ***Our acquisition of Worldpay Group plc has resulted in significant integration costs and any material delays or unanticipated additional expenses may harm our business, financial condition and results of operations.***

The complexity and magnitude of the integration effort associated with our acquisition of Worldpay Group plc are significant and require that we fund significant capital and operating expenses to support the integration of the combined operations. Such expenses have included significant transaction, consulting and third party service fees. We incurred integration planning costs during 2017 and 2018 and anticipate that we may incur additional integration implementation costs in the future. We have incurred and expect to continue to incur additional operating expenses while we continue to integrate the combined company. *The integration of the departments, systems, business units, operating procedures and information technologies of the two businesses continue to present certain challenges to management. There can be no assurance that we will be able to continue to integrate and manage these operations effectively* or that such operations, once fully-integrated, will provide us with the benefits we anticipate.

In addition to transition costs, we have incurred and expect to continue to incur increased expenses. Any material delays, difficulties or unanticipated additional expenses associated with integration activities, or the failure to successfully integrate the business in a timely manner, or at all, may harm our business, financial condition and results of operations.

140. News reporters, analysts, and other media commentators likewise were well aware of the ongoing nature of the Worldpay-Vantiv integration, and associated risks, and noted each in their reporting to the market. In an article published in the *Financial Times* on March 18, 2019, for example, it was reported that "Worldpay is being bought by Florida-based financial tech specialist Fidelity National Information Services (FIS) barely a year after Vantiv bought it – and took its name[,]" and that "Worldpay was only a third of the way into its integration plan." Yet, FIS only had access to the Worldpay data room for ten days before signing the merger agreement, and "FIS chairman Gary Norcross said there was no time to wait: 'This is such a

fast-moving industry you have to grab the growth and move toward where the growth is when you have the time.'"[22]

141.   Additionally, a Morningstar analyst report issued on March 18, 2019 concerning Fidelity National's announcement of its Merger with Worldpay warned: "***Our initial impression is that Fidelity will have its work cut out for them to integrate a firm already trying to digest another large company in Vantiv***."  And, an April 12, 2019 analyst report issued by Raymond James similarly highlighted: "While both legacy FIS and WP management teams have a solid track record of integration and executing on large acquisitions, ***this combination is by far the largest and brings a significant challenge, especially given the Vantiv/Worldpay deal closed just last year***."

142.   Despite being blatantly aware that Worldpay's integration of Vantiv remained ongoing and "continue[d] to present certain challenges to [Worldpay] management[,]" in Fidelity National's March 18, 2019 press release announcing the planned Merger, Defendants falsely represented that Worldpay had "an integrated technology platform":[23]

---

[22] *Worldpay $43bn deal piles pressure on rivals for more tie-ups*, FINANCIAL TIMES (March 18, 2019), https://on.ft.com/3Q2SmUw.

[23] Substantially identical false and misleading statements were repeated by Defendants in Fidelity National's Forms 10-Q for the first, second, and third quarters

> Worldpay is a leading payments technology company with unique capability to power global omni-commerce. ***With an integrated technology platform***, Worldpay offers a comprehensive suite of products and services, delivered globally through a single provider.

143.   Moreover, during the Company's M&A conference call with investors on the same day, Defendants downplayed risks associated with the integration of Worldpay.  For instance, when an analyst on the call explained that "integration risk is a question we're getting" and inquired "can you talk through platform consolidation plans[,]" Defendant Norcross explicitly proclaimed to investors, "***we see very little integration risk***[,]" stating:

> The good news on the platform side. You've seen us do it in the past. I mean we -- I've talked about it in my prepared remarks around how important these combinations are.  One of the things that's been a key underlying tenet of our strategy around these combination is really finding partners that have very little overlap.  So we don't have platform confusion in our combination. [. . .] ***So really from a platform standpoint, no overlap. So we see very little integration risk***.  When you think about even leveraging of data centers, that's a part of -- we had a 5-year program at FIS.  Obviously, over the next 3 years, we'll be evaluating that.  So we think there's very little integration risk.  We've got great line of sight into the $700 million of EBITDA that Woody discussed between revenue and expense.  And ***so we feel really good about how these 2 companies can come together in a real smooth integrated way***.

---

of 2019 and the first, second, and third quarters of 2020; in the Merger Proxy, and in FIS's Forms 10-K for 2019, 2020, and 2021.

i.   <u>FIS's Annual Proxy Statement for 2019</u>

144.   Fidelity National issued two proxy statements in April 2019, three days apart.  The first was the Company's annual 2019 Proxy which, among other things, sought the re-election of directors.  The second was the Merger Proxy, which sought shareholder approval for the Merger.   On April 12, 2019, Director Defendants Alemany, Hughes, Hunt, Norcross, Parent, Shea, and Stallings caused Fidelity National to file the 2019 Proxy in connection with the 2019 annual stockholder meeting.  In the 2019 Proxy, Defendants stated that "[t]he enclosed proxy is solicited by the Board . . . for use at the Annual Meeting of Shareholders to be held on May 22, 2019[.]"

145.   In the 2019 Proxy, these Director Defendants explained that "[t]he foundation of both the Company's success and long-term growth strategy includes four pillars[,]" one of which was "Strategic Mergers and Acquisitions" and, specifically, Fidelity National's "[p]ursuit of transformational inorganic expansion through strategic mergers and acquisitions."  These Defendants further warranted that **"[t]he collective skills and experience of our ten directors is broad and supports each of the pillars of our long-term growth strategy."**  The 2019 Proxy also included a chart identifying the pertinent areas of expertise for each director

nominee, which depicted 7 of the 10 directors nominated for reelection as possessing "significant" expertise in "Mergers and Acquisitions."[24]

146.   The 2019 Proxy stated that Fidelity National's Board was "actively involved in oversight of risks inherent in the operation of the Company's business, and its implementation of its strategic plan[,]" "highly engaged and receive[d] regular updates on a wide variety of matters affecting our Company[,]" "responsible for overseeing the management of the firm's most significant risks on an enterprise-wide basis[,]" and "manag[ing] areas of material risk to the company." Accordingly, these statements in the 2019 Proxy clearly led the Company's shareholders to believe that these Director Defendants were intimately involved in and actively overseeing Fidelity National's due diligence and integration of Worldpay.

## ii.   The Merger Proxy Statement

147. On April 15, 2019, Fidelity National and Worldpay filed the companies' joint Merger Proxy seeking approval of the Merger by their respective shareholders. According to that document, "[t]his joint proxy statement/prospectus [wa]s being provided to FIS shareholders in connection with the solicitation of proxies by the FIS board for the FIS special meeting."

---

[24] Specifically, Director Defendants Alemany, Hughes, Norcross, Parent, and Shea were identified as having expertise in mergers and acquisitions.

148.   In the Merger Proxy, Director Defendants Alemany, Hughes, Hunt, Norcross, Parent, Shea, and Stallings provided the Company's shareholders with a detailed description of the parties' negotiations and alleged due diligence leading up to the Merger, made statements concerning the integration of Worldpay, and solicited investor approval of certain actions necessary to effectuate the Merger.  The Merger Proxy provided that Defendant Norcross and former Worldpay CEO Defendant Drucker "ha[d] spoken on several occasions over the last two years about payments industry dynamics and the possibility of mutually beneficial commercial arrangements or combining the two companies."  And specifically, "[i]n that regard, on September 27, 2018 . . . Mr. Norcross and Mr. Drucker discussed the possibility of a business combination transaction, but they *agreed that the timing was not right as the legacy Worldpay acquisition was still being integrated* and that they would revisit this topic in 2019."

149.   The Merger Proxy further explained that (i) the companies entered into a mutual confidentiality agreement on February 2, 2019; (ii) FIS made its first indication of interest and proposal to Worldpay the next day on February 3, 2019 and the FIS Board approved a second, higher indication of interest and proposal on February 15, 2019, which was provided to Worldpay the same day; (iii) "[o]n March 4, 2019, the FIS board held a telephonic meeting in which management updated the FIS board on the meetings with Worldpay management, diligence, negotiations and

further financial analysis[,]" and FIS delivered another higher indication of interest and proposal to Worldpay later that same day; (iv) on March 8, 2019, "each of FIS and Worldpay provided data room access to the other party and its representatives and advisors"; and (v) a mere 10 days later the proposed Merger was publicly announced on March 18, 2019.

150.   After disclosing all of this information to FIS's shareholders, in the Merger Proxy the Director Defendants falsely explained:

> After consideration and consultation with its advisors, at a special meeting held on March 16, 2019, ***the board of directors of FIS***, which we refer to as the FIS board, ***unanimously determined that the merger was fair to and in the best interests of FIS and its shareholders and approved the merger agreement and the transactions contemplated thereby***, including the merger, declared it advisable that FIS enter into the merger agreement and further unanimously determined it advisable and in the best interests of FIS to issue the necessary amount of shares of FIS common stock in the merger, and recommended approval by the FIS shareholders of the FIS share proposals.
>
> **The FIS board unanimously recommends that FIS shareholders vote 'FOR' the [Merger.]**

151.   In the Merger Proxy, these Director Defendants also made misstatements concerning Fidelity National's due diligence of Worldpay, including by representing that, in reaching its decision to approve the Merger, "***the FIS board considered*** a number of factors, including . . . ***the results of due diligence review of Worldpay and its business, including with respect to the integration of prior acquisitions***, . . . conducted by FIS and its advisors[.]"  These Director Defendants

further falsely advertised the allegedly "integrated technology platform" of Worldpay, stating:

> With an ***integrated technology platform***, Worldpay offers a comprehensive suite of products and services, delivered globally through a single provider.  Worldpay processes over 40 billion transactions annually, supporting more than 300 payment types across 146 countries and 126 currencies.

152.   Defendants' statements concerning Fidelity National's due diligence of Worldpay and Worldpay's "integrated technology platform" were materially false and misleading when made.  In reality, Fidelity National did not conduct adequate due diligence, and Worldpay did not have "an integrated technology platform."

153.   After the closing of the Merger on July 31, 2019, Defendants continued making false and misleading statements in Fidelity National's press releases, and SEC filings, as well as during the Company's conference calls with investors, concerning the status of FIS's integration of Worldpay, including by routinely falsely claiming that the integration was "on track," "ahead of schedule," and even "***successfully complete***."  Defendants also continued making false and misleading statements concerning Worldpay's purportedly "integrated technology platform," including declaring that Worldpay's "***U.S. platform has been consolidated now, so that's behind us.***"

### iii.   The Second Quarter of 2019

154.   On August 6, 2019, Fidelity National issued a press release announcing financial results for the three and six months ending June 30, 2019 for FIS and Worldpay and issuing combined company guidance for 2019, filed its Form 10-Q for the second quarter of 2019 with the SEC (the "2Q 2019 10-Q"), and held an earnings call with investors.

155.   In the 2Q 2019 10-Q, Defendants informed Fidelity National shareholders that "[t]he **success of the merger will depend, in significant part, on FIS' ability to successfully integrate** [Worldpay], **grow the revenue of the combined company and realize the anticipated strategic benefits and synergies from the combination.**"[25]   And during Fidelity National's earnings call, in response to an analyst asking "what aspect of the merger is going to be the most challenging?", Defendant Norcross falsely assured investors that the Worldpay integration was proceeding smoothly, stating: "I mean it's a great question, Lisa.  **Right now, I'm not seeing any red flags**."

### iv.   The Third Quarter of 2019

156.   In Fidelity National's press release issued on November 5, 2019 announcing financial results for the third quarter of 2019 (the "3Q 2019 Press

---

[25] Substantially identical false and misleading statements also were made by Defendants in Fidelity National's Form 10-K for 2019 filed with the SEC on February 20, 2020.

Release"), Defendants applauded the success of FIS's early efforts to integrate Worldpay, claiming: "***These promising early integration efforts further solidify the Company's confidence in accelerating organic revenue growth, approaching 7 percent in 2020 with a target of 8 to 9 percent in the future***."

157.   And during Fidelity National's earnings call with investors also held on November 5, 2019 (the "3Q 2019 Earnings Call"), Defendant Norcross promised investors "we're very focused on integrating the Worldpay transaction" and claimed there were "significant integration activities occurring throughout the company." Norcross further falsely declared that "early synergies from the Worldpay integration [] clearly show that the combination of our 2 companies is paying significant dividends[,]" and that "integration of these large transformational M&A transactions continues to be a core competency."

158.   During the 3Q 2019 Earnings Call, Defendant Woodall claimed that, "***[a]t this early point in the integration, we are ahead of our planned revenue goals***, which puts us clearly on track to achieve our $500 million revenue synergy goal by the end of 2022[,]" and raised the Company's guidance based on the asserted success of Fidelity National's efforts to integrate Worldpay.  And Norcross concluded the call by stating: "I'm excited by the strength of our performance following the Worldpay acquisition and the progress we've made in bringing our 2 great teams together."

## 2.  Defendants Made False and Misleading Statements in 2020

### i.  The Fourth Quarter and Full Year of 2019

159.  On February 13, 2020, Fidelity National issued a press release announcing financial results for the fourth quarter and full year 2019 (the "4Q 2019 Press Release"), and also held an earnings call with investors the same day (the "4Q 2019 Earnings Call").

160.  In the 4Q 2019 Press Release, Defendant Norcross exclaimed that "*2019 was a transformative year for FIS*" primarily because:

> *We closed the largest fintech acquisition of the year and exited 2019 well ahead of our Worldpay integration synergy schedule*.  Our record-setting new sales performance was underpinned by our ongoing investment in next-generation technology, and we are seeing significant cross sell gains from our expanded payments portfolio.  These substantial accomplishments give us confidence in achieving our 2020 guidance.

161.  Defendants also announced increases to both the Company's 2020 annual run-rate synergy targets and total annual run-rate synergy targets through the end of 2022 in the 4Q 2019 Press Release.

162.  During the 4Q 2019 Earnings Call, Defendant Norcross stated:

> 2019 was a transformational year for FIS.  *We successfully closed and are well down the path on integrating the largest financial technology transaction in our industry*.  This, along with outstanding sales production, delivered strong organic revenue growth of 6% for the full year.  All 3 segments performed exceptionally well for the year as well as the quarter.  *Our record sales and integration activities position us for an even stronger 2020*.

\* \* \*

75

Now that **we are well into our integration execution**, we continue to discover new opportunities to cross-sell and bundle offerings as we go to market, **giving us strong confidence in our newly raised [synergy] targets**.

163.   In fact, Norcross announced that Fidelity National's execution of the integration of Worldpay allegedly had been so successful that the integration was now running one full year ahead of schedule, representing: "**With our very successful achievement of expense as well as revenue synergies, we are running a full 12 months ahead of our original integration schedule**."   And in connection with identifying the Company's top priorities for execution in 2020, Norcross boldly promised shareholders that "**we will seamlessly execute the Worldpay integration in order to achieve our revenue and cost synergy goals. We are already well ahead of schedule**, and we'll look to further accelerate our momentum in 2020."

164.   Defendant Woodall also emphasized during the 4Q 2019 Earnings Call that Fidelity National's integration of Worldpay was running "ahead of schedule" and "well ahead of plan[,]" stating:

We have made significant progress on our cost synergies as **our integration of Worldpay is running ahead of schedule**. We exited the fourth quarter generating $465 million in annual run rate cost synergies, including $275 million of interest expense savings and $190 million in reduced operating expenses. **We are making substantial progress in reducing duplicative corporate costs as well as consolidating our merchant and issuer platforms to generate the operating expense savings, which are also running well ahead of plan**.

76

165.   Then, on February 20, 2020 Fidelity National filed its Form 10-K for 2019 with the SEC (the "2019 10-K").[26]  In the 2019 10-K, Defendants again falsely asserted that "[t]he Worldpay acquisition brings an ***integrated technology platform*** with a comprehensive suite of products and services serving merchants and financial institutions," and the Worldpay integration was "ahead of schedule."[27]

ii.   FIS's Annual Proxy Statement for 2020 & Supplement

166.   On April 17, 2020, Director Defendants Adrean, Alemany, Hook, Hughes, Lauer, Norcross, Parent, Shea, Stallings, and Stiefler caused Fidelity National to file the 2020 Proxy in connection with the 2020 annual stockholders meeting.  In the 2020 Proxy, Defendants stated that "[t]he enclosed proxy is solicited by the Board . . . for use at the Annual Meeting of Shareholders to be held on May 28, 2020[.]"

167.   In the 2020 Proxy, in addition to again lauding the Board's significant expertise in "Mergers and Acquisitions" and promising the Board was actively overseeing Fidelity National's integration-related activities, these Director

---

[26] The 2019 10-K was signed by Defendants Norcross, Woodall, Drucker, Adrean, Alemany, Hook, Hughes, Hunt, Lauer, Parent, Shea, Stallings, and Stiefler.

[27] Substantially identical false and misleading statements claiming the integration of Worldpay was "ahead of schedule," "ahead of our previously announced targets," "on track to exceed our previously announced targets," and "remains on track" were repeated by Defendants in FIS's Forms 10-Q for the first, second, and third quarters of 2020 and the first quarter of 2021 as well as in Fidelity National's Form 10-K for 2020.

Defendants explicitly highlighted Fidelity National's acquisition of Worldpay in 2019 as the primary basis for their election to the Board in 2020, stating:

> *In 2019, FIS acquired Worldpay, the most significant acquisition in the history of our company*, empowering FIS to transform the way the world pays, banks and invests. *This acquisition will drive our pivot to growth strategy* and positions FIS in high secular growth markets, including integrated payments and global eCommerce.

168. The 2020 Proxy also once again touted Worldpay's purported "integrated technology platform."

169. Significantly, in the 2020 Proxy these Director Defendants also announced the Compensation Committee's approval of the Worldpay Integration Incentive Plan "for executive officers and key senior managers who would play critical roles in driving the revenue and expense synergies necessary to meet the expectations of the investor community following the close of the Worldpay acquisition[,]" and solicited FIS shareholder approval of the same, by misleadingly claiming:

> **Special Compensation Programs: Worldpay Integration Incentive Plan**
>
> Strategic acquisitions are an important element of our long-term growth strategy.  As a result, when a strategic acquisition occurs, we often design incentive programs tied to specific performance objectives related to specific integration goals.  Aligning specific incentives to these inorganic growth initiatives increases the focus on and achievement of acquisition-related integration targets, which, in turn, maximizes the earnings potential of the Company.  Moreover, integration incentive programs promote retention of management throughout the integration period.  Historically, integration incentive

programs have been a key driver in our ability to execute strategic, transformational acquisitions.

170.   In recommending shareholder approval of the Incentive Plan, these Director Defendants further represented in the 2020 Proxy that they had incorporated "some or all of the improvements suggested by our shareholders" in 2019 concerning integration-related incentive compensation plans generally and that "[e]ach executive's execution on his or her individual integration plan" under the Worldpay Integration Incentive Plan had been "critical to our success in 2019."

171.   The Worldpay Integration Incentive Plan was not well received by stockholders, resulting in the Board subsequently filing supplemental proxy materials further encouraging shareholders to approve it.  Specifically, on May 18, 2020, Director Defendants Adrean, Alemany, Hook, Hughes, Lauer, Norcross, Parent, Shea, Stallings, and Stiefler caused Fidelity National to file Supplemental Proxy Materials concerning the 2020 Proxy in connection with the 2020 annual stockholders meeting (the "2020 Supplement").  According to the face of that document, the 2020 Supplement was "being provided to shareholders in addition to FIS's proxy statement, dated April 17, 2020."

172.   In the 2020 Supplement, these Director Defendants made numerous additional false and misleading statements concerning the Worldpay Integration Incentive Plan, including by claiming:

- **We are excited about our strategic and transformational acquisition of Worldpay in 2019, and we believe our Worldpay Integration Incentive Plan explicitly incentivizes outperformance of synergy goals in order to accelerate and increase the amount of value created for our shareholders by the Worldpay acquisition.** (Emphasis in original);

- **Worldpay was a strategic and transformational acquisition** [that] [p]ositioned FIS as a global leader in the fast-growing and structurally-advantaged merchant acquiring segment (emphasis in original);

- The Plan is designed to create $9 - $17 billion in shareholder value by incentivized accelerated achievement of permanent and recurring revenue and expense synergies related to the Worldpay acquisition (emphasis in original);

- Plan Driving Desired Outcomes to Create Shareholder Value[;] and

- The Worldpay Incentive Integration Plan is accelerating value creation for shareholders[.]

173. Notwithstanding their extra efforts, FIS filed a Form 8-K on May 29, 2020 – the day after the annual stockholders meeting in 2020 – disclosing that the "Company's shareholders did not approve, on an advisory and non-binding basis, the compensation of the Company's named executive officers."

### iii.   The First Quarter of 2020

174. In a May 7, 2020 investor presentation accompanying FIS's earnings call the same day announcing financial results for the first quarter of 2020 (the "Q1 2020 Earnings Call"), FIS included a header noted: "INTEGRATION AHEAD OF SCHEDULE."

175.   On the Q1 2020 Earnings Call, Defendant Norcross falsely represented "[w]e continue to accelerate the integration of Worldpay[,]" including by ***continuing to "execute on integration initiatives to accelerate synergy achievement,***" and Defendant Woodall likewise falsely claimed that Fidelity National continued to "make significant progress in consolidating our merchant and issuer platforms and reducing duplicative corporate costs."  Norcross further represented that "***[w]e're well down the path through the integration of Worldpay***" and "the fact that we're already going to be well ahead of our targets by the end of this year, I couldn't be more pleased[.]"

iv.   The Second Quarter of 2020

176.   During the Company's next earnings call with investors on August 4, 2020 (the "2Q 2020 Earnings Call"), Defendant Woodall falsely reiterated that "***[o]ur integration [of Worldpay] remains ahead of schedule***[.]"  And, regarding the status of the integration, Woodall also explicitly proclaimed:

> In the quarter, we achieved $115 million in annual run rate revenue synergies, well ahead of our initial expectations, which is especially impressive considering the multiple headwinds caused by the COVID pandemic.  We also achieved cost synergies in excess of $700 million, including $350 million in operating expenses.  As a reminder, we originally targeted $400 million in operating cost synergies by the end of 2022.  ***At this pace, we are on track to reach our initial target by the end of this year, a full 2 years ahead of schedule.***

177.   Also during the 2Q 2020 Earnings Call, in response to an analyst question concerning the status of Fidelity National's efforts to complete the

integration of Vantiv and Worldpay, Defendant Norcross baselessly assured the market that those integration efforts were complete, stating:

> *Clearly, the Vantiv-Worldpay combination was very successful. And I think given our synergy results, you're seeing the success come out of the FIS-Worldpay combination*. But we talked about this in the past on calls. We integrate these companies so tightly, it gets difficult to actually track what is a synergy and what's just operating execution and what sales execution at some point in time. And so really, *we've kind of moved on beyond trying to track the Vantiv-Worldpay and just really focused on the FIS-Worldpay going forward*.

178. Unsurprisingly, the market reacted very favorably to this news, with FIS's share price closing at roughly $147 per share following this earnings call. For instance, in an Argus analyst report issued on August 4, 2020, the analyst explained:

> FIS shares have traded between $92 and $158 over the past year, and are currently near the high end of that range. We believe that the shares offer value in the mid-$140s. *We look for multiple expansion driven by substantial margin improvement as benefits from the Worldpay integration become apparent*.

179. A Wolfe analyst report issued the same day parroted Defendants' assertions that Fidelity National was "well ahead of schedule and on track to meet or exceed revenue and cost synergy targets for both 2020 and 2022" and likewise declared:

> We continue to see shares of FIS as compelling given our view that a strong pipeline, synergy upside and accelerating top line growth bolstered by investment into sales, deployment capabilities, and technology should drive shares and stock's multiple higher. We believe there is significant merit to the Worldpay acquisition[.]

180.   And a William Blair analyst also issued a report that day confirming what the market understood based on Defendants' false and misleading statements; namely: "***We believe the integration of Worldpay is going well***."

181.   Just two days later, on August 6, 2020, the first of a total of three separate vestings under the Worldpay Integration Incentive Plan occurred. Specifically, 50% of the PSUs available under the Incentive Plan vested at the maximum amount of 200% as a result of Defendants' achievement of targeted expense synergies purportedly evidencing the resounding success of FIS's efforts to integrate Worldpay.   Accordingly, Norcross was granted 65,982 PSUs worth approximately $9.7 million based on the value of FIS's common stock that day, Woodall was granted 43,986 PSUs worth approximately $6.5 million, and Ferris was granted 43,986 PSUs worth approximately $6.5 million.

### v.   The September 9, 2020 Investor Conference Call

182.   On September 9, 2020, Fidelity National held a conference with investors during which Defendants Norcross and Woodall further touted the financial benefits FIS was experiencing as a result of purportedly successfully integrating Worldpay.   Additionally, when a KeyBanc analyst noted, "I think initially, you had outlined $500 million of revenue synergies and $400 million of cost synergies, and you're tracking well ahead, I think, almost a full 2 years ahead,"

Norcross brazenly replied, "*This has been the easiest integration we've done to date*" which "just allowed us to really accelerate our synergies."

vi.   The Third Quarter of 2020

183.   On October 29, 2020, during Fidelity National's earnings call with investors announcing financial results for the third quarter of 2020, Defendant Woodall falsely touted that FIS's integration of Worldpay was now more than two years ahead of schedule, stating: "Touching on our Worldpay integration. *We are more than 2 years ahead of schedule*. We have achieved $150 million in revenue synergies[.]"

184.   On December 9, 2020, Defendants Norcross and Woodall participated in a conference call with investors hosted by Barclays. During that conference, after noting that it had been more than a year since the closing of the Worldpay acquisition, the analyst asked those Defendants to "[w]alk us through sort of your broad assessment of the integration thus far. What surprised you in terms of is it easier or more difficult than you imagine?" In response, Defendant Norcross described the purported success of Fidelity National's integration efforts, claiming among other things that "honestly, the good news is, I think, we've had more pleasant surprises than negative" and "we've really hit the cover off the ball." Commenting further on the success of the Company's integration activities, Norcross also represented:

84

When I look at all the attributes around the Worldpay integration, I would say from an internal focus of culture alignment, team alignment, execution on our operating synergies, viewpoint into where we are on revenue, I think we feel very, very good. ***In fact, in many ways, I would tell you the integration is pretty well behind us at this point in time***. It's been a much faster process than our other wins, but some of our other acquisitions were more of a turnaround.

Some of our other acquisitions needed to be fixed, and this was not [that] situation.

### 3.  Defendants Made False and Misleading Statements in 2021

i.   <u>Press Release Announcing New Share Buyback Program</u>

185.   On February 1, 2021, Fidelity National issued a press release, titled "FIS Board of Directors Approves Share Repurchase Program and Dividend Increase[,]" in which Fidelity National announced it would reinstate the share buyback program it had halted nearly two years before upon the March 18, 2019 announcement of Fidelity National's acquisition of Worldpay.  Defendant Norcross falsely represented:

> ***We believe that FIS shares are trading well below intrinsic value and that repurchasing shares of FIS is a good use of capital at this time. Our strong business fundamentals and robust free cash flow enable us to continue investing for growth, both organically and through M&A, while continuing to pay down debt to meet our leverage target and return capital to our shareholders[.]***
>
> ***The Board's decision to approve a new share repurchase program in conjunction with an increase in our quarterly dividend reflects continued confidence in the strength of our financial position, the durability of our business model and the future of FIS***.

ii.   The Fourth Quarter and Full Year of 2020

186.   During the Company's earnings call on February 9, 2021 concerning financial results for the fourth quarter and full year 2020 (the "4Q 2020 Earnings Call"), Norcross once again lauded the "great" and "exceptional" progress Fidelity National allegedly had made integrating Worldpay in 2020, including by claiming: "We also made great progress with the Worldpay integration, remaining well ahead of plan and exited the year generating more than $200 million in revenue synergies and more than $750 million in cost synergies."   Given this purported integration success, Norcross further explained: "When we did the Worldpay combination, we guided to 7% to 9% growth.   And this year, we're going to be in that range.   And obviously, we feel comfortable we can maintain in that range going even into 2022 and beyond with margin expansion based on things we've talked about."

187.   During the 4Q 2020 Earnings Call, Defendant Woodall also attributed Fidelity National's strong financial performance as the impetus for the Company's recent reinstatement of share buybacks, stating:

> Next, share repurchase will continue to be our primary tool for returning excess free cash flow along with a consistent 10% to 15% dividend increase each year.   In the short term, *we believe that FIS shares are trading well below their intrinsic value, creating an opportune time to buy back stock.   We recently announced Board approval to buy back 100 million shares, which represents approximately 16% of our shares outstanding or over $13 billion at current stock price.   The Board's decision to approve this program reflects continued confidence in the strength of our financial position and the durability of our business model*.

188.   On February 18, 2021, Fidelity National filed its Form 10-K for 2020 with the SEC (the "2020 10-K").[28]   In the 2020 10-K, Defendants made false and misleading statements, including that "[t]he Worldpay acquisition brought an integrated technology platform" and that the integration "remains on track," representing:

> ***As of the end of 2020, our achievement of revenue synergies remains on track to meet or exceed our current targets*** driven by successful cross-sell of our heritage Premium Payback solution into heritage Worldpay clients and by leveraging our heritage Worldpay sales and distribution teams, expanding on our existing relationships with financial institutions to establish merchant referral agreements and optimizing our network routing capabilities.   ***We have also exceeded our original target for expense synergies, as we have successfully integrated organizational structures***, reduced corporate overhead and achieved cost savings within our operating environment, and expect to continue to achieve additional expense synergies during 2021.

### iii.   The March 22, 2021 Investor Conference Call

189.   During a Company conference call with investors on March 22, 2021, Defendants touted Fidelity's integration of Worldpay as "well ahead of process" and "***the best integration we've ever done as a company***."   Specifically, in response to the analyst noting that FIS had "obviously been executing quite well against the original revenue and cost synergy plans on Worldpay," Defendant Norcross concurred with this assessment and further proclaimed:

---

[28] The 2020 10-K was signed by Defendants Norcross, Woodall, Adrean, Alemany, Goldstein, Hook, Hughes, Lauer, Parent, Shea, Stallings, and Stiefler.

*So really from an integration standpoint, there's really no metric that you can't point to, to say this is really the best combination or the best integration we've ever done as a company.* Of course, the operating expense side doesn't tout all the interest savings that we've highlighted. And obviously, that's significant on top of that. *But the fundamentals of putting the 2 companies together really has exceeded our expectations at this point.  We're well ahead of process.*

190. Moreover, during this call, when the analyst inquired specifically about FIS's Merchant Solutions segment, stating "I know that you're guiding mid- to high teens revenue growth for 2021.  I would love to just hear about some of the embedded assumptions underlying that outlook," Norcross replied: "Our cross-sell wins have been very strong coming out of the Worldpay integration.  So all of that was baked into our accelerating revenue growth."

### iv.   FIS's Annual Proxy Statement for 2021

191. On April 9, 2021, Director Defendants Adrean, Alemany, Goldstein, Hook, Hughes, Lauer, Norcross, Parent, Shea, Stallings, and Stiefler caused Fidelity National to file the 2021 Proxy in connection with the 2021 annual stockholders meeting.  The 2021 Proxy states that "[t]he enclosed proxy is solicited by the Board . . . for use at the Annual Meeting of Shareholders to be held on May 19, 2021[.]" In the 2021 Proxy, these Defendants solicited stockholder votes to, among other things, re-elect themselves to the Board.  With respect to these solicited votes, these Defendants issued materially false or misleading statements.

192.   For instance, the 2021 Proxy represented that "[t]he foundation of both the Company's success and long-term growth strategy includes the following pillars," one of which was "invest[ing] in organic growth through internal software development as well as through acquisitions[.]"  The 2021 Proxy further stated that *"[t]he collective skills and experience of our directors are broad and supports each of the pillars of our long-term growth strategy."*

193.   The 2021 Proxy also included a chart identifying the pertinent areas of expertise for each director nominee, which depicted 8 of those 9 directors as having expertise in "Mergers and Acquisitions."[29]   And significantly, these Defendants highlighted the successful integration of Worldpay in 2020 as the primary basis for their election to the Board in 2021, stating:

> *In 2020, FIS successfully integrated Worldpay, the most significant acquisition in the history of our company*, empowering FIS to transform the way the world pays, banks and invests.  As of December 31, 2020, revenue synergies exceeded $200 million and cost synergies exceeded $750 million, including over $400 million in operating expense savings.

194.   With regard to awarding performance-based executive compensation pursuant to the Worldpay Integration Incentive Plan, the 2021 Proxy disclosed that

---

[29] Specifically, each of Director Defendants Alemany, Goldstein, Hook, Lauer, Norcross, Parent, Shea, Stallings, and Stiefler were identified as having expertise in mergers and acquisitions.  Moreover, with respect to Director Defendant Goldstein, the 2021 Proxy stated that "Mr. Goldstein's qualifications to serve on the FIS Board include his extensive experience in mergers and acquisitions[.]"

the Board only "received approval from 46% of the shares voted at our 2020 shareholders' meeting.  This low vote was largely due to concerns with a one-time Worldpay Integration Incentive Program."   Specifically, with regard to that Incentive Plan, Fidelity's shareholders had previously raised concerns "including the quantum of the awards, early payout opportunities, structure of the awards and potential future use of such programs."

195.   Notwithstanding their receipt of this clear, negative feedback from Fidelity National's shareholders, however, in the 2021 Proxy these Director Defendants falsely promised the "use of rigorous incremental goals designed to drive shareholder value in order to receive a payout under the plan," and misled FIS shareholders into believing that the Worldpay integration had been proceeding successfully by representing:

> ***2019 One-Time Special Compensation Program: Worldpay Integration Incentive Plan***
>
> In July 2019, the Compensation Committee approved a one-time integration incentive plan in anticipation of the closing of the Company's acquisition of Worldpay.  On August 8, 2019, participants (other than Mr. Ramji) in the Worldpay Integration Incentive Plan were ***granted PSUs with an opportunity to vest based on the achievement of stated threshold, target and maximum revenue and expense synergy goals.***
>
> * * *
>
> ***The Worldpay Integration Incentive Plan has been highly successful in driving the attainment of revenue and cost synergies, which results in direct shareholder value creation.***  As of the first measurement date

of June 30, 2020, the Company achieved $109 million of actual revenue synergies and $686 million of actual expense synergies. *As a result, in accordance with the terms of the Worldpay Integration Incentive Plan, the Compensation Committee approved vesting of fifty percent (50%) of the PSUs at two hundred percent (200%) of the target amount for exceeding the expense synergy goal*. There was no vesting of the revenue synergy goal in 2020.

196.   Moreover, as regards Board oversight, the 2021 Proxy stated:

**Board oversight**

*Our Board is responsible for the oversight of the business and affairs of our Company. In carrying out this responsibility, the Board oversees the long-term strategy of our Company and advises our senior management to help drive long-term value creation for our shareholders*.   Our Board is highly engaged and receives regular updates on a wide variety of matters affecting our Company.

197.   And, with respect to the Board's role in risk oversight, the 2021 Proxy claimed:

**Risk oversight**

*The Board, acting directly and through its committees, is actively involved in oversight of risks inherent in the operation of the Company's businesses and the implementation of its strategic plan*.   Management is responsible for the day-to-day assessment, identification, monitoring and decision-making regarding the risks we face.   Our Board and each Committee are primarily responsible for risk oversight in the areas described below.   Each committee of the Board provides periodic reports to the full Board regarding their areas of responsibility and oversight.   *We believe that our Board's active role in risk oversight supports our efforts to manage areas of material risk to the Company*.

198.   Additionally, the 2021 Proxy further claimed that the *"[p]rimary areas of risk oversight*" for the "Full Board" included *oversight of "[r]isks and exposures*

***associated with our business strategy***, financial performance, policy matters, ***[and] acquisitions and divestitures[.]***"

199.   The false 2021 Proxy misled investors.   These Director Defendants were re-elected to the Board based on a false and misleading proxy statement.

v.   <u>The First Quarter of 2021</u>

200.   On May 6, 2021, the Company held an earnings call in which Defendants Norcross and Woodall continued to falsely tout the purported success of the integration of Worldpay, claiming the integration was going so well that FIS was instituting a full year guidance raise.   Defendant Norcross stated: "Our Worldpay revenue synergies are also accelerating through increased cross-selling as well as ramping volumes on prior synergistic sales.   As a result, we are increasing our 2021 and 2022 revenue synergy targets to $600 million and $700 million, respectively."

201.   Defendant Norcross also falsely attributed FIS's impressive revenue growth to Worldpay's purportedly integrated technology platform, stating "[o]bviously, we had some big programs that we had to get completed with the Worldpay integration, the NAP [next-generation acquiring platform] completion and migration is completely behind us," and we "feel really great about what that's going to do as far as accelerating revenue growth in that Merchant channel."

vi.   The Second Quarter of 2021

202.   During FIS's very next earnings call on August 3, 2021, Defendants yet

again instituted a guidance raise largely based on the purported success of Fidelity

National's efforts to integrate Worldpay to date.  In connection with announcing this

back-to-back guidance raise, Defendant Norcross explained: "I mean you're seeing

us succeed our cross-sales and revenue synergies with the Worldpay integration.

We're really pleased on that, with the acceleration[.]"

203.   Defendant Woodall similarly hyped the financial results for the quarter

as "exceeding our expectations" and attributed that success to the Worldpay

integration, explaining:

> *Adjusted EBITDA margin expanded 460 basis points to 44%,*
> *reflecting strong operating leverage and synergy contribution.  As a*
> *result, adjusted EPS increased 40% year-over-year* to $1.61 per share.
> As Gary mentioned, *we had exceptional cross-selling quarter*, driven
> primarily by Premium Payback, issuer processing, merchant referral
> and data analytics win.  *Given our progress and strength of our*
> *pipeline, we are increasing our revenue synergy target for 2021 by*
> *$100 million to exit the year at $700 million on an annualized run*
> *rate basis*.
>
> *Our achievement of cost synergies also continues to be successful,*
> *running further ahead of schedule than we anticipated when we*
> *announced the deal*.  We have more than doubled our initial cost
> synergy target of $400 million and are on track to exit the year with
> approximately $900 million in total annualized savings, including
> approximately $500 million in operating expense synergies.
>
> Turning to balance sheet and cash flow, *we repurchased 2.7 million*
> *shares worth approximately $400 million during the quarter,*
> *bringing share repurchase to a total of $800 million year-to-date at*
> *an average price of $145 a share*.  Our leverage ratio declined to 3.3x,

keeping us on track to end the year below 3x leverage. ***Lastly, we generated free cash flow in excess of $1 billion this quarter, which is the most in our company's history*** and reflects the highly cash-generative nature of our business.

\* \* \*

***Merchant's adjusted EBITDA margin expanded 910 basis points to 50%, primarily reflecting its high contribution margin and synergy benefits***.

\* \* \*

Based on our strong results and favorable outlook, I'm pleased to raise full year guidance. We now anticipate revenue of $13.9 billion to $14 billion for the full year 2021, which represents an increase of $250 million over our prior guidance. This guidance assumes full year revenue growth for Banking in the upper single digits and Capital Markets in the mid-single digits. We now expect Merchant growth to approach 20% this year, ahead of our initial expectations. . . . We're also raising our full year 2021 adjusted EBITDA guidance to $6.125 billion to $6.2 billion and increasing our adjusted EPS guidance to $6.45 to $6.60 per share.

204.   During this same call, Norcross attributed these outstanding financial results to successful and productive integration efforts and specifically explained: "It was cross-sells to existing customers of new product capabilities we're delivering to market or cross-selling existing products and then revenue synergies across the Worldpay integration efforts. So couldn't be more pleased with our sales channel." And Woodall similarly represented to investors: "Strong new sales and cross-selling activity drove our backlog above $22 billion and increased our revenue synergy attainment by 50% in just 1 quarter, which will continue to drive future growth into 2022 and beyond."

205.   Finally, Norcross concluded the call by informing investors that, given this cross-selling success, "We expect [the Merchant Solutions] segment in the coming years *to be a consistent double-digit performer on organic growth*, which used to perform below that historically."

206.   The market reacted favorably to this news, with FIS's share price closing at roughly $130 following this earnings call.  On August 3, 2021, for example, an analyst from Jefferies published a report in which one of the key takeaways stated, "EPS ~4% above Street on ~2% top-line beat with upside primarily from Merchant[.]"  In that same report, the analyst further highlighted: "**Raising Worldpay FY21 run-rate revenue and cost synergies.** Mgmt. expects to deliver ~ $700mn of revenue synergies exiting FY21 ($600mn prior) and $900mn of cost synergies ($500mn prior)."  (Emphasis in original).  And on August 4, 2021, a Citigroup analyst report disclosed, "Our estimates increase due to the quarter beat and solid sale performance.  We are leaving our $175 price target unchanged."

207.   Two days after this earnings call, on August 5, 2021, performance-based executive compensation awards vested under the Worldpay Integration Incentive Plan.  Norcross received 16,497 PSUs, worth approximately $2.1 million, and Woodall received 10,998 PSUs, worth approximately $1.4 million.

vii.   The Third Quarter of 2021

208.   By the time the Company held its next earnings call on November 4, 2021 announcing financial results for the third quarter of 2021, Defendants were already claiming near victory regarding the integration of Worldpay.  For example, Norcross stated during this call that "we look to conclude our Worldpay integration well ahead of schedule" and "the Worldpay integration [is] coming to a close." Norcross further lauded the success Fidelity National purportedly had integrating Worldpay, stating "Our team has a well-established track record of successfully integrating the businesses we acquire, consistently outperforming our synergy targets and driving shareholder value."  And Norcross went on to claim that "*[y]ear-to-date, we have repurchased $2 billion in shares, reflecting our view that FIS currently represents a generational buying opportunity*."

209.   Further underscoring Norcross' "generational buying opportunity" assertion, Defendant Woodall also claimed "as we round out and complete the Worldpay integration.  We are very focused on completing each integration before we move to the next.  So we feel good about where we're at on that integration," and as a result Fidelity National had "*tripled the pace of our share buybacks during the quarter, repurchasing 9 million shares for approximately $1.2 billion*."

210.   Shortly thereafter, during an investor conference call on November 15, 2021, Woodall publicly reiterated "*[w]e're just completing the Worldpay*

*integration work here, just finishing it up*."  And during another investor call just one day later, Norcross yet again declared on November 16, "When you look at where we are on the Worldpay integration, ***we've got really Worldpay predominantly behind us now*** . . . [t]he level of integration and [*sic*]synergies around that are just tremendous because ***we really have fully integrated these companies***."

### 4.  Defendants Made False and Misleading Statements in 2022

#### i.  The Fourth Quarter and Full Year of 2021

211.   During Fidelity National's final earnings call announcing fourth quarter and full year 2021 financial results on February 15, 2022, Defendant Norcross definitively announced that FIS's integration of Worldpay was "successfully complete," trumpeting:

> ***We also successfully completed the Worldpay integration nearly a year ahead of schedule, beating our initial revenue synergy target by 50% and more than doubling our initial expense synergy target***. . . . By any account, this was a record year for FIS and the strongest operating performance in our 53-year history.

212.   And, in the Form 10-K for 2021 that the Company filed with the SEC on February 23, 2022 (the "2021 10-K"),[30] Defendants again reiterated the same, stating:

---

[30] The 2021 10-K was signed by Defendants Norcross, Woodall, Alemany, Goldstein, Hook, Hughes, Lauer, Parent, Shea, Stallings, and Stiefler.

As of the end of 2021, our achievement of revenue synergies from the Worldpay acquisition have exceeded our targets, driven by successful cross-sell of our heritage FIS solutions into heritage Worldpay clients and leveraging our heritage Worldpay sales and distribution teams, expanding on our existing relationships with financial institutions to establish merchant referral agreements and optimizing our network routing capabilities.  We have also exceeded our original target for expense synergies, as ***we have successfully integrated organizational structures, reduced corporate overhead and achieved cost savings within our operating environment***.

ii.   FIS's Annual Proxy Statement for 2022

213.   On April 15, 2022, Director Defendants Alemany, D'Silva, Goldstein, Hook, Hughes, Lamneck, Lauer, Norcross, Parent, Shea, Stallings, and Stiefler caused Fidelity National to file the 2022 Proxy in connection with the 2022 annual stockholders meeting.  In the 2022 Proxy, Defendants stated that "[t]he enclosed proxy is solicited by the Board . . . for use at the Annual Meeting of Shareholders to be held on May 25, 2022[.]"  In the 2022 Proxy, these Director Defendants solicited stockholder votes to, among other things, re-elect themselves to the Board.  With respect to these solicited votes, these Defendants issued materially false or misleading statements.

214.   For instance, the 2022 Proxy represented that "[t]he foundation of both the Company's success and long-term growth strategy includes the following pillars," one of which was "invest[ing] in organic growth through internal software development as well as through acquisitions[.]"  The 2022 Proxy further stated that

*"[t]he collective skills and experience of our directors are broad and support each of the pillars of our long-term growth strategy*."

215.  The 2022 Proxy also included a chart identifying the pertinent areas of expertise for each director nominee, which depicted 11 of those 12 directors as having expertise in "Mergers and Acquisitions."[31]  These Defendants once again explicitly highlighted Fidelity National's successful integration of Worldpay in 2021 as the primary basis for their election to the Board in 2022, stating:

> As of December 31, 2021, we realized revenue synergies from the acquisition of Worldpay, Inc. of approximately $750 million on an annual run-rate basis and expense synergies from the acquisition of Worldpay, Inc. of approximately $900 million on an annual run-rate basis, including approximately $500 million of operating expense savings.

216.  Along the same lines, the 2022 Proxy further represented that "***the Company's operational performance remains on track to approximate its three-year revenue and EBITDA targets that were announced in 2019 at the time of the Worldpay, Inc. acquisition.***"

217.  Moreover, as regards Board oversight, the 2022 Proxy stated:

---

[31] Specifically, each of Director Defendants Alemany, Goldstein, Hook, Hughes, Lamneck, Lauer, Norcross, Parent, Shea, Stallings, and Stiefler were identified as having expertise in mergers and acquisitions.  Moreover, with respect to Director Defendant Goldstein, the 2022 Proxy stated that "Mr. Goldstein's qualifications to serve on the FIS Board include his extensive experience in mergers and acquisitions[.]"

**Board oversight**

***Our Board is responsible for the oversight of the business and affairs of our Company. In carrying out this responsibility, the Board oversees the long-term strategy of our Company*** and advises our senior management to help drive long-term value creation for our shareholders. Our Board is highly engaged and receives regular updates on a wide variety of matters affecting our Company[.]

218.   And, with respect to the Board's role in risk oversight, the 2022 Proxy claimed:

**Risk oversight**

***The Board, acting directly and through its committees, is actively involved in oversight of risks inherent in the operation of the Company's businesses and the implementation of its strategic plan.*** Management is responsible for the day-to-day assessment, identification, monitoring and decision-making regarding the risks we face. Our Board and each Committee are primarily responsible for risk oversight in the areas described below. Each committee of the Board provides periodic reports to the full Board regarding their areas of responsibility and oversight. ***We believe that our Board's active role in risk oversight supports our efforts to manage areas of material risk to the Company.***

219.   Additionally, the 2022 Proxy further claimed that the ***"[p]rimary areas of risk oversight***" for the "Board" included ***oversight of "[r]isks and exposures associated with our business strategy***, financial performance, policy matters, ***[and] acquisitions and divestitures[.]***"

220.   Regarding the Worldpay Integration Incentive Plan, in the 2022 Proxy these Director Defendants further misled FIS shareholders into believing that the Worldpay integration had proceeded successfully by representing:

***We believe the Worldpay Integration Incentive Plan has been highly successful in driving the attainment of revenue and cost synergies, which results in direct shareholder value creation.*** As of the second measurement date of June 30, 2021, the Company achieved $445 million of actual revenue synergies and $849 million of actual expense synergies. ***As a result, in accordance with the terms of the Worldpay Integration Incentive Plan, the Compensation Committee approved vesting of fifty percent (50%) of the PSUs at fifty percent (50%) of the target amount for exceeding the threshold revenue synergy goal***. There was no further vesting of the expense synergy goal in 2021, which had previously vested fifty percent (50%) of the PSUs at two hundred percent (200%) of the target amount for exceeding the expense synergy goal.

221.    The 2022 Proxy misled shareholders.  These Director Defendants were re-elected to the Board based on a false and misleading proxy statement.

## 5. In 2022 Executives Start To Flee And Defendants Make False Statements To Cover Up The Reasons For Their Fleeing

222.    Internally, the executives who had falsely touted the benefits and success of the acquisition and integration started to leave while the remaining officers and directors tried to continue to hide the truth.  On August 4, 2022, the Company announced that Woodall was stepping down as CFO.  During the same earnings call, FIS's then President, Ferris reassured shareholders that "***we are hugely successful in terms of driving revenue synergies on the Worldpay transaction***." Ferris also stated that "our Merchant results demonstrate that ***our long-term strategy is working***."  Specifically with regard to Worldpay, Ferris claimed, "***Our strategy for our merchant business is clearly advantaged in the fastest-growing and most***

***strategically important segments of the market***."  In fact, Norcross explained on the call that the Company "resumed share repurchase[s], buying back approximately $300 million in shares" during Q2 2022—indicating to investors that the Company believed its shares were undervalued.

223.   The third and final valuation period for the Worldpay Integration Incentive Plan was the end of September 2022.  Pursuant to that, Norcross received 49,495 PSUs, worth approximately $3 million, and Woodall received 32,998 PSUs, worth approximately $2 million.

224.   On October 18, 2022, the Company announced that Norcross would be stepping down as CEO on December 31, 2022, but that he would stay with the Company as its Executive Chairman of the Board through 2023.  Stephanie Ferris, who, according to the press release "led the integration of Worldpay into FIS, surpassing both revenue and cost synergy commitments," was to be appointed the new CEO.

225.   On November 3, 2022, the Company released disappointing results for the third quarter of 2022, where shareholders began to learn of the failed Worldpay integration and resulting struggles in FIS's Merchant Solutions segment.  During an earnings conference call, Norcross announced that profit margins in the Merchant Solutions business "saw [] continued pressure in the quarter," resulting "in an overall adjusted EBITDA margin contracting 150 points year-on-year."  Norcross explained

"we are not pleased with the profitability performance of the business and are taking actions to address them." In addition, the Company's new CFO, Eric Hoag, explained more specifically that the Company's Merchant Solutions division heavily contributed to the overall margin problems as the segment suffered from a 430 basis-point margin contraction during the quarter to 47.4%. During the call, an analyst pointed out that, for the Merchant Solutions segment's margins, "It was close to 100% incremental margin in both 2020 and 2021. And now this year, it's closer to 0."

226.   Given the poor performance in the Merchant Solutions segment, an analyst questioned whether FIS had thought about divesting Worldpay. In response, Ferris unequivocally stated, "*I believe, strategically, it's really important for these 3 segments to be together on 1 platform. So you're not going to look to see us do any big, large transaction either buy or sell… strategically, we believe, in these assets being together. And why we do is because of the ability for us to cross-sell products across segments.*"   On this news, FIS's stock price dropped $22.29 per share, or over 28% percent, from a closing price of $79.47 per share on November 2, 2022, to a closing price of $57.18 per share on November 3, 2022.

227.   On December 15, 2022, the Company also announced that CEO Norcross would immediately "depart" as CEO and a Board member, effective the

next day, and that he would not be appointed Executive Chairman of the Board as previously announced.

## B.   Defendants' Statements During the Relevant Period Were False and Misleading When Made

228.   As described above, during the Relevant Period, Defendants routinely made statements to Fidelity National shareholders concerning (i) the due diligence conducted on Worldpay and Worldpay's purportedly "integrated technology platform"; (ii) Fidelity National's integration of Worldpay, including that the integration was "on track," "ahead of schedule," "best integration", "easiest integration," "no red flags," and eventually "successfully complete"; (iii) as a result of the successful integration there was "successful" and "exceptional" cross-selling, "cross-sell wins have been very strong", and revenue synergies "have exceeded our targets, driven by successful cross-sell"; and (iv) that the Worldpay Integration Incentive Plan "is accelerating value creation for shareholders" and had been "highly successful" in driving that integration achievement.

229.   Defendants' statements were materially false and misleading.

230.   Defendants' misstatements proclaiming that Worldpay itself had an integrated technology platform were false at the time they were made.  For instance, Defendants lacked any basis in fact to claim that Worldpay had fully integrated its previous acquisitions because they failed to conduct adequate due diligence. Instead, the parties effectively commenced merger negotiations on February 2, 2019,

when they each executed confidentiality agreements, FIS only began conducting due diligence after receiving access to the Worldpay data room housing its confidential documents on March 8, 2019, and the transaction was publicly announced a mere 10 days later.  Indeed, CW 1 corroborates that Defendants failed to conduct sufficient due diligence because they felt FIS needed to respond quickly to its primary competitors' recent enormous growth in scale, and given the rapid turnaround time, "There was no way any or appropriate due diligence could have been carried out."

231.  And, in Worldpay's Form 10-K filed on February 26, 2019—mere weeks before Defendants first falsely lauded Worldpay's "integrated technology platform" on March 18, 2019—Worldpay itself publicly disclosed that the "complexity and magnitude of the integration effort associated with our acquisition of Worldpay Group plc are significant" and the "integration of the departments, systems, business units, operating procedures and information technologies of the two businesses *continue to present certain challenges to management*."  Indeed, as CW 1 aptly stated, Worldpay "wasn't trying to hide" its ongoing efforts to integrate acquired companies from anyone and "there was no reason for FIS not to be aware" that those efforts were not yet complete.

232.  Furthermore, a plethora of CWs attested that Worldpay had never fully integrated the platforms following its prior acquisitions, and that situation persisted following the Merger.  CW 1, for example, represented that Worldpay had acquired

6-7 platforms through its various acquisitions, but never unified those platforms, explaining "Worldpay should have done this centralization, but they never did." CW 2 likewise confirmed that Worldpay never assimilated Paymetric into its database systems or within its SAP configuration. And CW 8 asserted that Defendants' claims about Worldpay being fully integrated were "bullshit" and "completely misleading."

233.   Defendants' statements to investors during the Relevant Period about the purported success of Fidelity National's efforts to integrate Worldpay driven by the Director Defendants' implementation of the Worldpay Integration Incentive Plan also were false at the time they were made. In reality, Fidelity National's efforts to integrate Worldpay were not "on track," "ahead of schedule," "best integration", "easiest integration," "no red flags" or "successfully complete," but instead failed miserably. The Worldpay Integration Incentive Plan had not been "highly successful" in driving attainment of critical integration milestones, but rather incentivized and financially rewarded Defendants' masking of the failing integration of Worldpay.

234.   That FIS was never able to successfully integrate Worldpay is evidenced by, among other things (i) the departure of 8 out of the 9 key Worldpay executive officers who transitioned to FIS following the Merger and shortly thereafter unceremoniously left the Company; (ii) FIS's inability to generate and

sustain the substantial organic revenue growth and increased free cash flow Defendants had claimed the combined Company would benefit from once the integration of the companies was successfully complete; (iii) the total unwinding of the Merger in 2023, and Defendant Ferris's assurance that this divestiture would be "manageable"; and (iv) the massive destruction of Worldpay's business, as evidenced by FIS's write down of ***$24.4 billion*** of value over the course of only three years.

235.   Indeed, while this information was concealed by Defendants throughout the Relevant Period, numerous CWs have confirmed that FIS was, in fact, not able to integrate Worldpay.   For instance, CW 7 represented that Worldpay's antiquated technology presented significant challenges for FIS with respect to both "the build and deployment of the system" and that "antiquated technology was so deeply ingrained that no one could change it."   The loss of knowledge of Worldpay's systems and operations resulting from the vast exodus of Worldpay's executive leadership team only further exacerbated FIS's inability to integrate the companies' technologies.   As a result, as CW 8 disclosed, "There was no integration from admin-type processes from contracts all the way up to acting like one company" so that FIS and Worldpay "were two separate companies the entire time I was there and run with animosity."

236.   CW 8 further explained that for years after the Merger announcement, FIS and Worldpay continued to use separate customer relationship management systems that could not "talk" to each other so "if you wanted to crossover and take advantage of Worldpay's capabilities it was impossible."  She added that this lack of cross selling was "systemic" and frequently openly discussed during Town Hall meetings.  CW 5 similarly stated that her team was never able to cross-sell FIS's products to merchants through the Worldpay brand, and CW 3 concurred, opining, "If 10 people were estimating a sale, 9 would be wrong."  According to CW 5, the failing integration resulted in 30-40% customer attrition on the merchant side of the business, and FIS was "hemorrhaging money from day one."

237.   Defendants' statements to investors during the Relevant Period that there was "successful" and "exceptional" cross-selling, "cross-sell wins have been very strong," and revenue synergies "have exceeded our targets, driven by successful cross-sell" also were false at the time they were made.  In reality, Fidelity National was not achieving cross-selling success, as the Company lacked the systems and support to cross-sell.  For example, CW 8 described that they used separate customer relationship management systems and had no "integration from admin-type processes from contracts all the way up to acting like one company," "there were no procedures and no definition or education on how to sell Worldpay," and there was no idea about pricing or quoting contracts.  CW 8 said that these problems were

raised at company town meetings, with salespeople asking how to even sell the other company's products. CW 3 described that her team was never able to cross sell and that a third of their business was "going out the back door" as a result of different and incompatible sales models. Because cross-selling was not working, CW 3 described three separate reorganizations, which each took 9 to 12 months. CW 5 described 30% to 40% client attrition from the merchant segment being discussed at sales summits.

238. Thus, Defendants' statements were materially false and misleading, causing the price of FIS common stock to be artificially inflated throughout the Relevant Period.

## C.   In Repurchasing Stock, Fidelity Relied on Defendants' False and Misleading Statements

239. Defendants' misstatements caused the Company to purchase billions of dollars of its stock in order to inflate Fidelity National's stock price, including for the Individual Defendants' personal gain.

240. In repurchasing shares in connection with the stock repurchase program, Fidelity National relied on Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

241.   Throughout the Relevant Period, Fidelity National justifiably expected Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC.  Fidelity National would not have repurchased its securities at artificially inflated prices had Defendants disclosed all material information then known to them, as detailed in this Complaint.  Thus, reliance by Fidelity National should be presumed with respect to Defendants' omissions of material information as established under the *Affiliated Ute* presumption of reliance.

242.   Additionally, the "fraud on the market" presumption applies to Defendants' misstatements of material fact or failures to disclose material facts.

243.   At all relevant times, the market for Fidelity National's common stock was efficient, for the following reasons, among others:

- Fidelity National's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

- As a regulated issuer, Fidelity National filed periodic reports with the SEC and the NYSE;

- Fidelity National's common-stock trading volume was substantial on a daily basis, exceeding an average of over 4.25 million shares per day throughout the Relevant Period;

- Fidelity National regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Fidelity National was followed by numerous securities analysts employed by major brokerage firms, who wrote reports that were distributed to those brokerage firms' sales force and certain customers, and each of those reports was publicly available and entered the public marketplace; and

- The market price of Fidelity National's stock reacted rapidly to new information entering the market.

244.   As a result of the foregoing, the market for Fidelity National's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Fidelity National's stock.  The foregoing facts indicate the existence of an efficient market for trading of Fidelity National stock and support application of the fraud-on-the-market doctrine.

245.   Fidelity National relied on the integrity of the market price for the repurchase of its stock and is entitled to a presumption of reliance with respect to Defendants' misstatements and omissions alleged in this Complaint.

246.   Had Fidelity National known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, the Company would not have repurchased Fidelity National stock at artificially inflated prices.

### D.   Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrine Applies to Defendants' Misrepresentations

247.   Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances applies to any of the false or misleading statements pleaded in this Complaint.  None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the due diligence Defendants had conducted on Worldpay and the progress Fidelity National had made integrating Worldpay with the Company, among other things.

248.   Alternatively, to the extent any of the false or misleading statements pleaded in this Complaint could be construed as forward-looking statements, they

were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded in this Complaint, Defendants are liable for those false or misleading statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Fidelity National or a Defendant who knew the statement was materially false or misleading when made.

### E.   The Group Pleading Doctrine Applies to Defendants' Misstatements and Omissions

249.   While this Complaint identifies Defendant signatories or speakers with respect to the false or misleading statements identified above (*see* Section VI.A, *supra*), the group pleading doctrine also applies to render Defendants responsible for statements as to which they are not explicitly identified as the speaker or signatory.  Defendants participated in the drafting, preparation, or approval of the various shareholder and investor reports and other communications concerning Fidelity National identified in this Complaint, and were aware of or recklessly disregarded the misstatements contained in those reports and other communications as well as the omissions from them, and were aware of their materially false and misleading nature.  Each Defendant, by virtue of his or her position(s) at Fidelity

National, had access to adverse undisclosed information about the Company's failed integration of Worldpay as alleged in this Complaint, and knew or recklessly disregarded that those adverse facts rendered the subject statements materially false or misleading when made.

250. Defendants, because of their positions of control and authority as officers or directors of Fidelity National, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Relevant Period. Each Defendant was provided with copies of the documents alleged in this Complaint to be false or misleading prior to or shortly after their issuance, or had the ability or opportunity to prevent their issuance or to cause them to be corrected. Accordingly, each Defendant is responsible for the accuracy of the public reports, releases, and other statements detailed in this Complaint and is therefore primarily liable for the misrepresentations in them or misleading omissions from them.

### F.   Defendants' Misstatements and Omissions Caused Damages to Fidelity National

251. Throughout the Relevant Period, the price of Fidelity National's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above. Defendants engaged in a scheme to deceive the market and a course of conduct that operated as a fraud or deceit on Fidelity National, which repurchased shares at artificially inflated prices.

When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Fidelity National stock fell as the prior artificial inflation dissipated. As a result of its purchases of Fidelity National shares during the Relevant Period, the Company suffered damages under the federal securities laws.

252. Defendants' disclosures beginning on August 3, 2022 revealed to the market the false and misleading nature of Defendants' statements and omissions. On August 4, 2022, FIS released its second quarter 2022 operating results, disclosing a 2.8% year over year decline in its Merchant Solutions business, and further announced the retirement of Defendant Woodall as CFO. In response, FIS's share price declined 7.3%. On November 3, 2022, FIS released its third quarter 2022 operating results, disclosing a 4.3% year over year decline in its Merchant Solutions business, a 1% decline in its net earnings compared to the prior year period, and a reduction in earning guidance. In response, FIS's share price fell an astonishing 28%. Then on February 13, 2023, FIS announced the planned spinoff of Worldpay—essentially reversing the Merger—together with a massive $17.6 billion non-cash goodwill impairment charge related to the Merchant Solutions business. The same day, FIS also issued a forecast for 2023 that missed the lowest of analyst estimates, with revenue guidance for the Merchant Solutions business projected to decline 2-4%. In response, FIS's share price fell 12.5%. Between the closing date

of the Merger on July 31, 2019, when FIS's shares closed at $133.25, and the date the sale of 55% of Worldpay was announced, July 6, 2023, when FIS's shares closed at $59.09, the Company's market cap fell over *$46 billion*. Collectively, the earnings press releases and related disclosures revealed that the Merger was a total failure, with the planned spinoff confirming that FIS was never able to properly integrate Worldpay into the Company.

253. For instance, after digesting the unexpected negative financial news that FIS disclosed on November 3, 2022, Oppenheimer downgraded Fidelity National later that same day, noting that the Merchant Solution segment's "slower than market peer growth likely reignites market share loss conversations," and explaining: "**Why Downgrading:** FIS is going through a transition which takes time." Oppenheimer's analyst report further stated that "[c]ontinued missed expectations and company transition leaves us on the sidelines." And in a November 3, 2022 analyst report by Raymond James, titled "Holy Kitchen Sink," the analyst lamented that Defendants' coming-clean disclosure was a "much-needed step in the right direction as the EBITDA margin is expected to compress ~140 bps in FY22 and forward revenue comments were lackluster at best" and that "patience will no doubt be required as restoring credibility will likely take multiple quarters." This Raymond James analyst further succinctly noted: "Simply put, the guide was well below even the most bearish of investor expectations." A third analyst report issued

by UBS the same day also reached the conclusion that FIS must be having structural issues, stating: "While we were expecting some form of medium-term guidance reset, we were still anticipating to hear about a path back to high single digits for Merchant Solutions, which did not occur, *leading some investors to wonder if there may be structural problems*."

254.    Additionally, a Jefferies' analyst report issued after the Worldpay spin-off announcement on February 13, 2023, declared that FIS's "FY23 outlook fell well short of what were already muted expectations as *structural challenges in Merchant become more pronounced*."  And, an analyst report issued by William Blair the same day noted that FIS had determined to spin-off Worldpay "[f]ollowing new leadership and a strategic review that was launched late in 2022," that "the spin essentially reverses the $48 billion acquisition of Worldpay (closed July 2019)" and that as a result *"[n]ew leadership at FIS has a lot to prove* and internal execution remains key."  A report issued by Deutsche Bank the same day likewise noted that "all focus was on the announcement of a spinoff of the Merchant business, *in effect reversing the merger joining FIS and Worldpay in 2019*" and that "FIS' challenges were underscored by FY23 guidance (incl. Merchant) well below expectations[.]" Finally, an analyst from Credit Suisse issued a report on February 14, 2023, downgrading Fidelity National to Neutral, among other reasons, because the "Merchant segment's revenue growth is expected to turn negative in FY 2023" and

"*re-establishing a track record of delivering on its guidance will likely be required* before shares see meaningful multiple expansion."

255.  The dramatic decline in Fidelity National's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to the market.  The timing and magnitude of the decline in the Company's share price negates any inference that the losses suffered by Fidelity National were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

### G.   Defendants Norcross, Woodall, and Ferris Unlawfully Profited at Fidelity National's Expense by Selling Shares While in Possession of Non-Public Information

256.  Defendants Norcross, Woodall, and Ferris took advantage of the artificial inflation in FIS's share price caused by Defendants' false and misleading statements.  These Defendants collectively sold or otherwise disposed of millions of dollars' worth of FIS stock during that time, all while in the possession of material, non-public information.  The Company's share price was also lifted during this time by the share repurchase program, which was approved by the Defendants when they knew or recklessly disregarded that the diligence process for the Merger was inadequate and that the integration of Worldpay was a failure.

257.  As detailed in the chart below, from February 2020 through September 2022, Norcross, through the exercise of options, sold or otherwise disposed of over

1.3 million shares of FIS common stock.  The net proceeds of these sales, after accounting for the disposition of shares used to pay for the exercise of the options, totaled over ***$93.5 million***.   Based on his role as Fidelity National's CEO during this time, Norcross possessed material non-public information about (i) FIS's lack of due diligence prior to the closing of the Merger, and (ii) FIS's failure to integrate Worldpay.   Nevertheless, motivated by this information, he traded on this information at inflated prices, netting over $93.5 million.

| Sale Date | Shares Sold | Sale Price | Gross Proceeds | Exercise Price of Stock Options | Proceeds Net of Exercise Price of Stock Options |
|---|---|---|---|---|---|
| 02/20/20 | 11,450 | $153.66 | $1,759,441 | $48.75 | $1,201,254 |
| 02/20/20 | 33,374 | $154.69 | $5,162,657 | $48.75 | $3,535,675 |
| 02/20/20 | 9,163 | $155.63 | $1,426,010 | $48.75 | $979,314 |
| 02/20/20 | 53,394 | $156.92 | $8,378,853 | $48.75 | $5,775,896 |
| 02/20/20 | 7,619 | $157.19 | $1,197,631 | $48.75 | $826,205 |
| 02/21/20 | 46,855 | $154.27 | $7,228,368 | $48.75 | $4,944,187 |
| 02/21/20 | 65,945 | $155.10 | $10,227,740 | $48.75 | $7,012,921 |
| 02/21/20 | 2,200 | $156.04 | $343,284 | $48.75 | $236,034 |
| 02/24/20 | 7,554 | $150.69 | $1,138,305 | $48.75 | $770,048 |
| 02/24/20 | 13,762 | $151.53 | $2,085,315 | $48.75 | $1,414,418 |
| 02/24/20 | 3,137 | $152.15 | $477,282 | $48.75 | $324,353 |
| 02/24/20 | 29,330 | $150.69 | $4,419,884 | $58.23 | $2,711,998 |
| 02/24/20 | 49,345 | $151.54 | $7,477,643 | $58.23 | $4,604,284 |
| 02/24/20 | 11,872 | $152.14 | $1,806,254 | $58.23 | $1,114,947 |
| 02/25/20 | 15,462 | $145.05 | $2,242,779 | $58.23 | $1,342,427 |
| 02/25/20 | 7,190 | $145.91 | $1,049,064 | $58.23 | $630,390 |
| 02/25/20 | 3,450 | $147.12 | $507,571 | $58.23 | $306,678 |
| 02/25/20 | 4,100 | $148.05 | $606,989 | $58.23 | $368,246 |
| 02/25/20 | 15,440 | $149.15 | $2,302,799 | $58.23 | $1,403,728 |
| 02/25/20 | 8,311 | $150.05 | $1,247,024 | $58.23 | $763,074 |
| 02/25/20 | 5,500 | $150.84 | $829,598 | $58.23 | $509,333 |
| 03/01/21 | 69,360 | $140.33 | $9,733,219 | $58.23 | $5,694,386 |
| 03/01/21 | 100 | $141.05 | $14,105 | $58.23 | $8,282 |

| Sale Date | Shares Sold | Sale Price | Gross Proceeds | Exercise Price of Stock Options | Proceeds Net of Exercise Price of Stock Options |
|---|---|---|---|---|---|
| 03/02/21 | 9,671 | $140.01 | $1,354,037 | $58.23 | $790,895 |
| 03/05/21 | 43,495 | $140.51 | $6,111,395 | $58.23 | $3,578,681 |
| 03/05/21 | 61,505 | $141.34 | $8,692,871 | $58.23 | $5,111,435 |
| 03/08/21 | 7,840 | $142.28 | $1,115,475 | $58.23 | $658,952 |
| 03/08/21 | 10,499 | $143.31 | $1,504,570 | $58.23 | $893,213 |
| 03/08/21 | 50,237 | $144.57 | $7,262,864 | $58.23 | $4,337,563 |
| 03/08/21 | 26,200 | $145.23 | $3,805,078 | $58.23 | $2,279,452 |
| 03/08/21 | 10,224 | $146.35 | $1,496,303 | $58.23 | $900,959 |
| 03/09/21 | 25,384 | $143.28 | $3,636,893 | $58.23 | $2,158,783 |
| 03/09/21 | 17,827 | $144.53 | $2,576,554 | $58.23 | $1,538,488 |
| 03/09/21 | 51,092 | $145.63 | $7,440,528 | $58.23 | $4,465,441 |
| 03/09/21 | 10,697 | $146.13 | $1,563,121 | $58.23 | $940,235 |
| 03/10/21 | 5,833 | $142.52 | $831,313 | $58.23 | $491,657 |
| 03/10/21 | 10,263 | $143.48 | $1,472,525 | $58.23 | $874,911 |
| 03/10/21 | 5,490 | $144.54 | $793,525 | $58.23 | $473,842 |
| 03/10/21 | 3,774 | $145.26 | $548,230 | $58.23 | $328,470 |
| 12/27/21 | 5,920 | $107.30 | $635,222 | $63.61 | $258,651 |
| 12/27/21 | 97,434 | $108.04 | $10,526,574 | $63.61 | $4,328,797 |
| 12/27/21 | 1,646 | $108.79 | $179,067 | $63.61 | $74,365 |
| 12/28/21 | 3,700 | $108.43 | $401,180 | $63.61 | $165,823 |
| 12/28/21 | 91,824 | $109.63 | $10,067,124 | $63.61 | $4,226,199 |
| 12/28/21 | 9,476 | $110.35 | $1,045,667 | $63.61 | $442,899 |
| 12/29/21 | 20,061 | $109.06 | $2,187,853 | $63.61 | $911,773 |
| 09/07/22 | 26,069 | $89.27 | $2,327,180 | $66.18 | $601,934 |
| 09/07/22 | 29,038 | $90.00 | $2,613,507 | $66.18 | $691,772 |
| 09/07/22 | 24,893 | $90.99 | $2,265,014 | $66.18 | $617,595 |
| 09/08/22 | 44,043 | $89.43 | $3,938,854 | $66.18 | $1,024,088 |
| 09/08/22 | 35,857 | $90.08 | $3,229,963 | $66.18 | $856,947 |
| 09/08/22 | 100 | $90.72 | $9,072 | $66.18 | $2,454 |
| 09/09/22 | 18,945 | $90.02 | $1,705,353 | $66.18 | $451,573 |
| 09/09/22 | 42,412 | $90.99 | $3,859,238 | $66.18 | $1,052,412 |
| 09/09/22 | 18,643 | $91.55 | $1,706,729 | $66.18 | $472,935 |
| 09/12/22 | 5,364 | $92.89 | $498,267 | $66.18 | $143,277 |
| 09/12/22 | 34,039 | $93.25 | $3,174,103 | $66.18 | $921,402 |
| **Total** | **1,333,408** | | **$172,237,064** | | **$93,545,949** |

258. As detailed in the chart below, from September 2019 through September 2022, Woodall, through the exercise of options, sold or otherwise disposed of almost 300,000 shares of FIS common stock.  The net proceeds of these sales, after accounting for the disposition of shares used to pay for the exercise of the options, totaled over ***$17.3 million***.   Based on his role as Fidelity National's CFO during this time, Woodall possessed material non-public information about (i) FIS's lack of due diligence prior to the closing of the Merger, and (ii) FIS's failure to integrate Worldpay.  Motivated by this information, he traded on this information at inflated prices, netting over $17.3 million.

| Sale Date | Shares Sold | Sale Price | Gross Proceeds | Exercise Price of Stock Options | Proceeds Net of Exercise Price of Stock Options |
|---|---|---|---|---|---|
| 09/12/19 | 65,875 | $133.61 | $8,801,559 | $58.23 | $4,965,658 |
| 09/12/19 | 34,624 | $134.04 | $4,640,897 | $58.23 | $2,624,741 |
| 09/13/19 | 50,111 | $130.95 | $6,561,835 | $58.23 | $3,643,871 |
| 09/13/19 | 42,469 | $132.16 | $5,612,873 | $58.23 | $3,139,903 |
| 09/13/19 | 7,918 | $132.65 | $1,050,291 | $58.23 | $589,226 |
| 09/07/22 | 26,059 | $89.28 | $2,326,417 | $66.18 | $601,832 |
| 09/07/22 | 29,500 | $90.01 | $2,655,354 | $66.18 | $703,044 |
| 09/07/22 | 24,441 | $91.00 | $2,224,058 | $66.18 | $606,553 |
| 09/08/22 | 10,929 | $89.45 | $977,610 | $66.18 | $254,329 |
| 09/08/22 | 7,684 | $90.12 | $692,459 | $66.18 | $183,932 |
| **Total** | **299,610** | | **$35,543,353** | | **$17,313,089** |

259. As detailed in the chart below, from September 2019 through September 2020, Ferris sold or otherwise disposed of over 130,000 shares of FIS common stock.  The net proceeds of these sales, after accounting for the disposition

of shares used to pay for the exercise of the options, totaled over ***$13.4 million***. Based on her position as CFO of Worldpay prior to the Merger and her position as Fidelity National's Chief Operating Officer following the Merger, Ferris possessed material non-public information about (i) FIS's lack of due diligence prior to the closing of the Merger, and (ii) FIS's failure to integrate Worldpay. Nevertheless, motivated by this information, she traded on this information at inflated prices, netting over $13.4 million.

| Sale Date | Shares Sold | Sale Price | Gross Proceeds | Exercise Price of Stock Options | Proceeds Net of Exercise Price of Stock Options |
|---|---|---|---|---|---|
| 09/09/19 | 7,752 | $133.46 | $1,034,559 | $21.74 | $866,030 |
| 09/09/19 | 7,887 | $133.46 | $1,052,575 | $30.72 | $810,287 |
| 09/09/19 | 3,248 | $134.51 | $436,885 | $30.72 | $337,107 |
| 09/09/19 | 15,867 | $134.51 | $2,134,254 | $0.00 | $2,134,254 |
| 09/09/19 | 2,687 | $135.14 | $363,129 | $0.00 | $363,129 |
| 09/09/19 | 2,821 | $136.57 | $385,250 | $0.00 | $385,250 |
| 09/09/19 | 593 | $137.51 | $81,545 | $0.00 | $81,545 |
| 02/18/20 | 200 | $152.43 | $30,486 | $36.74 | $23,138 |
| 02/18/20 | 6,920 | $155.22 | $1,074,115 | $36.74 | $819,874 |
| 02/18/20 | 5,687 | $155.69 | $885,420 | $36.74 | $676,480 |
| 02/18/20 | 50 | $151.83 | $7,592 | $49.52 | $5,116 |
| 02/18/20 | 100 | $153.25 | $15,325 | $49.52 | $10,373 |
| 02/18/20 | 2,100 | $155.27 | $326,067 | $49.52 | $222,075 |
| 02/18/20 | 1,342 | $155.76 | $209,030 | $49.52 | $142,574 |
| 02/18/20 | 36 | $157.45 | $5,668 | $49.52 | $3,885 |
| 02/18/20 | 200 | $153.16 | $30,631 | $63.71 | $17,889 |
| 02/18/20 | 5,903 | $155.24 | $916,358 | $63.71 | $540,278 |
| 02/18/20 | 4,911 | $155.70 | $764,653 | $63.71 | $451,773 |
| 02/18/20 | 100 | $152.04 | $15,204 | $96.76 | $5,528 |
| 02/18/20 | 3,600 | $155.23 | $558,810 | $96.76 | $210,474 |
| 02/18/20 | 2,882 | $155.70 | $448,725 | $96.76 | $169,863 |
| 02/18/20 | 200 | $153.07 | $30,614 | $0.00 | $30,614 |
| 02/18/20 | 6,707 | $155.27 | $1,041,409 | $0.00 | $1,041,409 |

| Sale Date | Shares Sold | Sale Price | Gross Proceeds | Exercise Price of Stock Options | Proceeds Net of Exercise Price of Stock Options |
|---|---|---|---|---|---|
| 02/18/20 | 3,621 | $155.74 | $563,931 | $0.00 | $563,931 |
| 02/18/20 | 100 | $152.04 | $15,204 | $0.00 | $15,204 |
| 02/18/20 | 3,797 | $155.21 | $589,332 | $0.00 | $589,332 |
| 02/18/20 | 2,978 | $155.71 | $463,698 | $0.00 | $463,698 |
| 02/18/20 | 1,053 | $155.37 | $163,608 | $0.00 | $163,608 |
| 02/18/20 | 60 | $155.93 | $9,356 | $0.00 | $9,356 |
| 02/19/20 | 364 | $156.55 | $56,984 | $0.00 | $56,984 |
| 02/25/20 | 315 | $151.05 | $47,581 | $0.00 | $47,581 |
| 03/02/20 | 6,582 | $140.00 | $921,480 | $96.76 | $284,606 |
| 03/03/20 | 14,223 | $148.70 | $2,114,960 | $81.26 | $959,199 |
| 05/18/20 | 2,443 | $135.05 | $329,927 | $0.00 | $329,927 |
| 06/01/20 | 6,582 | $138.91 | $914,306 | $96.76 | $277,432 |
| 08/11/20 | 109 | $146.42 | $15,960 | $0.00 | $15,960 |
| 09/01/20 | 6,583 | $150.75 | $992,387 | $96.76 | $355,416 |
| **Total** | **130,603** | | **$19,047,018** | | **$13,481,178** |

260. These stock sales and dispositions are particularly unusual when compared to Ferris's stock sales when she was an executive at Worldpay. Between February 2018 (when she first began publicly reporting her insider stock transactions to the SEC) and the close of the Merger, Ferris sold or disposed of just 8,221 shares (excluding Worldpay stock that was converted to cash in connection with the Merger). By comparison, in a less than one year period following the Merger, Ferris sold or disposed of over 130,000 shares of FIS. The amount of these sales is suspicious in light of her material non-public information, especially compared to her prior Worldpay stock sales.

## VII.  **DAMAGES TO FIDELITY NATIONAL**

261.  Fidelity National suffered substantial damages as a result of the Defendants' breaches of fiduciary duties and violations of law.  The damages include but are not limited to the following:

A.     Fidelity National wrote down the value of Worldpay by $24.4 billion.

B.     The price of Fidelity National stock was artificially inflated due to the false and misleading statements.  With the disclosure of the true condition of Worldpay and the failure of the integration, the artificial inflation was taken out of the stock price.  On the closing date of the Merger, July 31, 2019, FIS's shares traded at $133.25, with the stock trading at a high of $155.69 on April 29, 2021, and as of October 16, 2023, the stock closed at $52.60.

C.     Fidelity National repurchased approximately $3.8 billion in stock during the relevant time period at artificially inflated prices.

D.     Defendants sold more than $300 million worth of Fidelity National stock during the relevant period, using insider information of the true condition of Worldpay and the failed integration.

E.     Fidelity National paid excessive executive compensation, including more than $31 million under the Worldpay Integration Incentive

Plan.

262.   Fidelity National incurred substantial costs for the failed acquisition

and integration.  The *Financial Times* reported on the sunk costs associated with the

failed Merger:

> The bankers on the deal were paid $93mn, but that is small potatoes
> compared to the $2.7bn in "acquisition, integration and other" costs FIS
> recorded from 2020 to 2022. At least $1.3bn of that is Worldpay
> integration costs, and possibly more, depending on how you want to
> allocate things such as severance and data cent[er] consolidation
> expenses. From the point of view of FIS investors, all that money is
> simply gone.

## VIII.  DEFENDANTS WERE OBLIGATED TO SAFEGUARD THE COMPANY'S INTERESTS

### A.    The Duties of All Defendants

263.   By reason of their positions as officers and/or directors of Fidelity

National and because of their ability to control the business, corporate, and financial

affairs of the Company, Defendants owed Fidelity National and its shareholders the

duty to exercise due care and diligence in the management and administration of the

affairs of the Company, including ensuring that Fidelity National operated in

compliance with all applicable federal and state laws, rules and regulations.

Defendants were and are required to act in furtherance of the best interests of Fidelity

National and its shareholders so as to benefit all shareholders equally and not in

furtherance of Defendants' personal interest or benefit. Each director and officer

owes to Fidelity National and its shareholders the fiduciary duty to exercise good

faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

264. Because of their positions of control and authority as directors or officers of Fidelity National, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of in this Complaint. Due to their positions with Fidelity National, Defendants had knowledge of material non-public information regarding the Company.

265. To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Company. By virtue of such duties, the officers and directors of Fidelity National were required to, among other things:

a. Manage, conduct, supervise, and direct the employees, businesses and affairs of Fidelity National in accordance with laws, rules and regulations, and the charter and bylaws of Fidelity National;

b. Ensure that Fidelity National did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations;

c.      Remain informed as to how Fidelity National was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

d.      Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by Fidelity National, and to examine and evaluate any reports of examinations or investigations concerning the practices or conduct of officers of the Company;

e.      Preserve and enhance Fidelity National's reputation as befits a public corporation;

f.      Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business; and

g.      Refrain from unduly benefiting themselves and other Fidelity National insiders at the expense of the Company.

**B.      Defendants' Obligations and Representations in the Company's Corporate Codes and Policies**

266.    All Defendants were required to abide by Fidelity National's Code of Business Conduct and Ethics (the "Code"), which is overseen by the Company's Board.  The Code states in relevant part that:

Fidelity National Information Services, Inc., and its subsidiaries (collectively, "Company" or "FIS") sponsor the FIS Corporate Compliance Program ("CC Program") and the FIS Business Ethics Program ("Ethics Program") (collectively referred to as "Programs"). These Programs exemplify a shared good faith effort by the Company and all FIS Colleagues, including executives, officers, and directors of FIS (collectively, "Colleagues") to conduct business in a manner that is values-based, in compliance with the letter and spirit of applicable law, socially responsible.

The Programs are overseen by our Board of Directors and includes the following main components:

- This Code of Business Conduct and Ethics ("the Code" or "Code of Conduct");

- Policies that supplement the Code, many of which are referenced herein; and

- Procedures for administration of the Programs.

The Code, related policies, and the Programs' operating guidelines are evaluated at least annually and are updated throughout the year, as necessary. Various risk assessments are an integral part of our evaluation including assessing ethical risks. The Programs apply to all Colleagues, officers, contractors and to the extent relevant, directors of the Company. All Colleagues, as a condition of employment or continued employment, are REQUIRED to complete mandatory annual companywide training on the Code, acknowledge that they have received a copy of the Code, have read it, and understand that the Code contains the Company's expectations regarding conduct in the business environment.

*** 

## 01.01.05 Responsibility to the Company and Its Shareholders

## 01.01.05.01 Accounting, Auditing, Public Disclosure and Controls

The Company has established policies and internal controls designed to provide reasonable assurance regarding the reliability of financial

reporting and the preparation of financial statements. Internal controls are intended to ensure the following:

> • Full and accurate records of dispositions of Company assets are maintained;

> • Transactions are recorded as necessary to prepare accurate financial statements….

Colleagues SHALL BE responsible for complying with policies and procedures applicable to their areas of responsibility. Also, Colleagues MUST BE alert to situations, whether in their direct area of responsibility or otherwise, where a policy may have been violated or internal controls could be improved. Colleagues are REQUIRED to report known or suspected violations of any company policy as described in the Reporting Violations section of this Code.

***

## 01.01.05.02 Public Disclosure

As a public company, the Company MUST provide full, fair, accurate, timely and understandable disclosure in the reports that the Company files with or submits to the SEC and its other public disclosures, including press releases. Such disclosures MAY include information generated by or related to the Company's subsidiaries located around the world. The Company has established disclosure controls and procedures to help ensure that information required to be disclosed by the Company in its SEC reports and other public disclosures is accumulated from appropriate information sources within the Company, and communicated to management as appropriate to allow timely decisions regarding disclosure and the completion of accurate SEC reports.

The Company's SEC reports and other public disclosures MUST be free of material misstatements and misleading omissions. The Company's public financial information SHOULD fairly represent in all material respects the Company's financial condition, results of operations and cash flows.

***

129

**01.01.05.12 Code of Ethics for Senior Financial Officers**

The Company's "Senior Financial Officers" (which includes the Company's Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, Controller, and any other persons performing similar functions) are bound by all provisions of this Code , particularly provisions relating to honest and ethical conduct, conflicts of interest, compliance with law, and internal reporting of violations of the Code. The Senior Financial Officers also have responsibility for full, fair, accurate, timely and understandable disclosure in the periodic reports and submissions filed by the Company with the U.S. Securities and Exchange Commission (SEC).

Senior Financial Officers are REQUIRED to be familiar with and comply with the Company's disclosure controls and procedures applicable to them to ensure that the Company's public reports and documents filed with the SEC comply in all material respects with the applicable federal securities laws and SEC rules. In addition, each such officer having direct or supervisory authority regarding these SEC filings or the Company's other public communications concerning its general business, results, financial condition and prospects SHOULD, to the extent appropriate within their area of responsibility, consult with other Company officers and Colleagues and take other appropriate steps regarding these disclosures with the goal of making full, fair, accurate, timely and understandable disclosure.

Each Senior Financial Officer SHALL bring promptly to the attention of the Audit Committee of the Board of Directors any information they may have concerning significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data; or any fraud, whether or not material, that involves management or other Colleagues who have a significant role in the Company's financial reporting, disclosures or internal controls.

The Audit Committee SHALL determine appropriate actions to be taken in the event of violations of this Code by any Senior Financial Officer. Any waiver of or amendments to the Code with respect to any Senior Financial Officer MUST be approved by the Audit Committee and will be promptly disclosed to the extent required under applicable law, rule or regulation.

***

### 01.01.06.04 Insider Trading

The stock of the Company is publicly traded on the New York Stock Exchange (NYSE). Accordingly, the Company MUST comply with U.S. federal and state securities laws and the regulations of the NYSE. Securities markets, such as the NYSE, assume that all important information about a company is publicly available to potential investors at the same time. The Company, in turn, respects this assumption by communicating to financial markets through press releases or earnings releases with broad distribution so that information is uniformly, rather than selectively, communicated.

From time to time Colleagues may become aware of material information about the Company, which is not yet publicly known. Examples of material, non-public information include impending legal or regulatory proceedings or settlement or a pending earnings release, Insider trading occurs when someone uses material, non-public information as the basis of making a stock trade. Colleagues SHOULD avoid engaging in trading of company securities on the basis of this inside information. The Company has published a Policy Governing Insider Trading and Tipping which is available on FIS & me.

If a Colleague learns of material, non-public information about another company while in the course of employment, trading in securities of such company on the basis of the "inside" information is likewise prohibited. Securities laws also prohibit passing along insider information to third parties, or recommending to a third party the purchase or sale of a security based on such information. A person MAY be held responsible for trading activity by a friend or relative if the person is the source of insider information.

267.   In addition, the Board developed Corporate Governance Guidelines "to promote the functioning of the Board and its committees and to set forth a common set of expectations as to how the Board should perform its functions." The Corporate Governance Guidelines note that the "business and affairs of the Company shall be

managed by or under the direction of the Board in accordance with Georgia law.  In performing their duties, the primary responsibility of the directors is to exercise their business judgment in the best interests of the Company."

268.   The Corporate Governance Guidelines highlight that the Board has adopted its own Code of Business Conduct and Ethics for Directors, which "provides guidelines for the Directors in performing their functions on the Board, particularly with respect to transactions in the securities of the Company, potential conflicts of interest, the taking of corporate opportunities for personal use, and competing with the Company."  This code states in relevant part that Fidelity National directors will:

- "[d]ischarge their duties, as members of the Board and any Committee on which they serve, in accordance with their good faith business judgment of the best interests of the Company and its shareholders;

- "[m]aintain the confidentiality of all non-public information entrusted to them by the Company regarding FIS and its customer's business and affairs, except where disclosure is authorized or legally mandated"; and

- "[a]bide by all applicable laws and regulations, including securities laws and the FIS policy governing insider trading and tipping when trading in FIS securities."

269.   The Director Defendants failed to meet their responsibilities and obligations as provided in the Code of Business Conduct and Ethics, the Corporate

Governance Guidelines, and other internal policies. The wrongs alleged herein constitute the Director Defendants' violations of the breaches of their fiduciary duties to Fidelity National, as well as violations of state and federal law. The Director Defendants' wrongful conduct was continuous and occurred throughout the Relevant Period, and this conduct has resulted in ongoing and continuous harm to the Company. The Director Defendants failed to act, and instead participated in, approved and/or permitted the wrongs herein to occur. The Board also participated in efforts to conceal or disguise the wrongs from Fidelity National stockholders or recklessly, knowingly and/or negligently disregarded the wrongs complained of herein, and each member's actions have played a part in subjecting the Company to millions of dollars in liability for potential securities laws violations and other violations.

### C. The Board and its Committees Were Expressly Charged with Overseeing and Monitoring Specific Aspects of Fidelity National's Business

270. Fidelity National currently has five standing Board committees: the Audit Committee; the Compensation Committee; the Corporate Governance, Nominating and Sustainability Committee; the Executive Committee; and the Risk and Technology Committee.

## 1. Audit Committee

271. The Charter of the Audit Committee states that it is "responsible for assisting the Board's oversight of (1) the quality and integrity of the Company's financial statements and related disclosures, (2) the Company's compliance with legal, tax and regulatory requirements, (3) the independent registered public accounting firm's qualifications and independence, and (4) the performance of the Company's internal audit function, internal controls over financial reporting, and independent registered public accounting firm." The specific duties and responsibilities of the Audit Committee, in relevant part, state that the committee shall:

- "review with management and the independent registered public accounting firm the annual audited financial statements, the quarterly financial statements, and any internal control matters requiring attention, including the Company's disclosures under MD&A [management discussion and analysis], before the filing of the Company's Form 10-K and Form 10-Q";

- "review with management earnings press releases before they are issued. The Committee shall review generally with management the nature of the financial information and earnings guidance provided to analysts and rating agencies";

- "review with management, and any outside professionals as the Committee considers appropriate, the effectiveness of the Company's disclosure controls and procedures"; and

- "review requests for and determine whether to grant or deny waivers of the Company's Code of Business Conduct and Ethics applicable to senior financial and executive officers, and shall also monitor the Company's activities to enforce compliance with the Code of Business Conduct and Ethics. The Committee shall also review and approve all transactions to which the Company is a party and in which any Company director and/or executive officer has a direct or indirect material interest (other than an interest arising solely as a result of their position as a director or executive officer of the Company)."

## 2. Compensation Committee

272.   The Charter of the Compensation Committee states that its purpose is to "approve and monitor the executive compensation plans, policies and programs of the Company that are applicable to the Company's section 16 officers (i.e., an officer subject to Section 16 of the Securities Exchange Act of 1934)."  The charter states that the Compensation Committee "monitor[s] the executive compensation program to ensure that it supports the Company's overall objective of paying section 16 officers for performance and motivating section 16 officers to work to enhance

135

shareholder value."  The specific duties and responsibilities of this committee related to "Section 16 Officer Compensation Matters" include, in relevant part, to:

- "[r]eview and approve corporate goals and objectives relevant to the compensation of the Chief Executive Officer ("CEO"); evaluate the CEO's performance in light of those goals and objectives; and determine and approve the CEO's compensation based on such evaluation";

- "[s]et salaries and approve incentive compensation awards and compensation policies for all other section 16 officers";

- "[a]uthorize and approve any new or materially amended employment agreements (including change-in-control and severance agreements) with section 16 officers"; and

- "[a]pprove all equity compensation awards made to section 16 officers."

273.   Additional specific duties and responsibilities of the Compensation Committee include, in relevant part, to:

- "[e]stablish and monitor compliance with any stock ownership and holding guidelines of the Company that are applicable to executive officers or directors";

- "[r]eview and approve the implementation or revision of any clawback policy allowing the Company to recoup compensation paid to executive officers and other employees";

- "[r]ecommend to the Board for approval the frequency with which the Company will include in its proxy and information statement a management proposal that provides shareholders an advisory vote on executive compensation ("Say on Pay")";

- "[r]eview the Company's incentive compensation practices, policies and programs for executive officers and other employees to determine whether such practices, policies and programs create undesired or unintentional risks and whether any such risks are reasonably likely to have a material adverse effect on the Company"; and

- "[r]eview and approve on an annual basis the Compensation Discussion and Analysis and Executive and Director Compensation sections for inclusion in the Company's Annual Proxy Statement."

### 3. Corporate Governance, Nominating and Sustainability Committee

274. The Charter of the Corporate Governance, Nominating and Sustainability Committee states that its purpose is "primarily to advise and assist the Board with respect to the Company's corporate governance matters, Board and committee organization, membership and function, and to oversee the evaluation of

the Board and management. The Committee is also responsible for identifying and recommending to the Board qualified individuals to be nominated for election as directors." The specific duties and responsibilities of this committee include, in relevant part, to:

- "[d]evelop and recommend to the Board a set of Corporate Governance Guidelines and to review the Guidelines annually and recommend to the Board any changes to the Guidelines the Committee may deem appropriate";

- "[i]dentify individuals believed to be qualified to serve as Board members and recommend to the Board the nominees to stand for election as directors at the annual meeting of shareholders or, if applicable, at a special meeting of shareholders";

- "[o]versee the evaluation of the performance of the Board and its committees and individual directors on a continuing basis and assist the Board in conducting an annual self-evaluation"; and

- "[m]ake recommendations to the Board regarding other matters relating to Board policies and practices as the Committee deems appropriate."

### 4. Risk and Technology Committee

275.   The Charter of the Risk and Technology Committee states that its purpose is "primarily to assist the Board in its oversight of executive management's

responsibilities for the management of the Company's overall operational, information security, strategic, reputational, technology and other risks." The specific duties and responsibilities of this committee include, in relevant part, to:

- "[o]versee executive management's overall deployment of an Enterprise Risk framework and its risk measurement methodologies";

- "[r]eview with executive management the Company's policies, procedures and standards for identifying and managing Enterprise Risk and the Company's compliance with, and performance against, those policies, procedures and standards"; and

- "[o]versee the Company's technology planning and strategy, including integration, investments, expenditures, innovation, modernization and response to client, competitor, market and industry trends and disruptions."

### 5. The Board's Committees Failed to Discharge Their Duties

276. The members of each Board committee failed to meet their obligations as provided in each committee's charter, and the Director Defendants' deliberate failure of oversight constituted breaches of their fiduciary duties to Fidelity National, resulting in significant harm to the Company.

277. For example, members of the Audit Committee, Defendants Adrean, Alemany, Goldstein, Hook, Hunt, Lamneck, Parent, Shea, and Stallings were

charged with assisting the Board in overseeing the integrity of the Company's financial statements and the adequacy and reliability of disclosures to its stockholders, including the Company's internal and disclosure controls. But Fidelity National's internal and disclosure controls were deficient, causing the Company to issue materially false and misleading information regarding the Company's Worldpay integration. The Audit Committee was directly responsible for approving the Company's materially false and misleading annual Forms 10-K and quarterly Forms 10-Q, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," as well as the Company's earnings press releases during the Relevant Period.

278. Further, the Board's Compensation Committee Charter charges its members with taking steps to ensure the Company's incentive compensation practices are consistent with the safety and soundness of the Company and do not encourage excessive risk-taking. Thus, the members of the Compensation Committee, Defendants Hughes, Hunt, Lauer, Stallings, and Stiefler had heightened duties to consider the risks of whether the Company's incentive compensation practices were reasonably likely to have a material adverse effect on the Company. Because the members of the Compensation Committee failed to ensure the Company's incentive compensation practices would comply with sound and safe

business practices, these Defendants violated the Compensation Committee Charter and breached their fiduciary duties to the Company and its shareholders.

279.   Additionally, pursuant to the Board's Corporate Governance, Nominating and Sustainability Committee Charter, Defendants Alemany, Lauer Parent, Shea, and Stiefler, as members of that committee, owed specific duties to Fidelity National. Specifically, the Corporate Governance, Nominating and Sustainability Committee Charter tasks the committee with overseeing the Company's recommendations to the Board of qualified individuals to be nominated for election as directors, and assisting the Board in overseeing the Company's corporate governance practices. The committee has repeatedly failed to fulfill its responsibilities and allowed the Company to engage in practices that violate the law and that have adversely impacted the Company's reputation and financial condition.

280.   Finally, the Risk and Technology Committee's Charter charges its members with taking steps to monitor the Company's risks generally, and to provide oversight of the Company's Enterprise Risk framework.  The members of the Risk and Technology Committee, Defendants Adrean, D'Silva, Hook, Hughes, Shea, and Stallings, failed to ensure the Company's risk management framework was working effectively, as Fidelity National acquired Worldpay without conducting adequate due diligence.  Indeed, the failed Worldpay integration has exposed Fidelity National to significant reputational risks and liability.

281.   Accordingly, by their memberships on the Board's committees, the Director Defendants face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing, and loyalty, as well as other violations of law.

## IX.   <u>THE DEMAND</u>

### A.   <u>The Board Rejected The Demand</u>

282.   On July 7, 2023, Plaintiff served its stockholder demand on the Board pursuant to Ga. Code § 14-2-742 (the "Demand").  Plaintiff's 24-page Demand, which covers the same factual background and alleged misconduct described in this Complaint, demands that the Board:

> (i) undertake an independent investigation into each Officer and Director discussed below for their breaches of fiduciary duty and/or violations of state and federal securities laws; and (ii) commence an action against each Officer and Director who committed or participated in the wrongdoing that is the subject of this Demand, to recover for the benefit of the Company the amount of damages sustained by the Company as a result and disgorge their ill-gotten gains.

283.   On August 2, 2023, FIS issued its Form 10-Q for the second quarter of 2019 (the "Q2 2023 10-Q"), which was certified as accurate, including by Ferris, the CEO and a Board member of Fidelity National.  In a section titled "Securities and Shareholder Matters," the 10-Q stated:

> On April 27, 2023, a shareholder derivative action captioned *Portia McCollum, derivatively on behalf of Fidelity National Information Services, Inc. v. Gary Norcross et al.,* was filed in the same court by a shareholder of the Company. Plaintiff dismissed the suit without

prejudice and sent a demand pursuant to Georgia Code § 14-2-742. Another putative stockholder, ***City of Hialeah Employees' Retirement System***, sent a similar demand. The demands claim that FIS officers and directors violated federal securities laws and breached fiduciary duties in connection with Worldpay's valuation, integration, and synergies, and they demand that the Board investigate and commence legal proceedings against officers and directors in connection with the purported wrongdoing.

While ***we believe the cases and demands are without merit***, no assurance can be given as to their ultimate outcome. ***We intend to contest them vigorously***. (Emphasis added).

284.   Based on the Q2 2023 10-Q, the Board has effectively rejected the Demand.

## B.   The Board is Incapable of Conducting a Fair and Impartial Investigation

285.   The Board of Fidelity National is also incapable of conducting a fair and impartial investigation, as they are predisposed to reject the claims herein.

286.   First, the Board stated in a filing with the SEC that the Demand made by Plaintiff is "without merit" and they will "contest" it "vigorously," even though it had not yet investigated the claims.  No statement could be clearer that the Board is predisposed to reject the claims.

287.   Second, the Board members are personally involved in the misconduct alleged in the Demand and the Complaint.  They each breached their fiduciary duties, violated the securities laws, and violated Company policies and charters, as described herein.

288.    Third, through their actions and failure to act, the Board has failed to protect the potential claims in the Demand, further showing they are predisposed to reject the claims.

289.    Ga. Code § 14-2-742 provides in part that a shareholder may not commence a derivative proceeding until 90 days have expired from the date the demand was made.  In this case, the 90-day period expired on or about October 10, 2023.

## X.    CLAIMS AGAINST DEFENDANTS

### COUNT I
**(Breach of Fiduciary Duty Against the Director Defendants)**

290.    Plaintiff incorporates by reference and realleges each of paragraphs 1 through 289 as if fully set forth in this paragraph.

291.    Each of the Director Defendants owed and owe fiduciary duties to Fidelity National and its stockholders.  By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Fidelity National the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

292.    Each of the Director Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to Fidelity National and its stockholders in at least the following ways:

144

a.      Failing to conduct adequate due diligence regarding the acquisition of Worldpay;

b.      Failing to properly oversee the integration of Worldpay into the Company;

c.      Structuring the Company's compensation policies so that Company executives were lavishly rewarded for synergies related to the Worldpay integration, when in fact the integration of Worldpay was a total failure;

d.      Allowing Fidelity National insiders to conduct insider sales and dispositions of Company stock while in the possession of material, adverse, non-public information;

e.      Approving the Company's repurchase of Fidelity National shares at a time when the shares were artificially inflated; and

f.      Allowing Fidelity National's public statements on due diligence, Merger integration, and other issues to be false and misleading due to the Company's failure to properly integrate Worldpay, which also resulted in the artificial inflation of the Company's share price.

293. Defendants, individually and in concert, engaged in the above referenced conduct in intentional, reckless, or grossly negligent breaches of the fiduciary duties they owed to Fidelity National to protect its rights and interests.

294.   In breach of their fiduciary duties owed to Fidelity National, Defendants willfully participated in misrepresentations related to the Company's due diligence, Merger integration, and other issues, failed to correct the Company's public statements, and failed to fully inform themselves prior to making decisions as directors, rendering them personally liable to the Company for breaching their fiduciary duties.

295.   Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the due diligence, the status of the integration of Worldpay, and the Company's financial condition, and they failed to correct the Company's public statements.  Defendants had actual knowledge of the misstatements and omissions of material facts set forth in this Complaint, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Fidelity National's securities.

296.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

297.   Additionally, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the charters

of various Board committees that, had they been discharged in accordance with the Director Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

298.   Nor are the claims subject to an exculpatory provision.  As detailed in this Complaint, the Director Defendants' misconduct involved: (i) breaches of their duty of loyalty; (ii) acts or omissions that involved intentional misconduct or a knowing violation of law; and (iii) personally benefited themselves.

299.   As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Fidelity National has sustained and continues to sustain significant damages.  As a result of the misconduct alleged in this Complaint, the Director Defendants are liable to the Company.

### COUNT II
### (Breach of Fiduciary Duty Against the Officer Defendants)

300.   Plaintiff incorporates by reference and realleges each of paragraphs 1 through 289 as if fully set forth in this paragraph.

301.   This Count is brought against Defendants Ferris, Norcross, and Woodall solely in their capacity as officers.

302.   The Officer Defendants owed fiduciary duties to Fidelity National and its stockholders.  By reason of their fiduciary relationship, the Officer Defendants specifically owed Fidelity National the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the

Company, including the Company's due diligence on Worldpay, the integration of Worldpay, financial reporting, internal controls, and compensation practices, and to make accurate and truthful public statements.

303.   The Officer Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, and loyalty by either intentionally causing the Company to fail to adequately conduct due diligence on Worldpay, failing to adequately oversee the integration of Worldpay, and issue false statements, and/or consciously ignoring numerous red flags related to the Worldpay integration.

304.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

305.   As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, Fidelity National has sustained and continues to sustain significant damages.

306.   As a result of the misconduct alleged in this Complaint, the Officer Defendants are liable to the Company.

## <u>COUNT III</u>
**(Breach of Fiduciary Duty for Insider Selling and Misappropriation of Confidential Information Against Defendants Ferris, Norcross, and Woodall)**

307.   Plaintiff incorporates by reference and realleges each of paragraphs 1 through 289 as though fully set forth herein.

148

308.   At the time of the stock sales set forth above, Defendants Ferris, Norcross, and Woodall knew the information described in this Complaint regarding the inadequate due diligence, the failure of the Worldpay integration and the false and misleading statements about the same, in selling Fidelity National common stock on the basis of that information.

309.   The information described above was proprietary non-public information concerning the Company's unlawful conduct associated with its Worldpay integration.   The information was a proprietary asset belonging to the Company, which Defendants Ferris, Norcross, and Woodall used for their own benefit when they sold Fidelity National common stock.

310.   Defendants Ferris, Norcross, and Woodall's sales of Fidelity National common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

311.   Because the use of the Company's proprietary information for their own gain constitutes a breach of the fiduciary duties of Defendants Ferris, Norcross, and Woodall, the Company is entitled to the imposition of a constructive trust on any profits Defendants Ferris, Norcross, and Woodall obtained thereby.

## COUNT IV
### (Violation of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Against the Individual Defendants)

312.   Plaintiff incorporates by reference and realleges each of paragraphs 1 through 289 as though fully set forth herein.

313.   During the Relevant Period, the Individual Defendants disseminated or approved false or misleading statements about Fidelity National as detailed above, including paragraphs 142, 143, 145, 146, 150, 151, 155-58, 160, 162-65, 167-70, 172, 174-77, 182-90, 192, 193, 195-98, 200-05, 208-12, 214-20, 222, and 226 of the Complaint, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.   Those false or misleading statements and the Individual Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

314.   At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by the Individual Defendants, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to the Individual Defendants' false or misleading statements.   The Individual Defendants engaged in a scheme to defraud Fidelity National by causing the Company to purchase millions of shares of Fidelity National stock at artificially inflated prices, as detailed above.

The Officer Defendants also used the Company's non-public information to sell their Company stock at artificially inflated prices.

315.   The Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Fidelity National in connection with the Company's purchases of Fidelity National stock during the Relevant Period.

316.   The Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Fidelity National stock, which were intended to, and did: (a) deceive Fidelity National regarding, among other things, the Worldpay

integration, the Company's internal controls and compensation practices, and the Company's financial statements; (b) artificially inflate and maintain the market price of Fidelity National stock; and (c) cause Fidelity National to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the Relevant Period, the Individual Defendants were in possession of material, adverse non-public information regarding the Worldpay integration.

317.   Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made, as alleged above.

318.   As described above, the Individual Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to Defendants or were so obvious that Defendants should have been aware of them. Throughout the Relevant Period, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

319.   The Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock.

320.   As a result of Defendants' misconduct, Fidelity National has and will suffer damages in that it paid artificially inflated prices for Fidelity National common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the Worldpay integration were disclosed beginning in August 2022 and continuing through July 2023.  Fidelity National would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by Defendants' false or misleading statements.   Fidelity National was also damaged by the Officer Defendants using non-public information to sell their stock.

321.   As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with (i) its purchases of Fidelity National stock during the Relevant Period, and (ii) the Officer Defendants' sale of stock using non-public information during the Relevant Period.  By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

322.   Plaintiff brings this claim within two years of the discovery of the violation and within five years of the violation.

## COUNT V
### (Violation of §14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 Against the Director Defendants)

323.   Plaintiff incorporates by reference and realleges each of paragraphs 1 through 289 as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by the Director Defendants.

324.   This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

325.   SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

326.   The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the Company's 2021 and 2022 Proxies, as

identified in paragraphs 192, 193, 195-98, and 214-20 of the Complaint.  These Proxies contained proposals to Fidelity National shareholders urging them to elect and re-elect members of the Board and provide advisory votes on issues relating to executive compensation.  These Proxies contained false and misleading statements concerning (i) the true condition of Worldpay's systems; (ii) the "successful" integration of Worldpay, when in fact the integration was a failure; (iii) that the Board was actively involved in the oversight of risks, which would include due diligence for the Merger and the post-Merger integration of Worldpay; (iv) that Board-approved compensation structures properly rewarded Company executives for synergies related to the Worldpay integration, when in fact the integration of Worldpay was a failure; and (v) portraying the Worldpay acquisition and integration as a success when it was not, to get themselves elected or re-elected to the Board.

327.  By reason of this conduct, the Director Defendants violated Section 14(a) of the Exchange Act.  As a direct and proximate result of this wrongful conduct, Fidelity National misled and/or deceived its shareholders by making misleading statements that were an essential link in shareholders heeding Fidelity National's recommendations to re-elect and elect the current Board and provide advisory votes on executive compensation.

328.  The false and misleading information contained in the Proxies was material to Fidelity National's shareholders in determining whether to re-elect and

elect the current Board and provide advisory votes on executive compensation.  This information was also material to the integrity of the directors who were proposed for election to the Board.  Plaintiff, on behalf of Fidelity National, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxies in connection with the improper election and reelection of the members of the Board, and advisory votes on executive compensation.

329.   This action was timely commenced within three years of the date of each Proxy Statement and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## COUNT VI
**(Unjust Enrichment Against the Officer Defendants)**

330.   Plaintiff incorporates by reference and realleges each of paragraphs 1 through 289 as though fully set forth herein.

331.   During the Relevant Period, the Officer Defendants received bonuses, stock options, stock, or similar compensation from Fidelity National that was tied to the Company's financial performance, or otherwise received compensation that was unjust in light of Defendants' bad faith conduct, violation of the Company's Code of Conduct, and self-dealing.

332.   Plaintiff, as a stockholder and representative of Fidelity National, seeks restitution from the Officer Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation—including any salary, options,

performance-based compensation, and stock—obtained by the Officer Defendants due to their wrongful conduct alleged in this Complaint.

## COUNT VII
### (Contribution and Indemnification Against the Individual Defendants)

333.   Plaintiff incorporates by reference and realleges each of paragraphs 1 through 289 as though fully set forth herein.

334.   Fidelity National is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to Fidelity National.

335.   Fidelity National's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants as alleged above, and Fidelity National is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are or may in the future be asserted against, Fidelity National by virtue of the Individual Defendants' misconduct.

336.   By reason of the foregoing, Fidelity National was damaged.

337.   Plaintiff, on behalf of Fidelity National, has no adequate remedy at law.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     A determination that this action is a proper derivative action maintainable under the law and that demand was rejected and/or the Board is incapable of conducting a fair and impartial investigation;

B.     Declaring that Defendants have breached their fiduciary duties to Fidelity National;

C.     Determining and awarding to Fidelity National the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

D.     Directing Fidelity National to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described in this Complaint;

E.     Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiff, on behalf of Fidelity National, has an effective remedy;

F.     Awarding to Fidelity National restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants, including the proceeds of insider transactions made in violation of federal and state securities laws;

G.    Ordering an accounting of all compensation awarded to the Individual Defendants during the Relevant Period;

H.    Awarding to Plaintiff costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

I.    Awarding such other relief as this Court deems appropriate.

## XII.   <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

DATED: October 18, 2023             Respectfully submitted,

**SAXENA WHITE P.A.**

*/s/ Maya Saxena*
Maya Saxena
Joseph E. White, III
Adam Warden
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
awarden@saxenawhite.com

David Wales (*pro hac vice* motion forthcoming)
Sara DiLeo (*pro hac vice* motion forthcoming)
10 Bank Street, Suite 882
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611

dwales@saxenawhite.com
sdileo@saxenawhite.com

-and-

Thomas Curry (*pro hac vice* motion
forthcoming)
824 N. Market Street, Suite 1003
Wilmington, Delaware 19801
Telephone: (302) 485-0483
Facsimile: (888) 424-8566
tcurry@saxenawhite.com

***Counsel for Plaintiff***

## **VERIFICATION**

I, Robert W. Williams III, being duly sworn, declare as follows:

I am the Chairperson of Plaintiff City of Hialeah Employees Retirement System ("Hialeah Employees" or "Plaintiff") and am authorized to act on its behalf with respect to this litigation and the filing of the Verified Shareholder Derivative Complaint ("Complaint"). Hialeah Employees is a shareholder of Fidelity National Information Services, Inc. (the "Company") and has been throughout the relevant period defined in the Complaint. Hialeah Employees has retained competent counsel and is ready, willing, and able to pursue this action vigorously on behalf of the Company. I have reviewed the Complaint, and based upon discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

October 17, 2023

_____
Robert W. Williams III
Chairperson
City of Hialeah Employees Retirement System