## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| CITY OF HIALEAH EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of Fidelity National Information Services, Inc., | |
| Plaintiff, | |
| v. | No. 3:23-cv-1223-TJC-LLL |
| STEPHANIE L. FERRIS, et al., | Hon. Timothy J. Corrigan |
| Defendants, | |
| and | |
| FIDELITY NATIONAL INFORMATION SERVICES, INC., | |
| Nominal Defendant. | |
| PORTIA MCCOLLUM, derivatively on behalf of Fidelity National Information Services, Inc., | |
| Plaintiff, | No. 3:24-cv-1090-TJC-MCR |
| v. | |
| GARY A. NORCROSS, et al., | Hon. Timothy J. Corrigan |
| Defendants, | |
| and | |
| FIDELITY NATIONAL INFORMATION SERVICES, INC., | |
| Nominal Defendant. | |

## FIS'S MOTION TO DISMISS UNDER GEORGIA CODE § 14-2-744 AND INCORPORATED MEMORANDUM OF LAW

## **TABLE OF CONTENTS**

INCORPORATED MEMORANDUM OF LAW ......................................1

BACKGROUND ............................................................................ 3

LEGAL STANDARD ..................................................................... 8

ARGUMENT .................................................................................10

    I.    The Committee Conducted A Reasonable Investigation. ......10

        A.    The Committee's Extensive Process Proves The Reasonableness Of The Investigation........................... 11

        B.    The Committee Retained Independent Georgia Counsel....................................................................... 17

    II.    FIS's Voting Board Members Are Independent And Rejected The Demands In Good Faith. .................................18

        A.    The Voting Board Members Are Independent. ..............19

        B.    FIS's Board Did Not Prejudge The Merits Of The Claims........................................................................ 23

CONCLUSION ............................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Benfield v. Wells*,
    324 Ga. App. 85 (2013) ................................................................. 9, 19

*Clifford v. Ghadrdan*,
    2014 WL 11829337 (N.D. Ga. Mar. 5, 2014) ........................................ 9, 11, 23

*In re Coca-Cola Enters., Inc. Deriv. Litig.*,
    478 F. Supp. 2d 1369 (N.D. Ga. 2007) ............................................... 21

*Conroy v. Amos*,
    338 F. Supp. 3d 1309 (M.D. Ga. 2018) ........................................ 19, 21, 22, 23

*Conroy v. Amos*,
    785 F. App'x 751 (11th Cir. 2019) ................................................ *passim*

*Deal v. Tugalo Gas Co.*,
    991 F.3d 1313 (11th Cir. 2021) ................................................... 9, 10, 14

*Goldstein v. Wells*,
    2008 WL 6741674 (Ga. Super. Ct. Mar. 13, 2008) ........................... 11, 12, 13, 18

*Highland Legacy Ltd. v. Singer*,
    2006 WL 741939 (Del. Ch. Mar. 17, 2006) ......................................... 24

*LR Trust v. Rogers*,
    270 F. Supp. 3d 1364 (N.D. Ga. 2017) ............................................. *passim*

*Millsap v. Am. Family Corp.*,
    208 Ga. App. 230 (1993) ....................................................... 2, 10, 13, 22

*Thompson v. Sci. Atlanta, Inc.*,
    275 Ga. App. 680 (2005) .......................................................... 10

*Tilden v. Cunningham*,
    2018 WL 5307706 (Del. Ch. Oct. 26, 2018) ........................................ 24

**Statutes**

Ga. Code § 14-2-202 .................................................................. 22

Ga. Code § 14-2-744 ............................................................... *passim*

Ga. Code § 14-2-801 ................................................................. 8

Ga. Code § 14-2-830 .............................................................. 9, 19

**Other Authorities**

NYSE Listed Company Manual § 303A.02(b).......................................20

Pursuant to Georgia Code § 14-2-744 ("§ 744"), Nominal Defendant Fidelity National Information Services, Inc. ("FIS" or the "Company") moves to dismiss the shareholder derivative actions filed by Plaintiffs City of Hialeah Employees' Retirement System ("Hialeah") and Portia McCollum ("McCollum").[1]

## INCORPORATED MEMORANDUM OF LAW

The Hialeah and McCollum derivative actions should both be dismissed because FIS's independent directors, after a thorough investigation, determined that litigating the proposed claims is not in the Company's best interests. Georgia law expressly gives corporate boards the authority to decide whether a company's litigation claims should be pursued, and courts defer to their judgment when the statutory requirements of independence and reasonable process are satisfied. Specifically, Georgia Code § 744 provides for dismissal of a derivative action on behalf of a company if a majority of the "independent directors" determine "in good faith after conducting a reasonable investigation" that the action is not in the company's best interests. These two statutory factors – independence and reasonableness of the investigation – define the Court's review and are met here.

FIS's Board of Directors received 5 shareholder demands, including from Plaintiffs, asking the Board to investigate and then litigate claims on behalf of the Company against current and former directors and officers related to FIS's acquisition of Worldpay, Inc. The Board created a Demand Review Committee

---

[1] Identical copies of this Motion are being filed simultaneously on the dockets of *City of Hialeah Emps. Ret. Sys. v. Ferris*, No. 3:23-cv-1223 (M.D. Fla.) ("*Hialeah*"), and *McCollum v. Norcross*, No. 3:24-cv-1090 (M.D. Fla.) ("*McCollum*").

(the "Committee") composed of three independent, non-management directors, and tasked them with investigating the allegations and recommending whether FIS should pursue the claims asserted in the demands. Plaintiffs then filed these actions, seeking to litigate the claims derivatively on behalf of FIS.

The Committee conducted an exhaustive, year-long investigation, on which its independent counsel spent more than 4,500 hours. The investigation included review and analysis of millions of pages of produced documents, interviews of 27 witnesses, and assistance from accounting experts – including the former Chief Accountant of the SEC's Division of Enforcement.

The Committee prepared a 219-page report (the "Report," attached as Exhibit A). The Report documents the Committee's process, analysis, findings, and conclusions. The Committee concluded that the claims lack merit and, in light of the expense of litigation, the Company's indemnification obligations, and the detrimental effect of litigating meritless claims, recommended that the Board reject the demands. After deliberating on the Report, the independent directors on the Board voted unanimously to adopt that recommendation.

The Board's decision meets the standards of § 744, and the Court should give the Board's business judgment the deference that Georgia law requires. Indeed, "[n]o principle of law is more firmly fixed" than the principle that courts "will not interfere in matters involving merely the judgment of a majority [of directors] in exercising control over corporate affairs." *Millsap v. Am. Family Corp.*, 208 Ga. App. 230, 233 (1993). Because the record demonstrates that FIS's

independent directors acted with good faith and had a diligent process, the Court should dismiss the derivative actions with prejudice.

## BACKGROUND

***The Demands & Derivative Complaints.*** From 2023 to 2025, FIS's Board received 5 demands asking the Board to investigate alleged wrongdoing.[2] *See, e.g.*, Ex. B, Hialeah Demand; Ex. C, McCollum Demand. Plaintiffs were two of the shareholders who sent demands. They also filed derivative actions.

Plaintiffs allege that directors and officers of FIS violated federal securities laws and breached their fiduciary duties to the Company in connection with FIS's acquisition of Worldpay in 2019. In particular, Plaintiffs allege that the director and officer defendants caused FIS to make misstatements related to the Worldpay transaction, including about due diligence, the integration of Worldpay into FIS, and synergies achieved from the transaction, and that they caused the Company to repurchase shares at artificially inflated prices through its stock repurchase program. *See Hialeah*, Dkt. 1, Compl. ¶¶ 134-36; *McCollum*, Dkt. 1, Compl. ¶ 124. Plaintiffs also point to the $17.6 billion goodwill impairment that FIS announced in 2023, claiming that the impairment should have been taken sooner and shows that the Worldpay acquisition was a failure. *See, e.g.*, Ex. B, Hialeah Demand at 7; *see also* Ex. A, Report at 156-94 (summarizing allegations in the demands).

---

[2] In addition to the demands from Hialeah (dated 7/7/23) and McCollum (6/30/23), the Board received demands from City of Southfield Fire and Police Retirement System (1/26/24), Young Family Living Trust (8/20/24), and Michele Luthin (2/25/25).

Neither complaint has any allegations about specific wrongdoing by any individual director, nor do they allege that any director obtained a personal benefit as a result of the Worldpay transaction. Instead, they claim the directors are responsible for the alleged misstatements only because they served on Board committees and signed FIS's Form 10-K filings and proxy statements. *See, e.g.*, *Hialeah* Compl. ¶¶ 188, 191, 212-13, 276-81; *McCollum* Compl. ¶¶ 106, 116, 122.

At a hearing in March 2025, the Court denied the individual defendants' motion to dismiss the Hialeah complaint under Rule 12(b)(6). *Hialeah*, Dkt. 54, 3/22/25 Hr'g Tr. at 80-81. The McCollum action has been stayed by joint stipulation, with no motion practice. *McCollum*, Dkt. 19, 11/7/24 Order.

FIS and four of its current and former officers were also named as defendants in a putative securities class action pending before this Court. *See In re Fidelity Nat'l Info. Servs., Inc. Sec. Litig.*, No. 3:23-cv-252 (M.D. Fla.) (the "Securities Action"). The claims in the Securities Action were incorporated by reference into the demands. *See, e.g.*, Ex. A, Report at 20. The Securities Action does not include any claims against current or former independent directors.

***The Committee & Its Investigation.*** On August 25, 2023, the Board created the Committee to investigate the demands and make a recommendation to the Board as to whether pursuing the claims would be in the Company's best interests. *See* Ex. D, 8/25/23 Board Resolutions. The Committee was delegated full authority to control the manner, means, and methods of the investigation and was required to report its conclusions and recommendations to the Board. *Id.* at

3-4. The Board appointed Jeffrey Goldstein, Mark Benjamin, and Kenneth Lamneck to serve on the Committee. *Id.* at 3. They were among the newest directors at the time, and each has a background in finance and executive leadership. *See* Ex. A, Report at 33-34. The Committee promptly retained independent counsel with expertise in Georgia corporate law and investigations from the Atlanta office of Nelson Mullins Riley & Scarborough LLP. *Id.* at 30; Ex. E, 10/19/23 Board Resolutions at 5.

Over the course of a year,[3] the Committee, assisted by Nelson Mullins, thoroughly investigated the allegations. The Committee requested documents from the Company relating to a broad range of topics, and the Company provided more than 800,000 documents in response, consisting of millions of pages of material from over 60 custodians. Ex. A, Report at 41. Leveraging what it learned from the documents, the Committee also selected 27 individuals and interviewed them on topics relevant to the allegations. *Id.* at 40-42. In total, Nelson Mullins lawyers spent over 4,500 hours on the investigation. *Id.* at 37.

The Committee also engaged experts at AlixPartners, including Susan Markel, the former Chief Accountant of the SEC's Division of Enforcement. *Id.* at 3; Ex. F, 9/8/25 Board Resolutions at 2. The experts closely analyzed relevant

---

[3] With the Board's approval, the Committee temporarily paused its investigation between October 19, 2023, and October 18, 2024, in light of the then-pending motion to dismiss the Securities Action. The Committee had determined that the motion could have significantly impacted the scope of its investigation if granted. Ex. E, 10/19/23 Board Resolutions at 7-8. The Committee promptly resumed active investigation following the Court's denial of the motion to dismiss. Ex. A, Report at 38-40.

accounting issues, including FIS's compliance with Generally Accepted Accounting Principles ("GAAP") related to goodwill impairment assessments and its disclosure of revenue synergies it achieved. Ex. A, Report at 41, 117.

**The Committee's Report & Recommendations.** On August 28, 2025, after completing its investigation, the Committee submitted a 219-page Report to the 8 non-management directors of the Company's Board.[4] The Report addresses the allegations and claims in the demands and derivative complaints over seven parts. It starts with an executive summary, *id.* at 1-11, an overview of the allegations and investigative process, *id.* at 11-45, and the applicable legal standards, *id.* at 45-57. It then discusses at length the relevant facts learned from interviews and document review, *id.* at 57-155, and analyzes the allegations in the demands and complaints in light of those, *id.* at 156-215.

As the Report explains, the investigation "did not uncover evidence that supports a finding of any breach of any fiduciary duty or other alleged misconduct," including as to "due diligence" and the "integration, synergies, goodwill, as well as associated public statements." *Id.* at 4. Instead, the Committee concluded the alleged misstatements were the product of "a robust process to assess the value of the [Worldpay] acquisition, to achieve a successful integration, to validate resulting synergy figures, and to evaluate goodwill." *Id.* at 8; *see also id.* at 90-104 (synergies processes), 116-45 (goodwill processes).

---

[4] FIS's CEO Stephanie Ferris voluntarily recused herself from participating in any Board consideration of the demands. *See* Ex. A, Report at 28, 33 n.42; Ex. D, 8/25/23 Board Resolutions; Ex. F, 9/8/25 Board Resolutions.

Based on its analysis, the Committee concluded that "it is not in the best interests of the Company or its shareholders to pursue the claims proposed in the Demands." *Id.* at 216. It recommended that "the independent Board members reject the Demand letters" in light of its determination that the claims lack merit, the expense of litigation, the Company's obligation to indemnify its current and former directors and officers, and the detrimental effect that the litigation would have on the Company's business. *Id.* at 216-18.

**The Board's Determination.** On September 8, 2025, after considering the Report, the 8 non-management Board members met to deliberate on the Committee's recommendations. The participating Board members were:

- **Jeffrey Goldstein, PhD (Committee and Board Chair)**. Former Under Secretary of the Treasury for Domestic Finance, former CFO of the World Bank, and current director on the Board of the Bank of New York Mellon; joined FIS's Board in 2020.

- **Kenneth Lamneck (Committee Member)**. Former CEO and director of Insight Enterprises, and former director of Benchmark Enterprises, Inc.; joined FIS's Board in 2022.

- **Mark Benjamin (Committee Member)**. Former CEO of Nuance Communications, former President of NCR Corp., and former President of Global Enterprise Solutions at ADP; joined FIS's Board in 2023.

- **Nicole Anasenes**. Former CFO of ANSYS, Squarespace, and Infor; joined FIS's Board in 2024.

- **Kourtney Gibson**. CEO of Retirement Solutions at TIAA, former director on the Board of Lululemon Athletica Inc.; joined FIS's Board in 2024.

- **Lisa Hook**. Former CEO and director of NeuStar, Inc.; joined FIS's Board in 2019.

- **Gary Lauer**. Executive Director and co-founder of Eminent Series Group, and associate consultant of Bain and Company; joined FIS's Board in 2019.

- **James Stallings**. CEO and Managing Partner of PS27 Ventures, LLC; joined FIS's Board in 2013.

Ex. A, Report at 33-34.

These directors unanimously voted to reject the demands. Ex. F, 9/8/25 Board Resolutions. They also directed the Company to move to dismiss the derivative actions pursuant to Georgia law. *Id.*

## LEGAL STANDARD

The "law of the state of incorporation" – here, Georgia – "controls" shareholder demands and shareholder derivative litigation. *Conroy v. Amos*, 785 F. App'x 751, 756-57 (11th Cir. 2019) (citing *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 96-99 (1991)). A "bedrock principle" of Georgia corporate law is that a board "has the prerogative to decide whether to pursue litigation on behalf of the corporation." *Id.* Indeed, Georgia statutory law states that "[a]ll corporate powers," including the power to determine whether to litigate claims belonging to the corporation, "shall be exercised by or under the authority of the board of directors of the corporation." Ga. Code § 14-2-801(b).

Georgia – unlike Delaware – requires shareholders to make a demand on the board before bringing a shareholder derivative suit, without exception. *See id.* § 14-2-742. This legislative determination enshrines a heightened respect for directors' business judgment in the Georgia Code. Consistent with that, Georgia Code § 14-2-744 provides for dismissal of derivative actions seeking to litigate the corporation's claims when independent directors decide that pursuing the claims is not in the company's best interests. Specifically, § 744(a) provides:

> The court may dismiss a derivative proceeding if, on motion by the corporation, the court finds that one of the groups specified in subsection (b) of this Code section has made a determination in good faith after conducting a reasonable investigation upon which its conclusions are based that the maintenance of the derivative suit is not in the best interests of the corporation.

In turn, § 744(b) provides that the determination in subsection (a) may be made by a "majority vote of independent directors." The Georgia legislature also has created a "presumption that the process a director followed in arriving at decisions was done in good faith" and with "ordinary care." *Id.* § 14-2-830(c). Thus, to proceed with derivative claims, plaintiffs must "come forward with evidence showing that the [board] wasn't independent or didn't make its determination to recommend dismissal in good faith after a reasonable investigation." *Deal v. Tugalo Gas Co.*, 991 F.3d 1313, 1319 (11th Cir. 2021).

In considering a motion to dismiss a derivative action pursuant to § 744, the Court's role is limited to reviewing the statutory factors: whether the voting directors "made a determination in good faith after conducting a reasonable investigation," and were independent. *Clifford v. Ghadrdan*, 2014 WL 11829337, at *2 (N.D. Ga. Mar. 5, 2014). This is limited to an "inquiry into the procedures"; it is not an evaluation of the "substantive decision" by the directors about the merits of the proposed litigation claims. *LR Trust v. Rogers*, 270 F. Supp. 3d 1364, 1369, 1372 (N.D. Ga. 2017). In making its assessment, the Court "may look beyond the pleadings to the evidence in the record," in particular the Committee's Report. *See Benfield v. Wells*, 324 Ga. App. 85, 85 (2013).

**ARGUMENT**

The independent members of FIS's Board considered the Committee's meticulous 219-page Report and recommendations in good faith, and they voted to reject the demands based on the Committee's thorough investigation and their judgment about the best interests of the Company. That decision is protected by Georgia law. These cases should thus be dismissed under § 744.

## I.    The Committee Conducted A Reasonable Investigation.

The Committee's process easily meets the standard for a good-faith, reasonable investigation. *See, e.g.*, *Conroy*, 785 F. App'x at 758 ("The reasonableness of the investigation turns on its thoroughness."). Assisted by independent counsel, the Committee undertook an extensive investigation and explained its evaluation of each claim in a detailed Report. Courts regularly dismiss derivative suits pursuant to Georgia law under similar circumstances. *E.g.*, *id.* (committee "hired outside counsel, had access to over 600,000 documents from [the company], interviewed 24 witnesses, and notably questioned the directors and officers who were accused of wrongdoing"); *Millsap*, 208 Ga. App. at 233 (committee "reached its conclusions based on detailed, documented investigation"); *Thompson v. Sci. Atlanta, Inc.*, 275 Ga. App. 680, 683 (2005) (committee report "reflected a detailed and documented investigation, including the backgrounds and qualifications of its members"); *Deal*, 991 F.3d at 1321 (committee "went through every paragraph and allegation of misconduct in the original complaint," "interviewed those accused of

wrongdoing and other employees with knowledge" of the alleged wrongdoing, and issued 5-page report).

### A.    The Committee's Extensive Process Proves The Reasonableness Of The Investigation.

***Committee Meetings.*** To start, the Committee held 21 meetings over the course of its investigation. Ex. A, Report at 37. That illustrates the attention and focus of the Committee members on this matter, and far surpasses what courts have deemed reasonable in other cases. *E.g.*, *Goldstein v. Wells*, 2008 WL 6741674, at *9 (Ga. Super. Ct. Mar. 13, 2008) (three meetings reasonable); *Clifford*, 2014 WL 11829337, at *9 ("multiple teleconferences" and two in-person meetings reasonable). The Committee members met to review documents from the Company, assess information related to witness interviews, and evaluate the demands' factual and legal allegations. Ex. A, Report at 38, 42. This "personal[], direct[], and extensive[]" involvement "through frequent meetings" shows the investigation's reasonableness. *LR Trust*, 270 F. Supp. 3d at 1373-74.

***Document Requests & Review.*** The document requests and review process also illustrate the rigor of the investigation. The Committee made "formal requests for relevant documents to FIS (as well as a number of informal, follow-up requests)." Ex. A, Report at 41. The requests covered a broad range of documents relevant to the demands, including (i) the Company's due diligence for the Worldpay acquisition, (ii) the integration of Worldpay into FIS, and revenue and cost synergies from the acquisition, (iii) the Worldpay Integration

Incentive Plan, under which compensation was paid to executives based in part on achievement of synergy targets, (iv) the Company's goodwill impairment assessments, (v) the Company's share repurchase program, (vi) director and officer trading, and (vii) the potential spinoff or sale of FIS's Merchant Solutions segment, which had been formed as a result of the Worldpay acquisition. *Id.* at 40-41; *see also* Ex. G (12/26/24 letter requesting documents). In response, the Company provided full access to everything the Committee requested. It produced "over 800,000 documents totaling roughly 4 million pages that came from over sixty custodians." Ex. A, Report at 41. This kind of "voluminous" production makes it "abundantly clear" that the "investigation was reasonable." *Conroy*, 785 F. App'x at 758 (600,000 documents produced); *see also Goldstein*, 2008 WL 6741674, at *9 (review of "nine binders" was reasonable).

**Witness Interviews.** The Committee, through its counsel, also interviewed 27 witnesses. This witness list was derived based on counsel's analysis of the Company's extensive document production, and the witnesses' responsibilities and knowledge, and was designed to cover all relevant topics in the demands efficiently. *See* Ex. A, Report at 41-42. The witnesses included:

- 4 individuals named as defendants in the Securities Action, 3 of whom are also named as defendants in the derivative actions.
- 15 other current or former officers or employees, including from FIS's Integration Management Office, Technical Accounting function, and Financial Planning & Analysis function, as well as the former President of the Merchant Solutions segment, the Head of M&A at the time of the Worldpay transaction, and other senior business executives.
- 2 directors (Stallings and Hook, members of the Compensation and

12

Audit Committees, respectively), both named as defendants in the derivative actions.

- 3 financial advisors that worked with FIS on matters relating to Worldpay and the Merchant Solutions segment.
- KPMG LLP, which served as FIS's independent auditor.
- PricewaterhouseCoopers LLP ("PwC"), which performed independent review and validation of FIS's revenue synergies and cost synergies.
- FIS's outside disclosure counsel.

*Id.*, App'x B. This witness list was reasonable. *See, e.g.*, *LR Trust*, 270 F. Supp. 3d at 1377 (there is "no rule of general application that a board must interview every possible witness who may shed some light" on allegations); *Goldstein*, 2008 WL 6741674, at *9 (investigation reasonable despite not interviewing every alleged director defendant); *Millsap*, 208 Ga. App. at 233 (interviews of 8 of 22 defendants reasonable); *Conroy*, 785 F. App'x at 758 (24 interviews reasonable).

The Committee members themselves attended 10 of these interviews, including the interviews of the 4 individual defendants in the Securities Action, the 2 directors, and FIS's independent auditor. Ex. A, Report at 42 n.58. This "personal participation" by Committee members further confirms the reasonableness of the investigation. *See, e.g.*, *LR Trust*, 270 F. Supp. 3d at 1373-74 (committee members participated in one quarter of all interviews).

For certain individuals who were not interviewed, the Committee explained in its Report why its investigation was sound without their input. This includes the confidential witnesses ("CWs") that Hialeah referenced in its allegations. *See Hialeah* Compl. ¶¶ 55-76. As part of its investigation, the Committee asked Hialeah for information regarding the CWs' identities in October 2023. Ex. A,

13

Report at 43. Hialeah refused to identify these individuals until May and June 2025 – over 1.5 years later – when it provided contact information for a third-party lawyer. *Id.* Despite persistent efforts, both Hialeah's counsel and the third-party lawyer ignored requests to set up interviews of the CWs. *Id.* at 43-44. Given those efforts and the investigation's progress in the meantime, the Committee "determined that no further information related to the CWs was necessary to complete its Investigation." *Id.* at 44.

**The Report.** Finally, the Committee's 219-page Report strongly evidences its comprehensive investigation. *Deal*, 991 F.3d at 1321 (5-page report satisfied reasonableness under Georgia law). The Report methodically addresses the facts, allegations, and claims at issue. *See* Ex. A, Report at 57-215.

By way of example, take the Report's analysis of the allegations that officers and directors caused the Company to manipulate or overstate synergies. The Committee requested documents relevant to these allegations and interviewed multiple individuals "directly involved" with the synergies validation process, including "members of management, Board members, and PwC," which was "engaged specifically to validate synergies from the acquisition." *Id.* at 174. The Report discusses the "Synergy Guidelines" that the Company "developed and used" to "govern the definitions and approach of revenue and expense synergies." *Id.* at 175. It compared those internal guidelines to the publicly stated definition of synergies in the Company's proxy statements, and concluded that those definitions "mirror[ed]" each other. *Id.*

14

The Report discussed in detail the Company's "robust process" for assessing synergies, which involved "(1) multiple levels of internal review and validation, followed by (2) external validation by PwC, and then (3) review of the validation results by the Audit Committee, with results then (4) provided to the Compensation Committee to assess and approve payouts pursuant to the Worldpay Integration Incentive Plan." *Id.* at 175-76. It also discussed the "significant challenge" the Company faced in achieving its synergy goals, and ways it addressed that challenge through "mitigation actions," such as "launching additional sales incentive programs," "working with the business lines to ensure synergy opportunities were not overlooked," and "conducting a sales audit for potentially missed synergies such as deals in the sales pipeline that inadvertently were not tagged as a synergy according to the Synergy Guidelines." *Id.* at 179-80. Based on its investigation of these issues, the Committee found "no evidence to support the allegations." *Id.* at 174. Instead, it concluded that the Company "utilized and disclosed a reasonable and accurate definition for its synergy metrics," and had a "thorough, multi-tiered review and validation process for calculating and reporting synergies." *Id.*

As another example, take the Committee's treatment of the allegations that FIS should have taken a goodwill impairment sooner. *See id.* at 188-95. As the Report explains, the Committee evaluated the Company's goodwill analyses from every relevant reporting period. *Id.* at 123-44. To further investigate, the Committee and its counsel interviewed "management, employees, and Board

members whose roles directly involved overseeing and conducting the Company's
assessments of goodwill," including two of the Company's former Chief Financial
Officers, the former Chief Accounting Officer, three Technical Accountants who
led the goodwill impairment analyses, the lead KPMG audit partner who
reviewed or audited the Company's financial statements, and a member of the
Audit Committee. *Id.* at 117; *see also id.*, App'x B. The Committee also retained
the former Chief Accountant of the SEC's Division of Enforcement to provide
accounting expertise and assist the Committee in assessing the allegations about
goodwill impairment. *Id.* at 41. The Report discusses the relevant accounting
standards and the Technical Accounting team's evaluation of potential "triggering
events" for a goodwill impairment, including "purported poor performance of the
Merchant Solutions business, loss of key employees, loss of major customers or
market share, decline in stock price, and efforts to sell the Merchant Solutions
segment." *Id.* at 188-94. It explains the Committee's conclusion that the
investigation "did not reveal evidence to support these allegations," and instead
"confirmed that the Company engaged in a reasonable process to conduct
impairment testing based on applicable accounting standards," consistent with
conclusions drawn by "the Company's independent auditor (KPMG)." *Id.* at 189.

Simply put, the Committee not only did its work, but showed its work
through the Report. Each subsection of Parts Five and Six of the Report
addresses other categories of allegations and claims, and each reveals the same
methodical, highly detailed analysis supporting the Committee's conclusions for

16

each. *See id.* at 156-215. The Report confirms the investigation was appropriate.

    ***The Board's Determination.*** The independent members of FIS's Board received the Committee's Report on August 28, 2025, and met on September 8, 2025, to discuss and deliberate on the Committee's recommendations. Ex. F, 9/8/25 Board Resolutions at 2. The Committee's counsel opened the meeting by discussing the Committee's investigation process and findings. *Id.* Counsel then explained the Committee's recommendation that the independent directors reject the demands. *Id.* at 3. The directors asked questions about the Report and recommendations, and then voted unanimously to adopt the recommendations. *Id.* at 3-9. Their thoughtful engagement with the Report confirms the appropriate and good-faith process underlying that judgment. *See* Ga. Code § 14-2-744(a).

    **B.**    **The Committee Retained Independent Georgia Counsel.**

    The Committee's retention of highly qualified independent Georgia counsel further supports the reasonableness of its process. *See LR Trust*, 270 F. Supp. 3d at 1373-74 (finding investigation assisted by "experienced" and "well-qualified" counsel reasonable); *Conroy*, 785 F. App'x at 758 (similar). The Committee's counsel, Nelson Mullins, is a "full-service national law firm with over 1,000 attorneys in the United States," with "broad-based experience in litigation matters, enforcement actions, and investigations involving public companies." Ex. A, Report at 30. The lead Nelson Mullins attorney working on the investigation, partner Scott Sherman, has over 20 years of experience, including as independent investigation counsel in securities and shareholder litigation

matters, serves as co-chair of the firm's Securities and Corporate Governance Litigation Group, and is ranked by Chambers in Securities Litigation. *See id.* The other principal attorney leading the investigation, partner Edgar A. Neely IV, has over 10 years of experience in the same practice. *See id.*

Nelson Mullins has never represented any of the current or former FIS officers, directors, or employees who were the targets of the demands' allegations, and thus had no conflicts for the investigation. *See id.* In addition, while FIS had previously engaged other lawyers at Nelson Mullins, the firm discussed that work with the Committee before its engagement, and the Committee appropriately concluded that it did not affect their counsel's independence for this investigation. In particular, those other lawyers issued a technical legal opinion that FIS's registration of shares issued in connection with its acquisition of Worldpay complied with Georgia law. *See* Ex. H, 6/5/19 Opinion; *see also* Ex. I, 8/25/23 Committee minutes. Nelson Mullins's prior work for FIS is not at issue in the demands or complaints, and the firm performed no other work for FIS after its investigative team was retained by the Committee. *Cf. Goldstein*, 2008 WL 6741674, at *6-8 (finding independence under § 744 where committee hired counsel that had represented the company on related matters).

## II. FIS's Voting Board Members Are Independent And Rejected The Demands In Good Faith.

A majority of directors deciding how to respond to shareholder demands must be independent and make their decision in good faith. Ga. Code § 14-2-

744(a); *see also Benfield*, 324 Ga. App. at 88; *Conroy v. Amos*, 338 F. Supp. 3d
1309, 1317 (M.D. Ga. 2018), *aff'd*, 785 F. App'x 751. Under Georgia law, directors
are "***presum[ed]***" to have acted in "good faith" and with "ordinary care." Ga.
Code § 14-2-830(c) (emphasis added).

Board members are "independent" if they are "disinterested," meaning
they do "not hav[e] a personal interest in the transaction being challenged" and
are not "influenced in favor of the defendants by reason of personal or other
relationships." *Benfield*, 324 Ga. App. at 88 (quoting Ga. Code § 14-2-744, Code
Revision Commission Comments). The Georgia Code expressly states that being
named "as a defendant in the derivative proceeding" does not "cause a director to
be considered not independent." Ga. Code § 14-2-744(c)(2). Nor does
"approv[ing] the action being challenged in the derivative proceeding so long as
the director did not receive a personal benefit as a result of the action." *Id*. § 14-2-
744(c)(3). Each director who voted to reject the demands meets this standard.

### A.    The Voting Board Members Are Independent.

The eight members of the Board who voted to reject the demands are all
outside (i.e., non-management) directors with impressive credentials for
overseeing a global fintech company like FIS. *See supra*, 7-8. All of them meet the
New York Stock Exchange ("NYSE") independence requirements.[5] Ex. A, Report

---

[5] Under NYSE rules, a director would not be independent if the director or an immediate
family member, during the last three years: (1) was an executive of FIS, (2) earned more
than $120,000 in annual compensation from FIS (excluding director fees), (3) was a
partner, controlling shareholder, or executive officer of an entity that received annual
payments from FIS exceeding the greater of $1 million or more than 2% of its

at 59; *see also* Ex. J, 2025 FIS Proxy Statement at 36. None of them has a familial or other personal relationship with any current or former director, or with any individual referenced in the demands. Ex. A, Report at 35 (concluding "each Board member lacks any close social or personal relationships that impacts their ability to independently assess and make decisions with respect to the Demands"); *see also LR Trust*, 270 F. Supp. 3d at 1372-73 (discussing committee's "detailed and documented report, including an investigation of the members' backgrounds and qualifications"). In addition, all of them are disinterested; there are no individualized allegations indicating otherwise. The Committee assessed the directors' independence and reached the same conclusion. *See* Ex. A, Report at 33-37; *see also* Ex. E, 10/19/23 Board Resolutions at 6 (explaining Committee members "are independent and able to conduct an investigation into the Demands under the legal standards provided under Georgia law, based on, among other things, an interview conducted by the [Committee's] counsel"); *id.* (explaining Committee "continued to analyze the independence of its members periodically at subsequent . . . meetings").

Though five of the voting directors (Goldstein, Lamneck, Hook, Lauer, and Stallings) were named in the demands or complaints, merely naming a director "as a defendant in the derivative proceeding" does not "by itself cause a director

---

consolidated gross revenues, (4) was employed as an executive officer of another company where any of FIS's present executive officers served on that company's compensation committee, or (5) was employed by FIS's independent auditor. *See* NYSE Listed Company Manual § 303A.02(b).

to be considered not independent." Ga. Code § 14-2-744(c)(2). Approving a challenged corporate action also does not strip a director of independence, so long as the director did not receive a personal benefit from that action. *Id.* § 14-2-744(c)(3). "Otherwise, board members would always be disqualified from serving on a litigation committee charged with the responsibility of evaluating whether a derivative action is in the best interest of the corporation." *Conroy*, 338 F. Supp. 3d at 1319-20. That "is simply not the law in Georgia." *Id.* at 1320.

Georgia's independence rules especially make sense here, as the demands and complaints reference the voting directors only generally. There are no specific allegations that any voting director engaged in wrongdoing or received a personal benefit from the challenged actions. Nor are there allegations that these directors "acted in a manner uniquely different than the other members of the board." *Id.* The demands and complaints instead allege only generally that "all members of the board violated duties owed to the corporation." *Id.*; *see also, e.g.*, *Hialeah* Compl. ¶ 281 (allegations against directors based on "their memberships on the Board's committees"); *McCollum* Compl. ¶ 122 (similar). These types of allegations are "not sufficient to taint the independence" of any director. *Conroy*, 338 F. Supp. 3d at 1320; *see also In re Coca-Cola Enters., Inc. Deriv. Litig.*, 478 F. Supp. 2d 1369, 1378 (N.D. Ga. 2007) ("[A] director is not interested merely by virtue of sitting on an Audit Committee."). If the rule were otherwise, plaintiffs could circumvent the Georgia statute in every derivative case, by simply naming directors who were on committees or signed SEC filings.

The Committee's investigation likewise "did not reveal that any Board member received a personal benefit that would impact their independence or render them incapable of exercising independent business judgment." Ex. A, Report at 34-35. The Committee and its independent counsel thoroughly analyzed the claims and concluded the voting directors did not face a substantial likelihood of personal liability. *Id.* at 216-18. As the Committee also noted, FIS's Articles of Incorporation exculpate the directors from liability for all negligence-based claims as permitted under Georgia Code § 14-2-202(b)(4), further lessening the likelihood that any director could face personal liability impacting their ability to assess the demands independently. *Id.* at 4, 198; Ex. K, Articles of Incorporation; *see also Conroy*, 338 F. Supp. 3d at 1320; *Millsap*, 208 Ga. App. at 232 (holding directors were independent where "there was no showing that they likely would or actually did benefit" or "were incapable of exercising independent business judgments free from personal interests"). There is no basis to conclude that these directors lack independence under Georgia law.

None of this is changed by the Court's ruling on the individual defendants' motion to dismiss the *Hialeah* complaint under Rule 12(b)(6). That ruling was based solely on the pleadings and thus could not change the status of the directors' independence. Hialeah's counsel previously acknowledged this, in arguing that the Rule 12(b)(6) motion should be briefed even though the Committee's investigation was not yet complete. During a hearing, the Court specifically asked Hialeah's counsel about whether the Rule 12(b)(6) motion

22

could create independence issues, and counsel confirmed it does not:

> Court: "I do have one more question for you. [Defense counsel] says that you're forcing these parties to – if you – by going to merits briefing, you're forcing these parties to take positions on the litigation that then potentially could be used against them, in terms of the committee's work, and – and other aspects of the case, maybe even in the related action. What's your answer to that?
>
> Hialeah's Counsel: . . . "[W]hat they'd be doing is attacking the pleading. And lawyers attack pleadings. . . . This is addressing a pleading, and either the pleadings adequately allege a claim or they don't adequately allege a claim. And so I just don't see that as a real issue."

*Hialeah*, Dkt. 37, 2/8/24 Hr'g Tr. at 26-27.

In short, "none of the independent Board members" considering the demands "face a substantial likelihood of personal liability that would make any of them incapable of independently considering the Demands." Ex. A, Report at 35. Without a substantial likelihood of liability or other personal interest, there is no independence issue. *See Clifford*, 2014 WL 11829337, at *5-6 (finding independence requirement satisfied); *Conroy*, 338 F. Supp. 3d at 1320 (same).

### B.    FIS's Board Did Not Prejudge The Merits Of The Claims.

The Hialeah complaint asserts that the directors lack independence because the Board purportedly prejudged the demands and rejected the claims before creating the Committee, based on language in FIS's Form 10-Q filed with the SEC on August 2, 2023. *Hialeah* Compl. ¶¶ 283-86. That argument fails.

The Form 10-Q is a statement by the Company, not the Board. And it does not indicate prejudgment by anyone. It describes the Securities Action and shareholder demands and states:

23

> While we believe the cases and demands are without merit, no assurance can be given as to their ultimate outcome. We intend to contest them vigorously.

*Id.* ¶ 283. Courts routinely reject prejudgment arguments based on similar statements by management, because such statements do not indicate anything about the beliefs of directors. *E.g.*, *Tilden v. Cunningham*, 2018 WL 5307706, at *8 (Del. Ch. Oct. 26, 2018) (rejecting prejudgment argument based on statement in Form 10-K that derivative claims were "without merit" and the company would "vigorously defend th[e] lawsuit"); *Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *6 n.69 (Del. Ch. Mar. 17, 2006) (same, based on "generalized statement" that "management[] intend[ed] to defend against the litigation").

Moreover, none of the Board members who considered the demands signed the Form 10-Q. And although two of them (Lamneck and Hook) served on FIS's Audit Committee in 2022 and thus reviewed the Form 10-Q before the Company filed it, they have confirmed that this language was included inadvertently, did not reflect prejudgment of the demands, and did not taint their ability to impartially consider the merits of the demands in good faith. *See* Ex. A, Report at 36. The Company's outside disclosure counsel confirmed the same when interviewed by the Committee's independent investigating counsel. *Id.*

After investigating this argument, the Committee concluded that the language in the Form 10-Q was "inadvertently included with the description of the Demands," after which it "was subsequently removed the next quarter and has not reappeared in the Company's filings." *Id.* Moreover, after the Form 10-Q

was filed, the Board established the Committee, and the Committee hired independent counsel and conducted a thorough investigation of the demands – none of which Hialeah acknowledged in its complaint, which it filed after the Committee's formation. Indeed, McCollum's complaint – which acknowledges the Committee – does not make any prejudgment allegations. *McCollum* Compl. ¶¶ 148-55. The Committee's actions – especially the 219-page Report – bely any notion of prejudgment, and instead reflect the Committee's and Board's good-faith desire to set up a robust process to independently evaluate the demands.

## CONCLUSION

The voting directors were independent and acted in good faith in rejecting the demands, based on the Committee's thorough investigation. The Court should thus dismiss these actions with prejudice under Georgia Code § 14-2-744.


Dated: November 24, 2025                    Respectfully submitted,

                                            */s/ John M. Skakun III*
                                            Hille R. Sheppard*
                                            John M. Skakun III*
                                            Caroline A. Wong*
                                            Takayuki Ono*
                                            *Admitted under Local Rule 2.01*
                                            SIDLEY AUSTIN LLP
                                            One South Dearborn
                                            Chicago, IL 60603
                                            Tel: (312) 853-7000
                                            hsheppard@sidley.com
                                            jskakun@sidley.com
                                            caroline.wong@sidley.com
                                            tono@sidley.com

Ian M. Ross (FL Bar No. 91214)
SIDLEY AUSTIN LLP
830 Brickell Plaza
Miami, FL 33131
Tel: (305) 391-5100
iross@sidley.com

R. Eric Bilik (FL Bar No. 987840)
Kimberly T. Mydock (FL Bar No. 100571)
MCGUIREWOODS LLP
50 North Laura Street, Suite 3300
Jacksonville, FL 32202
Tel: (904) 798-2685
ebilik@mcguirewoods.com
kmydock@mcguirewoods.com

*Counsel for Nominal Defendant
Fidelity National Information
Services, Inc.*

26

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ John M. Skakun III*